IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEGIS MORTGAGE CORPORATION, *et al.*,[1] | ) | Case No. 07-11119 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Related Docket No. 3958** |

## AMENDED CHAPTER 11 PLAN OF AEGIS MORTGAGE CORPORATION, ET AL.

**Dated:  July 12, 2010**

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Aegis Mortgage Corporation (9883); Aegis Wholesale Corporation (9888); Aegis Lending Corporation (9884); Aegis Correspondent Corporation (0359); Aegis Funding Corporation (9886); Aegis Mortgage Loan Servicing Corporation (0515); Solutions Settlement Services of America Corporation (6879); Solutions Title of America Corporation (7045); and Aegis REIT Corporation (3436).  The address for all Debtors is 11381 Meadowglen, Suite 1, Houston, TX  77042.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1
ARTICLE I  DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME AND GOVERNING LAW ............................................................................... 2

  A.  Rules of Interpretation, Computation of Time and Governing Law...................... 2
  B.  Defined Terms ................................................................................ 3

ARTICLE II  TREATMENT OF UNCLASSIFIED CLAIMS ................................................. 34

  A.  Introduction................................................................................ 34
  B.  Administrative Claims ....................................................................... 34
  C.  Professional Fee Claims..................................................................... 35
  D.  Priority Tax Claims ........................................................................ 36
  E.  CSFB Servicing Claim........................................................................ 36

ARTICLE III  CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND
EQUITY INTERESTS............................................................................... 37

  A.  Summary .................................................................................... 37
  B.  Classification and Treatment of Claims against the Debtors................................. 37

    1.  Class 1 – Priority Claims ............................................................... 38
    2.  Class 2 – Secured Claims................................................................ 39
    3.  Class 3 – Convenience Claims............................................................ 39
    4.  Class 4 – Consolidated Debtors Unsecured Claims................................... 41
    5.  Class 5 – Consolidated Debtors EPD/Breach Claims................................... 42
    6.  Class 6 – Velazquez Claims .......................................................... 44
    7.  Class 7 – Aegis REIT Unsecured Claims .............................................. 46
    8.  Class 8 – Aegis REIT  EPD/Breach Claims ............................................. 47
    9.  Class 9 – Intercompany Claims ....................................................... 49
    10.  Class 10 – Consolidated Debtors Equity Interests.................................... 49
    11.  Class 11 – Aegis REIT Preferred Stock Equity Interests ......................... 50
    12.  Class 12 – Aegis REIT Common Stock Equity Interests ......................... 50

ARTICLE IV  ACCEPTANCE OR REJECTION OF THE PLAN ...................................... 51

  A.  Voting Classes ............................................................................ 51
  B.  Acceptance by Impaired Classes ............................................................ 51
  C.  Presumed Acceptance/Rejection of Plan ..................................................... 52

D.      Nonconsensual Confirmation.................................................................. 52

E.      How to Vote......................................................................................... 52

ARTICLE V  MEANS FOR IMPLEMENTATION OF THE PLAN ......................... 53

A.      Revesting of Plan Assets and Collection of Plan Proceeds. ................... 53

B.      Aegis REIT Implementation Options. .................................................. 54

    1.      Aegis REIT Disposition............................................................ 54

    2.      Aegis REIT Maintenance.......................................................... 55

    3.      Aegis REIT Dissolution............................................................ 57

C.      Implementation of Certain Subordination Rights and Reallocations. ....... 59

    1.      CSFB....................................................................................... 59

    2.      UBS......................................................................................... 60

    3.      Limitations. ............................................................................. 61

    4.      Countrywide............................................................................ 61

    5.      Class 4 Creditors. .................................................................... 62

D.      Implementation of WARN Settlement.................................................. 63

E.      Implementation of Thompson Stipulation. ........................................... 63

F.      Certain Claim Waivers........................................................................ 64

G.      Payment of Plan Expenses. ................................................................. 64

H.      Litigation. .......................................................................................... 65

I.      Reimbursement for Aegis REIT Advanced Claims................................ 66

J.      Liquidation and Dissolution of the Liquidating Debtors. ...................... 66

K.      Power and Authority of Responsible Officer........................................ 67

L.      Power and Authority of the Disbursing Agent. ..................................... 69

M.      Distribution Procedures. ..................................................................... 70

N.      Full and Final Satisfaction. ................................................................. 71

O.      Withholding Taxes.............................................................................. 71

P.      Claims Reserve Account. .................................................................... 71

Q.      Resolution of Disputed Claims. ........................................................... 73

R.      Reserve Provisions for Disputed Claims. ............................................ 73

S.      Allocation of Distributions. ................................................................ 76

T.      Rounding. ........................................................................................... 76

U.      No Interim Cash Payments of $25 or Less on Account of Allowed Claims. ....... 76

V.      Disputed Payments............................................................................. 76

W.    Unclaimed Property. ................................................................................ 77

X.    No Distributions on Late-Filed Claims. ................................................. 77

Y.    De Minimis Distributions; Charitable Donation. .................................... 78

Z.    Setoffs. ..................................................................................................... 78

AA.    United States Trustee Fees. ................................................................... 78

ARTICLE VI  TREATMENT OF EXECUTORY CONTRACTS ........................... 79

A.    Rejection of Executory Contracts. .......................................................... 79

B.    Claims Based on Rejection of Executory Contracts. .............................. 79

C.    Insurance Policies .................................................................................... 80

ARTICLE VII  CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND TO THE EFFECTIVE DATE ....................................................................... 81

A.    Conditions to Confirmation of the Plan. ................................................. 81

B.    Effect of Failure of Conditions to Confirmation. ................................... 81

C.    Conditions to Effectiveness of the Plan ................................................. 81

D.    Substantive Consolidation of the Consolidated Debtors. ....................... 82

        1.    Substantive Consolidation Order. ................................................ 82

        2.    Effect/Extent of Substantive Consolidation. ............................... 82

        3.    Reservation of Rights. .................................................................. 83

E.    Effective Date. ......................................................................................... 83

ARTICLE VIII  EFFECTS OF CONFIRMATION ............................................... 84

A.    Binding Effect of Plan. ............................................................................ 84

B.    Revesting of Property of Debtors. ........................................................... 84

C.    Property Free and Clear. .......................................................................... 85

D.    Limitations of Liability. ........................................................................... 85

        1.    Exculpation. .................................................................................. 85

        2.    Releases. ........................................................................................ 86

E.    Optional Discharge of Aegis REIT. ........................................................ 89

F.    Injunction. ................................................................................................ 89

G.    Post-Confirmation Liability of Responsible Officer and Disbursing Agent. ........ 90

H.    Insurance. ................................................................................................. 91

ARTICLE IX  RETENTION OF JURISDICTION ................................................ 92

ARTICLE X  MISCELLANEOUS ......................................................................... 93

A.    Revocation of Plan of Reorganization. ................................................... 93

| | | |
|---|---|---|
| B. | Severability of Plan Provisions. | 94 |
| C. | Governing Law. | 94 |
| D. | Exhibits. | 94 |
| E. | Notices. | 95 |
| F. | Reservation of Rights. | 95 |
| G. | Computation of Time Periods. | 96 |
| H. | Defects, Omissions and Amendments. | 96 |
| I. | Filing of Additional Documents. | 97 |
| J. | Successors and Assigns. | 97 |
| K. | Setoffs and Recoupments. | 97 |
| L. | Securities Exemption. | 98 |
| M. | Plan Interest Rate. | 98 |
| N. | Implementation. | 98 |
| O. | Record Date. | 99 |
| P. | Certain Actions. | 99 |
| Q. | Dissolution of Committee. | 100 |
| R. | Waiver of Ten (10) Day Stay. | 100 |

## PRELIMINARY STATEMENT

Aegis Mortgage Corporation, *et al.*, the debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (the "Debtors"), hereby respectfully propose the following Plan under Chapter 11 of the Bankruptcy Code.[2]  This amended Plan supersedes the Chapter 11 Plan filed by the Debtors on October 14, 2008.  Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, former operations and pre-petition cessation of their business and for a summary and analysis of the Plan.  All Holders of Claims and Equity Interests should read the Disclosure Statement and the Plan carefully -- and consult with their counsel and other applicable professionals -- before voting to accept or reject the Plan.

The Plan sets forth a proposal for the satisfaction of all Claims against and Equity Interests in the Debtors.  Certain Creditors will receive a Ballot with the Plan for voting on the Plan and a Disclosure Statement that provides information concerning the Debtors and the Plan. The Disclosure Statement includes a summary of the assets and liabilities of the Debtors, a summary of what Creditors and Equity Interest Holders will receive under the Plan, a summary of the procedures and voting requirements necessary for confirmation of the Plan, and a discussion of certain alternatives to the Plan in the event that the Plan is not confirmed.  You should thoroughly review both the Plan and Disclosure Statement before deciding whether you will vote to accept or reject the Plan.

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in Article I of this Plan.

As more fully described in the Disclosure Statement, the Plan must be approved by the requisite number of Creditors and the Bankruptcy Court must find that the Plan meets the applicable legal standards before it can be confirmed.  If the Plan is not confirmed, the Bankruptcy Court may order the Chapter 11 Cases dismissed or converted to liquidating cases under Chapter 7 of the Bankruptcy Code, or the Debtors or other parties in interest may propose a different plan.

## ARTICLE I

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

**A.      Rules of Interpretation, Computation of Time and Governing Law**

1.      For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (e) the words "herein," "hereof," "hereunder," and "hereto" and similar terms refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) references to part includes

the whole, except where the context clearly requires otherwise; (g) unless otherwise specified, "or" has the inclusive meaning represented by the phrase "and/or"; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; and (j) any term used in capitalized form in the Plan that is not defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

B.    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in the Plan:

1.    "AABSC" means Aegis Asset Backed Securities Corporation, a Delaware corporation.

2.    "ACC" means Aegis Correspondent Corporation, a Delaware corporation.

3.    "<u>Administrative Claim</u>" means a Claim for an expense of administration of the Chapter 11 Cases arising under Sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual, necessary costs and expenses of preserving the Estates or administering the Chapter 11 Cases, (b) all Professional Fee Claims, (c) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930, and (d) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court.

4.    "<u>Administrative Claims Bar Date</u>" means the last date set by the Bankruptcy Court pursuant to the Administrative Claims Bar Date Order for a Creditor to file a request for payment of any Administrative Claim that arose between the Petition Date and the Effective Date, <u>provided that</u>, Professional Fee Claims shall *not* be subject to the Administrative Claims Bar Date.

5.    "<u>Administrative Claims Bar Date Order</u>" means the orders setting any Administrative Claims Bar Date, which order shall be: (a) the *Order (1) Fixing Deadline for Filing Administrative Expense Requests (2) Approving Form and Manner of Notice Thereof, and (3) Granting Related Relief* {Docket No. 949}, entered on January 11, 2008, with respect to Administrative Claims arising on or prior to January 1, 2008, or (b) the Confirmation Order with respect to Administrative Claims arising as of January 2, 2008, through and including the Effective Date.

6.    "<u>Aegis REIT</u>" means Aegis REIT Corporation, a Maryland corporation.

7.    "Aegis REIT Advanced Claims" means any Administrative Claims, Priority Tax Claims, Priority Claims or Secured Claims against Aegis REIT that are satisfied by the Liquidating Debtors under this Plan from the Plan Assets.

8.    "Aegis REIT Assets" means all of the property of the Estate of Aegis REIT under Section 541 of the Bankruptcy Code including, without limitation, all Litigation (Aegis REIT) and any related Litigation Recovery.

9.    "Aegis REIT Assets Remainder" means (i) all rights and claims arising under any Aegis REIT Sale Agreement, and (ii) any of the Aegis REIT Assets that are *not* sold by Aegis REIT under any Aegis REIT Sale Agreement.

10.    "Aegis REIT Certificates" means, collectively (i) the Class X, Class P and Class R certificates held by AEHC representing certain participation, ownership and residual interests in the Aegis REIT Trusts, (ii) all other certificates, notes and securities registered in the name of any of the Aegis REIT Parties (including, without limitation, any "REMIC" or "Net Interest Margin" trust securities).

11.    "Aegis REIT Common Stock Equity Interests" means the Equity Interests in Aegis REIT consisting of (i) one share of common stock held by AMC, (ii) 2,634 shares of common stock held by ALC, and (iii) 1,859 shares of common stock held by ACC.

12.    "Aegis REIT Disposition" means a sale or other transfer of all or substantially all of the Aegis REIT Certificates or any Debtor's Equity Interests in any of AEHC, AIC or AABSC to a REIT Entity.

13.    "<u>Aegis REIT Dissolution</u>" means the determination by the Aegis REIT Parties to, following the Effective Date: (a) dissolve under applicable nonbankruptcy law, (b) sell or otherwise transfer all or substantially all of the Aegis REIT Certificates or any Debtor's Equity Interests in any of AEHC, AIC or AABSC to an entity that is *not* a REIT Entity, or (c) otherwise discontinue their status (if applicable) as a REIT Entity.

14.    "<u>Aegis REIT Maintenance</u>" means the determination by the Aegis REIT Parties to, following the Effective Date, maintain their status (if applicable) as a REIT Entity pending: (a) a sale or other transfer of all or substantially all of the Aegis REIT Certificates or any Debtor's Equity Interests in any of AEHC, AIC or AABSC to an entity that *is* a REIT Entity, or (ii) the maturity, expiration or termination of the Aegis REIT Certificates according to their respective terms.

15.    "<u>Aegis REIT Parties</u>" means (i) Aegis REIT, (ii) AEHC, (iii) AIC, and (iv) AABSC.

16.    "<u>Aegis REIT Preferred Stock Equity Interests</u>" means the Equity Interests in Aegis REIT consisting of (i) 496 shares of preferred stock held by AMC, and (ii) 104 shares of preferred stock each held by 104 individuals.

17.    "<u>Aegis REIT Sale Agreement</u>" means any contract, instrument or other document under which the Debtors and any of the Aegis REIT Parties have agreed to carry out the Aegis REIT Disposition.  For purposes of this Plan, an Aegis REIT Sale Agreement shall include an agreement among AMC, AEHC and AABSC, and Chotin Acquisition Company LLC, a Colorado limited liability company.

18.    "<u>Aegis REIT Treatment Election</u>" means the written notice of election filed with the Bankruptcy Court by the Debtors on or before the 10th day prior to the Plan Objection Deadline specifying one of the following alternative options for the implementation of the Plan as to the Aegis REIT Parties: (a) Aegis REIT Disposition, (b) Aegis REIT Dissolution, or (c) Aegis REIT Maintenance.

19.    "<u>Aegis REIT Trusts</u>" means (i) Aegis Asset Backed Securities Trust 2004-6, (ii) Aegis Asset Backed Securities Trust 2005-1, (iii) Aegis Asset Backed Securities Trust 2005-2, (iv) Aegis Asset Backed Securities Trust 2005-3, and (v) Aegis Asset Backed Securities Trust 2006-1.

20.    "<u>AEHC</u>" means Aegis Equity Holding Corporation, a Delaware corporation.

21.    "<u>AFC</u>" means Aegis Funding Corporation, a Delaware corporation.

22.    "<u>Affiliate</u>" means an affiliate as defined in Section 101(2) of the Bankruptcy Code.

23.    "<u>Agent</u>" means any shareholder, director, officer, employee, partner, principal, member, manager, agent, attorney, accountant, advisor, consultant or other representative of any Entity (solely in their respective capacities as such, and not in any other capacity).

24.    "<u>AIC</u>" means Aegis Investments Corporation, a Delaware corporation.

25.    "<u>ALC</u>" means Aegis Lending Corporation, a Delaware corporation.

26.    "Allowed" or "Allowed...Claim" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which the Debtors or any other party in interest has not Filed an objection on or before the 180th day after the Effective Date (unless such date is extended, for cause, by the Bankruptcy Court upon request of the Liquidating Debtors or the Disbursing Agent); (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been Filed as of the relevant deadline for filing such objection; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Liquidating Debtors on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Claim or Priority Tax Claim executed by (x) the Debtors and approved by the Bankruptcy Court, or (y) the Liquidating Debtors; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by Debtors in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely Filed by the Creditor before the Rejection Bar Date for such claim or has otherwise been deemed timely Filed under applicable law; or (f) a Claim that is Allowed pursuant to the terms of this Plan.

27.    "AMC" means Aegis Mortgage Corporation, a Delaware corporation.

28.    "AMLSC" means Aegis Mortgage Loan Servicing Corporation, a Delaware corporation.

29.    "Assumption Objection Deadline" means the date seven (7) days prior to the date of the Confirmation Hearing.

30.    "Assumption Schedule" means a schedule of Executory Contracts (not previously assumed in the Chapter 11 Cases) to be assumed by Reorganized Aegis REIT or a Consolidated Debtor as of the Effective Date.

31.    "Available Cash" means the aggregate amount of all Cash held by the Consolidated Debtors on the Effective Date.

32.    "Avoidance Actions" mean all claims and causes of action which the Debtors have or had the power to assert pursuant to any or all of Sections 506(d), 510(c), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, whether or not such claims or causes of action seek an affirmative recovery or are raised as a defense to or offset against the allowance of a Claim.

33.    "AWC" means Aegis Wholesale Corporation, a Delaware corporation.

34.    "Ballot" means the ballot upon which the Holders of Impaired Claims shall indicate their (i) acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions, and (ii) election of the Convenience Claim option.

35.    "Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101, *et seq.*, of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

36.    "Bankruptcy Court" means the United States District Court for the District of Delaware having jurisdiction over these Chapter 11 Cases and, to the extent of any reference made pursuant to Section 157 of title 28 of the United States Code and/or the General Order of such District Court pursuant to Section 151 of title 28 of the United States Code, the bankruptcy unit of such District Court.

37.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General, and Local Rules of the Bankruptcy Court.

38.    "Bar Date" means February 1, 2008, for non-Governmental Units and February 11, 2008, for Governmental Units, which are the dates set by the Bankruptcy Court as the last day for filing a Claim arising prior to the Petition Date against the Debtors in these Chapter 11 Cases.

39.    "Business Day" means any day, other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)).

40.    "Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments and legal tender of the United States of America or instrumentalities thereof.

41.    "Cerberus" means Cerberus Capital Management, L.P., a Delaware limited partnership.

42.    "Chapter 11 Cases" means the jointly administered cases commenced under Chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, styled *In re Aegis*

*Mortgage Corporation, et al.*, Case No. 07-11119 (BLS), currently pending before the

Bankruptcy Court.

43.    "Charter" means the articles or certificate of incorporation and the by-laws

of a company, and any amendments to the foregoing.

44.    "Claim" means a claim (as defined in Section 101(5) of the Bankruptcy

Code) against any Debtor, including, but not limited to: (a) any right to payment from the

Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right

to an equitable remedy for breach of performance if such performance gives rise to a right of

payment from the Debtors, whether or not such right to an equitable remedy is reduced to

judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

45.    "Claims Agent" means Epiq Bankruptcy Solutions LLC, which was

appointed by the Bankruptcy Court as the Debtors' claims, notice and balloting agent.

46.    "Claims Reserve Account" means an interest bearing bank account or

money market account to be established and held in trust by the Disbursing Agent on or after the

Effective Date for the purpose of holding the Cash necessary to pay projected Plan Expenses and

the Plan Proceeds to be distributed under the Plan.  The Claims Reserve Account will be funded

by the Liquidating Debtors on or immediately after the Effective Date with the Available Cash

and, following the Effective Date, from time to time, by the Liquidating Debtors, with any

Liquidation Proceeds realized after the Effective Date.

47.    "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

48.    "Class 4 Creditors Contribution" means the greater of (a) the product of (i) the Final Distribution Percentage and (ii) $5,000,000, *or* (b) $500,000.

49.    "Class 4 Creditors Subgroup A" means all Creditors holding Allowed Claims in Class 4 (Consolidated Debtors Unsecured Claims) *excluding* (i) Madeleine, and (ii) any Creditors holding Warehouse Claims.

50.    "Class 4 Creditors Subgroup B" means all Creditors holding Allowed Claims in Class 4 (Consolidated Debtors Unsecured Claims) *excluding* Madeleine.

51.    "Committee" means the Official Committee of Unsecured Creditors appointed by the United States Trustee in these Chapter 11 Cases on August 24, 2007 (and the members thereof in their capacity as such).

52.    "Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Article 7 of the Plan having been (a) satisfied or (b) waived pursuant to Article 7.

53.    "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

54.    "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court concerning Confirmation.

55.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

56.    "Consolidated Debtors" means all of the Debtors other than Aegis REIT.

57.    "Consummation" or "Consummate" means the occurrence of or to achieve the Effective Date.

58.    "Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

59.    "Convenience Claim" means Unsecured Claims held by a single Creditor that are either (i) less than $25,000 in the aggregate, or (ii) greater than $25,000 in the aggregate but as to which the Holder thereof has voluntarily and timely elected in writing to reduce to a single Claim of $25,000 in the manner set forth on the Ballot.

60.    "Countrywide" means Countrywide Warehouse Lending.

61.    "Countrywide Allowed Warehouse Claim" means the Allowed Class 4 Claim of Countrywide in the amount of $2.3 million pursuant to the Countrywide Stipulation.

62.    "Countrywide Minimum Recovery" means $1,250,000.

63.    "Countrywide Stipulation" means the *Settlement Stipulation Under Bankruptcy Rule 9019 Among the Debtors, Countrywide, the Committee and Madeleine L.L.C.*, approved by the Bankruptcy Court on December 1, 2009.

64.    "Creditor" means any Holder of an Allowed Claim against any of the Debtors.

65.    "CSFB" means Credit Suisse First Boston Mortgage Capital, LLC, a Delaware limited liability company.

66.    "CSFB Account" means the "Segregated Account" established under, and as defined in, the CSFB Stipulation.

67.    "CSFB Fund" means the reconciled amount (approximately $859,623) of the "Affected Reimbursements," as defined in the CSFB Stipulation, actually deposited by the Debtors in the CSFB Account pursuant to the CSFB Stipulation.

68.    "CSFB Minimum Recovery" means $2,500,000, provided that, the CSFB Minimum Recovery shall be increased (i) by $500,000, if the Final Distribution Percentage on account of the Allowed Madeleine Claim equals or exceeds 15%, and (ii) by another $500,000, if the Final Distribution Percentage on account of the Allowed Madeleine Claim equals or exceeds 20%.

69.    "CSFB Plan Distribution" means the aggregate amount of the distributions received by CSFB under the Plan on account of the Allowed CSFB Warehouse Claim.

70.    "CSFB Reimbursement Payment" means the positive difference between (x) the sum of (i) the CSFB Shortfall Payments, and (ii) the CSFB Plan Distributions, and (y) the CSFB Minimum Recovery.

71.    "CSFB Servicing Claim" means the Claim of CSFB under a loan servicing agreement with the Debtors.

72.    "CSFB Shortfall Payment" means the positive difference between (x) the CSFB Minimum Recovery and (y) the CSFB Plan Distribution.

73.    "CSFB Stipulation" means the *Stipulation and Order Granting Credit Suisse Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1)*, entered by the Bankruptcy Court on October 16, 2007.

74.    "CSFB Warehouse Claim" means the Warehouse Claim of CSFB.

75.    "Debt" means liability on a Claim.

76.    "Debtors" means AMC, AWC, ALC, ACC, AFC, AMLSC, SSS, STAC and Aegis REIT.

77.    "Disallowed Claim" means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

78.    "Disbursing Agent" means the Liquidating Debtors, or alternatively, such other such person or persons designated to act as the disbursing agent for the purpose of making the distributions required under the Plan.  To the extent that the Liquidating Debtors do not act as the Disbursing Agent, the Confirmation Order shall identify the Disbursing Agent and may provide for one or more persons to serve in the capacity of Disbursing Agent.

79.    "Disclosure Statement" means the Debtors' *Disclosure Statement for Amended Chapter 11 Plan of Aegis Mortgage Corporation, et al.*, dated July 12, 2010, as amended, supplemented, or modified from time to time, describing the Plan, that was prepared and distributed in accordance with the Bankruptcy Code and Bankruptcy Rules and other applicable law.

80.    "Disputed" means, with respect to any Claim or interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent; (b) as to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; or (c) unless otherwise indicated in the Plan, a Claim as to which the period within which to object to such Claim has not yet expired.

81.    "Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of the Effective Date or any later deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim for which a Proof of Claim is required to be filed and no such Proof of Claim is filed or, if filed, is filed after the applicable Bar Date for such Claim; (iii) any Contingent Claim or Unliquidated Claim; (iv) any Claim scheduled by the Debtors in the Schedules as disputed, contingent or unliquidated; (v) a Proof of Claim filed in a

greater amount, or of a different nature or priority, than the amount, nature, or priority listed for

that Claim in the Schedules; or (vi) a Claim that is not listed in the Schedules.

      82.    "Disputed Claims Amount" means the aggregate amount of Disputed

Claims that are fixed and absolute.  For purposes of calculating distributions of Cash under the

Plan, the amount of each Disputed Claim shall be based upon either (i) the face amount of such

Creditor's Disputed Claim (or the disputed portion thereof) as set forth in the Creditor's filed

Proof of Claim, (ii) the amount at which the Bankruptcy Court may estimate such Disputed

Claim, or (iii) the amount which the Disbursing Agent determines in its reasonable judgment is

the appropriate amount to be reserved for such Disputed Claim.

      83.    "Distribution Dates" means collectively the Initial Distribution Date, any

Subsequent Distribution(s) Date and the Final Distribution Date.

      84.    "Distribution Record Date" means the close of business on the Business

Day immediately preceding the Effective Date.

      85.    "Effective Date" means the date selected by the Debtors, after consultation

with the Committee, which is a Business Day after the Confirmation Date on which: (a) no stay

of the Confirmation Order is in effect, and (b) all conditions specified in Article VII(C) of the

Plan have been satisfied, unless waived by the Debtors.

      86.    "Entity" means an entity as defined in Section 101(15) of the Bankruptcy

Code and the Committee.

      87.    "EPD/Breach Claim" means an Unsecured Claim arising under an

agreement between one or more of the Debtors and a loan buyer or securitization party for

(i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan.

88.    "EPD/Breach Claim Election" means the written notice of election filed with the Bankruptcy Court by any Holder of an EPD/Breach Claim on or before the Plan Objection Deadline to opt out of the EPD/Breach Claim Protocol and instead have its claim independently determined and allowed by order of the Bankruptcy Court (other than as provided for under the EPD/Breach Claim Protocol), or as otherwise permitted under the Plan.

89.    "EPD/Breach Claim (Opt Out)" means each EPD/Breach Claim that, as a result of the decision of the Holder of such claim to timely file an EPD/Breach Claim Election, shall be treated as a Disputed Claim under the Plan and determined and allowed by order of the Bankruptcy Court or as otherwise permitted by the Claim resolution procedures under the Plan.

90.    "EPD/Breach Claim (Submitted)" means each EPD/Breach Claim that, as a result of the failure of the Holder of such claim to timely file an EPD/Breach Claim Election, shall be treated in accordance with, and subject to the calculation and allowance procedures established by, the EPD/Breach Claim Protocol, provided that, in the event the EPD/Breach Claim Protocol Conditions are not satisfied, such claim shall instead be determined and allowed by order of the Bankruptcy Court or as otherwise permitted by the Claim resolution procedures under the Plan.

91.    "EPD/Breach Claim Protocol" means the protocol, attached as **Exhibit A** hereto, in accordance with which the Allowed amount of each EPD/Breach Claim (Submitted) will be calculated if the EPD/Breach Claim Protocol Conditions are satisfied.

92.    "EPD/Breach Claim Protocol Conditions" means either (a) the absence of any timely EPD/Breach Claim Elections, or (b) in the event any EPD/Breach Claim Elections are timely made, the Debtors' determination, in its sole discretion after consultation with the Committee, to otherwise treat only the EPD/Breach Claims (Submitted) pursuant to the EPD/Breach Claim Protocol, provided that, in the event that (i) one or more timely EPD/Breach Claim Elections is filed, and (ii) the Debtors determine *not* to otherwise treat the EPD/Breach Claims (Submitted) pursuant to the EPD/Breach Claim Protocol, then the Debtors shall file a notice stating that the EPD/Breach Claim Protocol Conditions have *not* been satisfied not later than five days following the Plan Objection Deadline.

93.    "EPD/Breach Claim Questionnaire" means the questionnaire, in substantially the form attached to the Voting Procedures Motion, soliciting the information necessary for the Debtors to apply the EPD/Breach Claim Protocol to calculate the amount of each EPD/Breach Claim (Submitted) for allowance and distribution purposes.

94.    "Equity Interest" means any equity security in any Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock, together with any warrants, options or contract rights to purchase or acquire such interests at any time.

95.    "<u>Estates</u>" means the estates of the Debtors in these Chapter 11 Cases

created pursuant to Section 541 of the Bankruptcy Code upon the commencement of these

Chapter 11 Cases.

96.    "<u>Executory Contract</u>" means any executory contract or unexpired lease

subject to Section 365 of the Bankruptcy Code between a Debtor and any other Entity.

97.    "<u>File</u>" or "<u>Filed</u>" means file or filed with the Bankruptcy Court or its

authorized designee in these Chapter 11 Cases.

98.    "<u>Final Decree</u>" means the decree contemplated under Bankruptcy Rule

3022.

99.    "<u>Final Distribution Date</u>" means the date of the last payment to Holders of

Allowed Claims in accordance with the provisions of the Plan.

100.    "<u>Final Distribution Percentage</u>" means the aggregate, final Pro Rata

distribution percentage based on distributions actually paid to and received by the holders of

Allowed Class 4 Claims as of the Final Distribution Date.

101.    "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court or

other court of competent jurisdiction (i) which has not been reversed, stayed, modified or

amended, (ii) as to which the time to or the right to appeal or seek reconsideration, review,

rehearing, or certiorari has expired or been waived (without regard to whether the time to seek

relief from a judgment under Bankruptcy Rule 9024 has expired), and (iii) as to which no appeal

or petition for reconsideration, review, rehearing, or certiorari is pending.

102.    "<u>Final Resolution Date</u>" means the date on which all Disputed Claims in each and every Class shall have been resolved by Final Order or otherwise finally determined.

103.    "<u>Governmental Unit</u>" means the United States and any state, commonwealth, district, territory, municipality, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), or any foreign state.

104.    "<u>Holder</u>" means an Entity holding a Claim or Equity Interest.

105.    "<u>Impaired</u>" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

106.    "<u>Initial Distribution Date</u>" means the Effective Date, or as soon as practicable thereafter, when the initial distribution shall be made to the Holders of Allowed Unsecured Claims, as determined by the Liquidating Debtors.

107.    "<u>Intercompany Claim</u>" means a Claim held by a Debtor against another Debtor.

108.    "<u>Interim Fee Order</u>" means that certain *Administrative Order Under 11 U.S.C. §§ 105(A) and 331 Establishing Procedures for Interim Compensation and Expense Reimbursement of Professionals and Committee Members* {Docket No. 131}, entered by the Bankruptcy Court on September 5, 2007.

109.    "<u>Lien</u>" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind) to secure payment of a debt or performance of an obligation.

110.   "Liquidating Debtors" means the Consolidated Debtors on and after the Effective Date.

111.   "Liquidation Proceeds" means any Cash or other consideration paid to or realized by the Consolidated Debtors or the Liquidating Debtors, as applicable, upon the sale, transfer, assignment or other disposition of the Plan Assets.

112.   "Litigation" means Litigation (Aegis REIT) and Litigation (Consolidated Debtors).

113.   "Litigation (Aegis REIT)" means the interest of Aegis REIT, its Estate or Reorganized Aegis REIT, as applicable, in any and all claims, rights and causes of action which have been or may be commenced by Aegis REIT or Reorganized Aegis REIT, as applicable. Litigation (Aegis REIT) includes, without limitation, any (i) Avoidance Action; (ii) action for the turnover of property to Reorganized Aegis REIT; (iii) action for the recovery of property or payment of money that belongs to or can be asserted by Reorganized Aegis REIT; (iv) action for compensation for damages incurred by Aegis REIT or Reorganized Aegis REIT; and (v) equitable subordination actions against Creditors.

114.   "Litigation (Consolidated Debtors)" means the interest of the Debtors, their Estates or the Liquidating Debtors, as applicable, in any and all claims, rights and causes of action which have been or may be commenced by the Debtors or the Liquidating Debtors, as applicable. Litigation (Consolidated Debtors) includes, without limitation, any (i) Avoidance Action; (ii) action for the turnover of property to the Liquidating Debtors; (iii) action for the recovery of property or payment of money that belongs to or can be asserted by the Liquidating

Debtors; (iv) action for compensation for damages incurred by the Debtors or the Liquidating

Debtors; and (v) equitable subordination actions against Creditors.

115.    "Litigation Recovery" means any Cash or other property received from all

or any portion of any Litigation, including, but not limited to, awards of damages, attorneys' fees

and expenses, interest and punitive damages, whether recovered by way of settlement, execution

on judgment or otherwise.  If any Litigation is pursued on a contingent fee basis, the Litigation

Recovery will be net of any contingent fee paid to legal counsel.

116.    "Madeleine" means Madeleine L.L.C., a New York limited liability

company.

117.    "Madeleine Claim" means the Claim of Madeleine.

118.    "Net Plan Proceeds" means all Plan Proceeds after the deduction of

payments for, or amounts deposited to or withheld in the Claims Reserve Account in anticipation

of the payment of, (i) Plan Expenses, (ii) Allowed Administrative Claims, (iii) Allowed Priority

Tax Claims, (iv) Allowed Priority Claims, (v) Allowed Secured Claims, and (vi) Allowed

Convenience Claims, as such deductions and reserves are determined by the Liquidating Debtors

pursuant to the terms of this Plan.

119.    "Petition Date" means August 13, 2007, the date on which each of the

Debtors filed their respective petitions for relief commencing these Chapter 11 Cases.

120.    "Plan" means this *Amended Chapter 11 Plan of Reorganization of Aegis

Mortgage Corporation, et al.*, dated July 12, 2010, either in its present form or as it may be

altered, amended, modified or supplemented from time to time in accordance with the Plan, the

Bankruptcy Code and the Bankruptcy Rules, including, without limitation, any exhibits and

schedules hereto, either in its present form or as the same may be amended, modified or

supplemented from time to time in accordance with the terms and provisions hereof.

121.    "Plan Assets" means all of the property of the Estates of the Consolidated

Debtors under Section 541 of the Bankruptcy Code including, without limitation, all Available

Cash and all Litigation (Consolidated Debtors) and any related Litigation Recovery.  In the event

the Aegis REIT Disposition option is selected, the Plan Assets shall also include all Aegis REIT

Assets Remainder that are distributed to, and deemed vested in, the Liquidating Debtors.

122.    "Plan Expenses" means the expenses incurred by the Liquidating Debtors

or the Disbursing Agent following the Effective Date (including the fees and costs of attorneys

and other professionals) for the purpose of (i) prosecuting or otherwise attempting to collect or

realize upon the Litigation (Consolidated Debtors); (ii) selling or collecting upon any of the Plan

Assets or otherwise incurred following the Effective Date in connection with generating the

Liquidation Proceeds; (iii) resolving Disputed Claims and effectuating distributions to Creditors

under the Plan; (iv) if the Aegis REIT Maintenance option is selected, satisfying the Reorganized

Aegis REIT Operating Costs; (iv) if the Aegis REIT Dissolution option is selected, satisfying the

Reorganized Aegis REIT Dissolution Costs or (v) otherwise implementing the Plan and closing

the Chapter 11 Cases, including, but not limited to post-Effective Date taxes (such as for income

in the Disputed Claims Reserve) and wind-down expenses (such as document storage and final

tax returns) and the cost of any bond or insurance obtained for the protection of the Responsible

Officer.

123.    "Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

124.    "Plan Proceeds" means the aggregate amount of all Available Cash and all Liquidation Proceeds.

125.    "Plan Supplement" means the pleading or pleadings identified in the Plan or Disclosure Statement for filing with the Bankruptcy Court prior to the Confirmation Hearing.

126.    "Preserved Setoff Rights" means, with respect to each Entity released in Section VIII(D)(2)(a) of this Plan where this term is used, an exclusion from such release that permits any claim, debt, or cause of action of the Debtors or the Estates against such Entity to be asserted defensively, as a setoff, counter-claim or cross-claim, in response to and in reduction of any Claim asserted by such Entity against the Liquidating Debtors, Reorganized Aegis REIT or the Estates, notwithstanding the releases in Section VIII(D)(2)(a) of this Plan.

127.    "Priority Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

128.    "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

129.    "Pro Rata" means proportionately so that, with respect to a Claim, the ratio of (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed Amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims of the Classes entitled to share in the applicable

distribution to (ii) the amount of all Allowed Claims in the Classes entitled to share in the applicable distribution.

130.    "Professional" means an Entity (a) employed pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

131.    "Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to Sections 330, 331 and/or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

132.    "Proof of Claim" means a proof of claim Filed pursuant to Section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

133.    "REIT Entity" means an Entity that (i) qualifies for taxation as a real estate investment trust under applicable provisions of the Tax Code, (ii) is a qualified subsidiary of a real estate investment trust under applicable provisions of the Tax Code, or (iii) is solely owned by either of the foregoing entities but is otherwise disregarded as an entity separate from its owner under applicable provisions of the Tax Code.

134.    "Rejection Bar Date" means the 30th day following the Effective Date, which shall be the last day for any Holder to file a Proof of Claim against any of the Debtors arising from or related to the rejection of an Executory Contract by the Plan.

135.   "Reorganized Aegis REIT" means Aegis REIT on and after the Effective

Date.

136.   "Reorganized Aegis REIT Common Stock Transferee" means an entity to

be designated by the Debtors in a notice Filed by the Debtors at the Confirmation Hearing.

137.   "Reorganized Aegis REIT Dissolution Costs" means, in the event the

Aegis REIT Dissolution option is selected, the costs and expenses incurred by Reorganized

Aegis REIT in the ordinary course of business, for the period from and after the Effective Date

until such time as Reorganized Aegis REIT is dissolved under applicable nonbankruptcy law,

including taxes, consulting fees, attorneys' fees and other obligations associated with the (a)

termination of the Aegis REIT Trusts, (b) cancellation or other distribution of the Aegis REIT

Certificates, and (c) dissolution of the Aegis REIT Parties.  Reorganized Aegis REIT Dissolution

Costs include, to the extent not otherwise paid from the assets and income of each of the Aegis

REIT Parties, similar costs and expenses incurred by such Aegis REIT Parties following the

Effective Date

138.   "Reorganized Aegis REIT Operating Costs" means, in the event the Aegis

REIT Maintenance option is selected, the costs and expenses incurred by Reorganized Aegis

REIT in the ordinary course of business, for the period from and after the Effective Date until

such time as Reorganized Aegis REIT is dissolved under applicable nonbankruptcy law,

including taxes, consulting fees, attorneys' fees and other obligations associated with the (a)

maintenance of the Aegis REIT Trusts, (b) ownership of the Aegis REIT Certificates, and (c)

operation of the Aegis REIT Parties.  Reorganized Aegis REIT Operating Costs include, to the

extent not otherwise paid from the assets and income of each of the Aegis REIT Parties, similar

costs and expenses incurred by such Aegis REIT Parties following the Effective Date.

139.    "Reserved Avoidance Actions" means those Avoidance Actions jointly

identified by the Debtors and the Committee in a schedule filed with the Bankruptcy Court on or

before the 10th day prior to the Confirmation Hearing, specifying those creditors that, following

Confirmation, may remain subject to the prosecution of Avoidance Actions.

140.    "Responsible Officer" means an individual selected by the Debtors, after

consultation with the Committee, on or before the 10th day prior to the Confirmation Hearing.

141.    "RFC" means Residential Funding Company, LLC, formerly known as

Residential Funding Corporation.

142.    "RFC Stipulation" means the *Settlement Stipulation Among the Debtors,*

*Residential Funding Company, LLC, the Committee and Madeleine, L.L.C.*, approved by the

Bankruptcy Court on August 12, 2009.

143.    "Schedules" means the schedules of assets and liabilities as the

Bankruptcy Court required each of the Debtors to file pursuant to Section 521 of the Bankruptcy

Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they may be amended and

supplemented from time to time, and each Debtor's statement of financial affairs filed with the

Bankruptcy Court, as the Bankruptcy Court required each of the Debtors to file pursuant to

Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules,

as they may be amended and supplemented from time to time.

144.   "Secured Claim" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under Sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

145.   "SSS" means Solutions Settlement Services of America Corporation, a Delaware corporation.

146.   "STAC" means Solutions Title of America Corporation, a Delaware corporation.

147.   "Subordination Rights" means any subordination rights under any instrument or agreement enforceable pursuant to Section 510(a) of the Bankruptcy Code, including that certain *Debt Subordination Agreement* dated as of March 18, 2005, among AMC and certain designated senior creditors.

148.   "Tax" means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

149.    "Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a tax assessed or assessable against the Debtors, including income and employment taxes and any related penalties or interest.

150.    "Tax Code" means the Internal Revenue Code of 1986, as amended.

151.    "Thompson" means D. Richard Thompson.

152.    "Thompson Claim" means the amended Proof of Claim filed by Thompson in the Chapter 11 Cases on or about February 5, 2008, and assigned claim number 1440.

153.    "Thompson Contribution" means $50,000.

154.    "Thompson Stipulation" means that certain *Stipulation Among the Debtors, D. Richard Thompson, the Committee and Madeleine L.L.C. Under Bankruptcy Rule 9019 Compromising Controversy and Allowing Nonpriority Unsecured Claim* approved by the Bankruptcy Court on September 11, 2009.

155.    "UBS" means UBS Real Estate Securities, Inc., a Delaware corporation, formerly known as UBS Warburg Real Estate Securities, Inc.

156.    "UBS Minimum Recovery" means $2,800,000, provided that, the UBS Minimum Recovery shall be increased (i) by $500,000, if the Final Distribution Percentage on account of the Allowed Madeleine Claim equals or exceeds 15%, and (ii) by another $500,000, if the Final Distribution Percentage on account of the Allowed Madeleine Claim equals or exceeds 20%.

157.  "UBS Plan Distribution" means the aggregate amount of the distributions received by UBS under the Plan on account of the Allowed UBS Warehouse Claim.

158.  "UBS Reimbursement Payment" means the positive difference between (x) the sum of (i) the UBS Shortfall Payments, and (ii) the UBS Plan Distributions, and (y) the UBS Minimum Recovery.

159.  "UBS Shortfall Payment" means the positive difference between (x) the UBS Minimum Recovery and (y) the UBS Plan Distribution.

160.  "UBS Warehouse Claim" means the Warehouse Claim of UBS.

161.  "Unimpaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is unimpaired within the meaning of Section 1124 of the Bankruptcy Code.

162.  "Unliquidated Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain, and which Claim has not been estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date.

163.  "Unsecured Claim" means any Claim against any of the Debtors or their Estates that is not a Secured Claim, Administrative Claim, Priority Tax Claim or Priority Claim.

164.  "U. S. Trustee" means the Office of the United States Trustee for the District of Delaware.

165.  "Velazquez Claims" means any Claims asserted, or which could have been asserted, in the Velazquez Class Action or the Velazquez Class Claim.

166. "Velazquez Claims Deadline" means the 30th day following the last date for the Holder of a Velazquez Claim to request exclusion from the Velazquez Settlement (as such date to request exclusion shall be specified in connection with the approval of the Velazquez Settlement by the Bankruptcy Court), which shall be the last day for any Velazquez Excluded Class Member to file an application with the Bankruptcy Court to extend the time within which such member may file a Proof of Claim against any of the Debtors arising from or related to any of the Velazquez Claims.

167. "Velazquez Class Action" means that certain class action complaint filed on June 11, 2007, in the United States District Court for the Central District of California titled *Maria Velazquez, on behalf of herself and others similarly situated v. Aegis Whole Corporation, Aegis Mortgage Corporation, and Does 1 through 100*, Case No. CV 07-03784 AHS-FMO.

168. "Velazquez Class Claim" means the Proof of Claim filed by Maria Velasquez and Guadalupe Velasquez, on behalf of themselves and other members of the general public similarly situated, in the Chapter 11 Cases on or about February 1, 2008, and assigned claim number 1490.

169. "Velazquez Class Member" means any Holder of a Velazquez Class Claim that is *not* a Velazquez Excluded Class Member.

170. "Velazquez Excluded Class Member" means any Holder of a Velazquez Claim that timely requests exclusion from the Velazquez Settlement before the deadline specified in connection with the approval of the Velazquez Settlement by the Bankruptcy Court.

171.   "Velazquez Settlement" means that certain *Class Action Settlement Agreement and Release*, dated as of February 2, 2010, among AMC, AWC and Maria Velazquez, as the representative of the Holders of Velazquez Claims.

172.   "Velazquez Settlement Payment" means $275,000.

173.   "Voting Instructions" means the instructions for voting on the Plan set forth in the Voting Procedures Motion.

174.   "Voting Procedures Motion" means the *Debtors' Motion for Entry of an Order (A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Scheduling a Hearing to Confirm the Amended Chapter 11 Plan of Aegis Mortgage Corporation, et al.; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; (E) Approving EPD/Breach Claims Questionnaire Process; and (F) Approving Form and Manner of Notices*, Filed by the Debtors in or about July 2010.

175.   "Warehouse Claim" means a Claim against the Debtors under a warehouse line of credit, master repurchase agreement or other lending arrangement or facility, provided that, a Warehouse Claim shall not include an EPD/Breach Claim.

176.   "WARN Contribution" means $200,000.

177.   "WARN Settlement" means that certain *Compromise and Settlement Agreement* dated as of February 26, 2009, among the Debtors, Cerberus, the Committee and the "Class Members," as defined in such agreement.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

**A.**     **Introduction**

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, Debtors have not placed the following Claims in a Class.

**B.**     **Administrative Claims**

Each Holder of an Allowed Administrative Claim shall receive, from Plan Proceeds, without interest, Cash equal to the Allowed Amount of such Claim, unless such Holder shall have agreed to different treatment of such Claim, at the sole option of the Debtors or the Liquidating Debtors, as the case may be: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holders of such Claims and the Debtors or the Liquidating Debtors, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), until the entry of a Final Decree or an order converting or dismissing the Chapter 11 Cases.

All requests for payment of Administrative Claims (except with respect to Professional Fee Claims) must be filed by the Administrative Claims Bar Date or the holders

thereof shall be forever barred from asserting such Administrative Claims against the Debtors, their Estates, Reorganized Aegis REIT, the Liquidating Debtors, or any of their successors or assigns or property, or from sharing in any distribution under the Plan.

Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, and without waiver of any argument available that such Claim is already time-barred by prior orders of the Bankruptcy Court, all Administrative Claims that are required to be Filed and not Filed by the Administrative Claims Bar Date shall be deemed disallowed and discharged. As provided herein, the Claims Reserve Account will include funds sufficient to cover the aggregate asserted amount of all disputed Administrative Claims. Without limiting the foregoing, all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date.

## C. Professional Fee Claims

Except to the extent authorized for interim payment pursuant to an order of the Bankruptcy Court, the Bankruptcy Court must rule on and allow all Professional Fee Claims before the fees will be owed and paid. For all Professional Fee Claims, except fees and expenses of the Claims Agent, the Professional in question must file and serve a properly noticed final fee application and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

The Liquidating Debtors may retain and compensate professionals for services rendered following the Effective Date without order of the Bankruptcy Court. If the Liquidating

Debtors object in writing to the payment of any compensation, such Disputed amount shall not be paid prior to the earlier of the resolution of such dispute or a ruling by the Bankruptcy Court.

Professionals requesting allowance and payment of Professional Fee Claims for services rendered prior to the Effective Date must File and serve, pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

**D.** **Priority Tax Claims**

On the later to occur of (i) the Effective Date or (ii) the date on which such Claim shall become an Allowed Claim, the Liquidating Debtors shall pay (from the Plan Proceeds) to each Holder of an Allowed Priority Tax Claim against the Debtors the Allowed Amount of such Allowed Priority Tax Claim without interest from Petition Date.

**E.** **CSFB Servicing Claim**

On or as soon as practicable following the Effective Date, the Debtors shall release the CSFB Fund to CSFB in full and final settlement and satisfaction of any CSFB Servicing Claims. On the Effective Date, CSFB and the Debtors shall be deemed to waive and release any other Claims reserved against each other under the CSFB Stipulation, including any Claims by CSFB for interest on account of the CSFB Funds (except insofar as such funds may

have earned interest while on deposit in the CSFB Account, in which case, the earned interest

attributable to such funds shall also be released to CSFB), provided that, nothing in this Plan

shall affect CSFB's rights to "Reimbursements" (as defined in the CSFB Stipulation) from

Ocwen Loan Servicing, LLC for the period on and after the Petition Date.

## ARTICLE III

### CLASSIFICATION AND TREATMENT
### OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**    **Summary**

The categories of Claims and Equity Interests listed below classify Claims and

Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the

Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity

Interest shall be deemed classified in a particular Class only to the extent that the Claim or

Equity Interest qualifies within the description of that Class and shall be deemed classified in a

different Class to the extent that any remainder of such Claim or Equity Interest qualifies within

the description of such different Class.  A Claim or Equity Interest is in a particular Class only to

the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or

otherwise settled prior to the Effective Date.

**B.**    **Classification and Treatment of Claims against the Debtors**

The classification of Claims and Equity Interests against the Debtors pursuant to

the Plan is as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – Priority Claims | Impaired | Entitled to Vote |
| Class 2 – Secured Claims[3] | Impaired | Entitled to Vote |
| Class 3 – Convenience Claims | Impaired | Entitled to Vote |
| Class 4 – Consolidated Debtors Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 – Consolidated Debtors EPD/Breach Claims | Impaired | Entitled to Vote |
| Class 6 – Velazquez Claims | Unimpaired | Not Entitled to Vote |
| Class 7 – Aegis REIT Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 – Aegis REIT EPD/Breach Claims | Impaired | Entitled to Vote |
| Class 9 – Intercompany Claims | Impaired | Not Entitled to Vote |
| Class 10 – Consolidated Debtors Equity Interests | Impaired | Not Entitled to Vote |
| Class 11 – Aegis REIT Preferred Stock Equity Interests | Impaired | Entitled to Vote |
| Class 12 – Aegis REIT Common Stock Equity Interests | Impaired | Not Entitled to Vote |

    1.    Class 1 – Priority Claims

        a.    Classification: Class 1 consists of Priority Claims against any of the Debtors.

        b.    Treatment: The Liquidating Debtors shall pay from the Plan Proceeds the Allowed amount of each Class 1 Priority Claim to each Creditor holding a Class 1 Priority Claim as soon as practicable following the later of (a) the Effective Date and (b) the date such Class 1 Priority Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Debtors shall pay each Creditor holding a Class 1 Priority Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; provided, however, that such Creditor may be treated on such less favorable terms as may be agreed to in writing by such Creditor.

        c.    Voting: Class 1 is an Impaired Class and Holders of Class 1 Claims are entitled to vote on the Plan.

---

[3] Each Holder of a Class 2 Claim constitutes a separate subclass under the Plan, to the extent any such Claims exist.

2.    Class 2 – Secured Claims

a.    Classification:  Class 2 consists of Secured Claims against any of the Debtors.  Each Holder of a Class 2 Claim constitutes a separate subclass under the Plan.

b.    Treatment:  To the extent any Secured Claims exist, at the option of the Debtors, the Liquidating Debtors or Reorganized Aegis REIT, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such Allowed Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the holder of such Claim and the Liquidating Debtors, the Holder of such Secured Claim will receive a Cash payment (from the Plan Proceeds) equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Secured Claim.

c.    Voting:  Class 2 is an Impaired Class and Holders of Class 2 Claims are entitled to vote on the Plan.

3.    Class 3 – Convenience Claims

a.    Classification:  Class 3 consists of Convenience Claims against any of the Consolidated Debtors.

b.      Treatment: Each Holder of an Allowed Convenience Claim shall receive, in exchange for and in full satisfaction of such Claim, a Cash payment from the Plan Proceeds equal to 20% of the amount of such Claim.  Any Holder of a Claim that would otherwise have been classified in Class 4, but for the timely election on the Ballot by the Holder to reduce the aggregate of all its Claims to a single Claim of $25,000 and participate solely in Class 3, shall be deemed to have waived any right to participate in Class 4 as to any and all Claims held by such Holder and shall receive no distribution under Class 4.

c.      Voting:  Class 3 is an Impaired Class and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

d.      Distributions:  On the Initial Distribution Date, the Disbursing Agent shall make a distribution to the holders of Class 3 Claims that, as of such date, have been Allowed. Thereafter, on the 10th Business Day of each month following the Initial Distribution Date, the Disbursing Agent shall make a distribution to the holders of Class 3 Claims that have been Allowed as of the last day of the preceding month.

e.      No Class 7 Convenience Election:  Notwithstanding the selection of the Aegis REIT Disposition option, no Holder of a Class 7 Claim (that shall otherwise be deemed classified in Class 4 of the Plan following the selection of such option), shall be entitled to treatment (or to elect treatment) as the Holder of a Convenience Claim under Class 3 of the Plan.

4.    Class 4 – Consolidated Debtors Unsecured Claims

        a.    Classification:  Class 4 consists of the Claims of Holders of Unsecured Claims against any of the Consolidated Debtors, excluding EPD/Breach Claims against any of the Consolidated Debtors.

        b.    Treatment:  Each Holder of an Allowed Class 4 Claim shall receive a Pro Rata share (with the Holders of Class 5 Claims) of the Net Plan Proceeds.  In addition, (i) each Holder of an Allowed Unsecured Claim in Class 4 Creditors Subgroup A shall receive a Pro Rata share of the Class 4 Creditors Contribution, and (ii) each Holder of an Allowed Unsecured Claim in Class 4 Creditors Subgroup B shall receive a Pro Rata share of the WARN Contribution.

        c.    Voting:  Class 4 is an Impaired Class and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

        d.    Certain Claims Allowed Under Plan:  On the Effective Date, the (i) CSFB Warehouse Claim shall be reduced and Allowed as a general, unsecured, non-priority claim under 11 U.S.C. § 502 against the Consolidated Debtors in the fixed, liquidated amount of $12,200,000; (ii) UBS Warehouse Claim shall be reduced and Allowed as a general, unsecured, non-priority claim under 11 U.S.C. § 502 against the Consolidated Debtors in the fixed, liquidated amount of $14,100,000; and (iii) the Madeleine Claim shall be reduced and Allowed as a general, unsecured, non-priority claim under 11 U.S.C. § 502 against the Consolidated Debtors in the fixed, liquidated amount of $135,000,000, provided that, upon the approval of the Thompson Stipulation, the amount of the Allowed Madeleine Claim shall be reduced to $133,000,000 as a result of the transfer of $2,000,000 of the face amount (not recovery amount)

of the Allowed Madeleine Claim to Thompson pursuant to such stipulation. The foregoing

Claims that are Allowed pursuant to this Section III(B)(4)(d) of the Plan shall (x) not be subject

to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or

recoupment, and shall be allowed without necessity of any further filings or amendments,

including any proof of claim, and (y) be classified and treated as Allowed Class 4 Claims.

      e.    Inclusion of Class 7 Claims: In the event the Aegis REIT Disposition

option is selected, all Class 7 Claims shall be deemed classified under Class 4 of the Plan and

shall receive the treatment specified for the Holders of Allowed Class 4 Claims under the Plan.

Any co-Debtor Claims in Class 7 of the Plan (*i.e.*, any Claim against Aegis REIT that is also a

liability of any of the Consolidated Debtors) that are included in Class 4 of the Plan, shall be

treated as if such claims were substantively consolidated into a single Claim against the

Liquidating Debtors.

    5.    <u>Class 5 – Consolidated Debtors EPD/Breach Claims</u>

      a.    Classification: Class 5 consists of the Claims of Holders of EPD/Breach

Claims against any of the Consolidated Debtors.

      b.    Treatment: The allowance or disallowance of Class 5 EPD/Breach Claims

(Submitted) shall be determined in accordance with the EPD/Breach Claim Protocol if the

EPD/Breach Claim Protocol Conditions are satisfied. If the EPD/Breach Claim Protocol

Conditions are not satisfied, the allowance or disallowance of such claims will be determined in

accordance with the Bankruptcy Code and the resolution procedures established under the Plan.

The allowance or disallowance of Class 5 EPD/Breach Claims (Opt Out) shall be determined in

accordance with the Bankruptcy Code and the resolution procedures established under the Plan.

Each Holder of an Allowed Class 5 EPD/Breach Claim (Submitted) and EPD/Breach Claim

(Opt Out) shall receive a Pro Rata share (with the Holders of Class 4 Claims) of the Net Plan

Proceeds.

        c.      Voting:  Class 5 is an Impaired Class and Holders of Class 5 Claims are

entitled to vote to accept or reject the Plan.

        d.      Compliance with EPD/Breach Claim Protocol:  If any Holder of a Class 5

EPD/Breach Claim (Submitted) fails to (a) submit an EPD/Breach Claim Questionnaire by the

date of the Confirmation Hearing, or (b) if such Holder has timely submitted an EPD/Breach

Claim Questionnaire by the date of the Confirmation Hearing, supply sufficient additional

information to calculate the amount of its EPD/Breach Claim (Submitted) in accordance with the

EPD/Breach Claim Protocol within thirty (30) days following the date of a written request for

such additional information by the Liquidating Debtors, such Holder shall be forever barred from

asserting an EPD/Breach Claim against the Debtors or their property, or sharing in any

distributions under the Plan.  Any disputes concerning the application of the EPD/Breach Claim

Protocol to the determination of any EPD/Breach Claim (Submitted) shall be submitted to the

Bankruptcy Court for resolution.

        f.      Certain EPD/Breach Claims:  The EPD/Breach Claim held by CSFB shall

be treated as an EPD/Breach Claim (Submitted).  The EPD/Breach Claim held by RFC shall be

treated as an EPD/Breach Claim (Submitted), subject to the terms of the RFC Stipulation.  The

EPD/Breach Claim held by Countrywide Home Loans, Inc., shall be treated as an EPD/Breach Claim (Submitted), subject to the terms of the Countrywide Stipulation.

       g.     Inclusion of Class 8 Claims:  In the event the Aegis REIT Disposition option is selected, all Class 8 Claims shall be deemed classified under Class 5 of the Plan and shall receive the treatment specified for the Holders of Allowed Class 5 Claims under the Plan. Any co-Debtor Claims in Class 8 of the Plan (*i.e.*, any Claim against Aegis REIT that is also a liability of any of the Consolidated Debtors) that are included in Class 5 of the Plan, shall be treated as if such claims were substantively consolidated into a single Claim against the Liquidating Debtors.

      6.     <u>Class 6 – Velazquez Claims</u>

       a.     Classification:  Class 6 consists of the Claims of Holders of Velazquez Claims.

       b.     Treatment:  The Holders of Velazquez Claims will be treated pursuant to the terms and conditions of the Velazquez Settlement. The Debtors shall provide a combined, single notice of the Velazquez Settlement to the Holders of Velazquez Claims pursuant to Federal Rule of Civil Procedure 23(c)(2) and (e).  The effectiveness of the Velazquez Settlement shall be conditioned and contingent upon the (a) satisfaction or waiver of the conditions specified in the Velazquez Settlement (including the condition that the number of Velazquez Excluded Class Members shall not exceed 5% of the total number of Holders of Velazquez Class Claims), and (b) approval of such settlement by the Bankruptcy Court according to the procedures set forth in Federal Rule of Civil Procedure 23(e).  The Velazquez Settlement shall provide for,

among other terms and conditions, (i) the certification, for settlement purposes only, by the

Bankruptcy Court of the Velazquez Class Claim as a class Proof of Claim pursuant to Section

501 of the Bankruptcy Code and Bankruptcy Rules 7023 and 9014, and (ii) the stipulated

dismissal of the Velazquez Class Action with prejudice on the merits and with each party to bear

its own costs and attorneys' fees.  Subject to the approval of the Velazquez Settlement, at the

time and pursuant to the terms and conditions set forth in the Velazquez Settlement, the Debtors

shall make the Velazquez Settlement Payment in full and final settlement, satisfaction and

release of all Velazquez Claims.  The Velazquez Settlement Payment  includes any amounts that

may be payable on account of (w) an award of attorney's fees and costs for class counsel

appointed by the Bankruptcy Court in connection with the approval of the Velazquez Settlement,

(x) costs arising under the Velazquez Settlement or incurred in the Velazquez Class Action, (y)

costs of administering the distributions to the Velazquez Class Members, and (z) costs of notice

of the Velazquez Settlement to the Holders of Velazquez Claims.

      c.     Voting:  The Claims of Velazquez Class Members are not impaired and

shall be treated in accordance with the terms and conditions of the Velazquez Settlement.  Any

Velazquez Excluded Class Member must file with the Bankruptcy Court, on or before the

Velazquez Claims Deadline, an application to extend the time (*i.e.*, the Bar Date) within which

such member may file an individual Proof of Claim against any of the Debtors arising from or

related to any of the Velazquez Claims.  The Debtors and the Committee reserve their rights to

oppose any extension of the Bar Date for leave to file an individual Proof of Claim that is sought

by any Velazquez Excluded Class Member.  If any Velazquez Excluded Class Member fails to

timely file an application to extend the Bar Date by the Velasquez Claims Deadline, such

member shall be forever barred from asserting a Claim against the Debtors or their property, or

sharing in any distributions under the Plan.  If a Velazquez Excluded Class Member obtains

leave from the Bankruptcy Court to file an individual Proof of Claim, such claim shall be treated

as a Class 4 Claim under the Plan.  The allowance or disallowance of an individual Proof of

Claim permissibly filed by a Velazquez Excluded Class Member shall be determined in

accordance with the Bankruptcy Code and the resolution procedures established under the Plan.

All rights and defenses to the allowance of an individual Proof of Claim permissibly filed by a

Velazquez Excluded Class Member are reserved, respectively, by such member and the Debtors

and the Committee.

        d.      Alternative Treatment:  In the event the Velazquez Settlement is not

approved by the Bankruptcy Court, or does not otherwise become effective pursuant to its terms,

the Velazquez Claims shall be treated pursuant to Class 4 of the Plan (*i.e.*, the Holders of

Velazquez Claims, if Allowed, shall receive the same treatment as the Holders of Allowed Class

4 Claims under the Plan).

      7.      Class 7 – Aegis REIT Unsecured Claims

        a.      Classification:  Class 7 consists of the Claims of Holders of Unsecured

Claims against Aegis REIT, excluding any EPD/Breach Claims against Aegis REIT.

        b.      Alternative Treatment:  To the extent any Class 7 Claims exist, one of the

following treatments shall be provided: (i) if the Aegis REIT Disposition option is selected, each

Holder of an Allowed Class 7 Unsecured Claim shall receive the same treatment as the Holders

of Allowed Class 4 Unsecured Claims (and such claims shall be deemed classified in Class 4);

(ii) if the Aegis REIT Maintenance option is selected, then, following the establishment of

appropriate reserves for the Reorganized Aegis REIT Operating Costs, each Holder of an

Allowed Class 7 Unsecured Claim shall receive a Pro Rata share of the remaining available

Aegis REIT Assets, as such reserves and remaining available assets are determined by

Reorganized Aegis REIT, on the later of the first anniversary of the Effective Date or the date

such Claim becomes an Allowed Claim; or (iii) if the Aegis REIT Dissolution option is selected,

then, following the establishment of appropriate reserves for the Reorganized Aegis REIT

Dissolution Costs, each Holder of an Allowed Class 7 Unsecured Claim shall receive a Pro Rata

share of the remaining available Aegis REIT Assets, as such reserves and remaining available

assets are determined by the Liquidating Debtors, on the later of the first anniversary of the

Effective Date or the date such Claim becomes an Allowed Claim.

      c.    Voting: Class 7 is an Impaired Class and Holders of Class 7 Claims are

entitled to vote to accept or reject the Plan.

      8.    <u>Class 8 – Aegis REIT  EPD/Breach Claims</u>

      a.    Classification: Class 8 consists of the Claims of Holders of EPD/Breach

Claims against Aegis REIT.

      b.    Treatment: The allowance or disallowance of Class 8 EPD/Breach Claims

(Submitted) shall be determined in accordance with the EPD/Breach Protocol if the EPD/Breach

Claim Protocol Conditions are satisfied. If the EPD/Breach Claim Protocol Conditions are not

satisfied, the allowance or disallowance of such claims will be determined in accordance with the

Bankruptcy Code.  The allowance or disallowance of Class 8 EPD/Breach Claims (Opt Out) shall be determined in accordance with the Bankruptcy Code and the resolution procedures established under the Plan.  To the extent any Class 8 Claims exist, one of the following treatments shall be provided: (i) if the Aegis REIT Disposition option is selected, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive the same treatment as the Holders of Allowed Class 5 Unsecured Claims (and such claims shall be deemed classified in Class 5);  (ii) if the Aegis REIT Maintenance option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Operating Costs, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by Reorganized Aegis REIT, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim; or (iii) if the Aegis REIT Dissolution option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Dissolution Costs, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by the Liquidating Debtors, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim.

   c.  Voting:  Voting Class 8 is an Impaired Class and Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

   d.  Compliance with EPD/Breach Claim Protocol:  If any Holder of a Class 8 EPD/Breach Claim (Submitted) fails to (a) submit an EPD/Breach Claim Questionnaire by the

date of the Confirmation Hearing, or (b) if such Holder has timely submitted an EPD/Breach

Claim Questionnaire, supply sufficient additional information to calculate the amount of its

EPD/Breach Claim (Submitted) in accordance with the EPD/Breach Claim Protocol within thirty

(30) days following the date of a written request for such additional information by the

Liquidating Debtors, such Holder shall be forever barred from asserting an EPD/Breach Claim

against the Debtors or their property, or sharing in any distributions under the Plan.  Any

disputes concerning the application of the EPD/Breach Claim Protocol to the determination of

any EPD/Breach Claim (Submitted) shall be submitted to the Bankruptcy Court for resolution.

      9.     Class 9 – Intercompany Claims

          a.     Classification:  Class 9 consists of all Intercompany Claims.

          b.     Treatment:  There shall be no distribution on account of any Intercompany

Claims.

          c.     Voting:  Holders of Class 9 Claims will receive no distribution under the

Plan and therefore are deemed to have rejected the Plan.  Accordingly, the Holders of Class 9

Claims are not entitled to vote.

      10.     Class 10 – Consolidated Debtors Equity Interests

          a.     Classification:  Class 10 consists of Equity Interests in any of the

Consolidated Debtors.

          b.     Treatment:  There shall be no distribution on account of Class 10 Equity

Interests.  Upon the Effective Date, all Class 10 Equity Interests will be terminated and canceled

and will cease to exist.

      c.     Voting:  Holders of Class 10 Equity Interests will receive no distribution under the Plan and therefore are deemed to have rejected the Plan.  Accordingly, the Holders of Class 10 Equity Interests are not entitled to vote.

     11.     <u>Class 11 – Aegis REIT Preferred Stock Equity Interests</u>

      a.     Classification:  Class 11 consists of Aegis REIT Preferred Stock Equity Interests.

      b.     Treatment:  The Holders of the Aegis REIT Preferred Stock Equity Interests shall receive one of the following treatments: (i) if the Aegis REIT Disposition option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist; (ii) if the Aegis REIT Maintenance option is selected, the Holders of the Aegis REIT Preferred Equity Interests shall retain their Equity Interests; or (iii) if the Aegis REIT Dissolution option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist.

      c.     Voting:  Class 11 is an Impaired Class and Holders of Class 11 Aegis REIT Preferred Stock Equity Interests are entitled to accept or reject the Plan.

     12.     <u>Class 12 – Aegis REIT Common Stock Equity Interests</u>

      a.     Classification:  Class 12 consists of Aegis REIT Common Stock Equity Interests.

      b.     Treatment:  No distribution shall be made to the Holders of the Aegis REIT Common Stock Equity Interests.  The Holders of the Aegis REIT Common Stock Equity Interests shall receive one of the following treatments: (i) if the Aegis REIT Disposition option is selected, all Class 12 Equity Interests will be terminated and cancelled and will cease to exist;

(ii) if the Aegis REIT Maintenance option is selected, then, at the time and subject to the provisions of Section V(B)(2)(d) of the Plan, the Holders of the Aegis REIT Common Stock Equity Interests shall assign and transfer their Equity Interests to the Reorganized Aegis REIT Common Stock Transferee; or (iii) if the Aegis REIT Dissolution option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist.

      c.    Voting:  The Holders of Class 12 Equity Interests will receive no distribution under the Plan and are therefore deemed to reject the Plan.  Accordingly, the Holders of Class 12 Aegis REIT Common Stock Equity Interests are not entitled to vote.

**ARTICLE IV**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**A.**    **Voting Classes**

      Each Holder of an Allowed Claim in Classes 1, 2, 3, 4, 5, 7, 8 and 11 is entitled to vote either to accept or to reject the Plan.  Only those votes cast by Holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

**B.**    **Acceptance by Impaired Classes**

      An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

C.    **Presumed Acceptance/Rejection of Plan**

Class 6 is unimpaired and the Holders of Velazquez Class Members in such Class are therefore deemed to accept the Plan and are not entitled to vote.  Classes 9, 10 and 12 shall not receive any distributions under the Plan and the Holders of Claims or Equity Interests in such Classes are therefore deemed to reject the Plan and are not entitled to vote.

D.    **Nonconsensual Confirmation**

Because Classes 9, 10 and 12 are deemed to reject the Plan by operation of law, the Debtors will request the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.  Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by Section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to Section 1129(b) of the Bankruptcy Code.

E.    **How to Vote**

A form of Ballot is being provided to Creditors in Classes 1, 2, 3, 4, 5, 7, 8 and 11 pursuant to which Creditors in such Classes may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives such Creditors one important choice to make with respect to the Plan – to vote for or against this Plan.  All Ballots must comply with the Voting Instructions in order to be counted.  As more specifically set forth in the Voting Instructions, to vote on the Plan, a Creditor should complete the Ballot by: (1) indicating on the Ballot that (a) it accepts the Plan or (b) rejects the Plan, (2) making the optional Convenience Claim election

(under which all of a Creditor's Claims would be reduced to a single Claim of $25,000), and (3) signing its name and mailing the Ballot in the envelope provided for this purpose. The Claims Agent will count the Ballots. In order to be counted, all Ballots must be completed, signed and received, no later than the deadline specified in the Voting Instructions, at the address specified on the Ballots. Creditors should not send Ballots by facsimile or e-mail – such Ballots will not be counted. If a Ballot is not properly completed, signed and received as described, it will not be counted. If a Ballot is damaged or lost, a creditor may request a replacement by addressing a written request to the Claims Agent.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Revesting of Plan Assets and Collection of Plan Proceeds.

Upon the Effective Date, the Liquidating Debtors shall be vested with all right, title and interest in the Plan Assets and all such property shall become the property of the Liquidating Debtors. Following the Effective Date, the Liquidating Debtors may use, acquire and dispose of the Plan Assets without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules, but consistent with the terms of this Plan. The Plan Assets shall be held by the Liquidating Debtors in trust for Creditors and shall be distributed or used exclusively in accordance with this Plan. From and after the Effective Date, the Liquidating Debtors shall retain and pursue the Litigation owned by the Liquidating Debtors on such terms and conditions as are consistent with the interests of Creditors of the Liquidating Debtors and the reasonable business judgment of the Liquidating Debtors, sell

or liquidate Plan Assets, and collect the accounts receivable, if any, of the Debtors. All Cash, all Liquidation Proceeds, and all Litigation Recoveries realized or obtained by the Liquidating Debtors shall be promptly delivered to the Disbursing Agent for deposit into the Claims Reserve Account. Except as otherwise provided in this Plan and the Confirmation Order, such Plan Proceeds shall be free and clear of all Claims and Liens. To the extent required to make distributions to the Holders of Allowed Claims, fund the Claims Reserve Account, pay Plan Expenses, and otherwise implement this Plan, all Plan Proceeds shall be held in trust by the Disbursing Agent and shall be distributed to Creditors in accordance with Section 1123 of the Bankruptcy Code.

**B.**      **Aegis REIT Implementation Options.**

The Debtors shall make the Aegis REIT Treatment Election and shall carry out the option selected thereby as follows:

1.      Aegis REIT Disposition. If the Aegis REIT Disposition option is selected, (i) the Aegis REIT Sale Agreement shall be consummated, (ii) all right, title and interest in any Aegis REIT Assets Remainder shall be distributed to, and shall be deemed vested in, the Liquidating Debtors and all such property shall become the property of the Liquidating Debtors, and (iii) all Aegis REIT Assets Remainder shall constitute Plan Assets for all purposes.

a.      No Continued Business. Following the Effective Date, Reorganized Aegis REIT shall conduct no business other than winding up its affairs in accordance with applicable law and the provisions of this Plan.

b.     <u>Management</u>.  The Responsible Officer shall be authorized to (X) wind up the affairs of Reorganized Aegis REIT and dissolve Reorganized Aegis REIT, and (Y) put into effect and carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the Chapter 11 Cases, without further action by its directors or stockholders.  The Responsible Officer or any officer of Reorganized Aegis REIT is hereby authorized to make, execute, acknowledge and file a certificate of dissolution for Reorganized Aegis REIT pursuant to applicable nonbankruptcy law at or following such time as Reorganized Aegis REIT has fully wound up its affairs in accordance with applicable law pursuant to the provisions of the Plan.

2.     <u>Aegis REIT Maintenance</u>.  If the Aegis REIT Maintenance option is selected, Aegis REIT shall be revested with all right, title and interest in the Aegis REIT Assets and all such property shall become the property of Reorganized Aegis REIT.

a.     <u>Continued Business</u>.  Following the Effective Date, Reorganized Aegis REIT may use, acquire and dispose of the Aegis REIT Assets without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules, but consistent with the terms of this Plan.  Reorganized Aegis REIT shall (i) continue to maintain its separate corporate existence for all purposes under this Plan with all the powers of a corporation under applicable law in the jurisdiction in which it is incorporated, and (ii) operate and continue to operate in a manner that enables it to qualify as a REIT Entity.  Reorganized AEGIS REIT shall be authorized to cause the Aegis REIT Parties to maintain their respective ownership of the Aegis REIT Certificates or, alternatively, shall be authorized to transfer such

certificates to Reorganized Aegis REIT (provided that Reorganized Aegis REIT then qualifies as

a REIT Entity) or another REIT Entity.

b.    Management.  Upon the Effective Date, the management, control and

operation of Reorganized Aegis REIT  shall become the general responsibility of the board of

directors of Reorganized Aegis REIT.  The initial board of directors of Reorganized Aegis REIT

shall be composed of those persons identified in a notice Filed by the Debtors on or before the

10th day prior to the Confirmation Hearing.  Each of the members of such initial board of

directors shall serve in accordance with applicable nonbankruptcy law and the Charter of

Reorganized Aegis REIT, as the same may be amended from time to time.  From and after the

Effective Date, the members of the board of directors of Reorganized Aegis REIT shall be

selected and determined in accordance with the provisions of applicable law and the Charter of

Reorganized Aegis REIT.  Upon the Effective Date, those persons identified in a notice Filed by

the Debtors on or before the 10th day prior to the Confirmation Hearing shall be deemed

appointed to serve as officers of  Reorganized Aegis REIT without further action under

applicable law, regulation, order or rule including, without limitation, any action by the

stockholders or directors of Reorganized Aegis REIT.  The officers of Reorganized Aegis REIT

shall serve in accordance with applicable nonbankruptcy law, any employment agreement with

Reorganized Aegis REIT, and the Charter of Reorganized Aegis REIT, as the same may be

amended from time to time.

c.    Operating Expenses.  All Reorganized Aegis REIT Operating Costs, not

otherwise defrayed by the assets, income and revenues of Reorganized Aegis REIT or the other

Aegis REIT Parties, shall be paid by the Liquidating Debtors as a Plan Expense, provided that,

Reorganized Aegis REIT and the Liquidating Debtors shall maintain an accounting of all

Reorganized Aegis REIT Operating Costs.  In the event that, upon the dissolution of

Reorganized Aegis REIT, there exist any remaining corporate assets of Reorganized Aegis REIT

otherwise available for distribution under this Plan, such assets shall instead be distributed to the

Liquidating Debtors (and shall constitute Plan Assets) until such time as all Reorganized Aegis

REIT Operating Costs have been fully reimbursed.  The Disbursing Agent, in consultation with

Reorganized Aegis REIT, shall establish an appropriate reserve for anticipated Reorganized

Aegis REIT Operating Costs that will enable distributions under the Plan on account of Allowed

Claims in accordance with the priorities and amounts set forth in Article III.

        d.      Reorganized Aegis REIT Common Stock Transferee.  Upon written

request by Reorganized Aegis REIT, the Holders of the Aegis REIT Common Stock Equity

Interests (*i.e.*, AMC, ALC and ACC) shall, as promptly as practicable following the receipt of

such request, transfer and assign such interests to the Reorganized Aegis REIT Common Stock

Transferee, without further notice to Creditors or approval of the Bankruptcy Court.

        3.      Aegis REIT Dissolution.  If the Aegis REIT Dissolution option is selected, all

right, title and interest in any Aegis REIT Assets shall be distributed to, and shall be deemed

vested in, the Liquidating Debtors and all such property shall become the property of the

Liquidating Debtors.  The Liquidating Debtors shall segregate such property from the Plan

Assets for the purpose of making distributions to the Holders of Class 7 and Class 8 Claims

under the Plan.

a.      No Continued Business. Following the Effective Date, Reorganized Aegis

REIT shall conduct no business other than winding up its affairs in accordance with applicable

law and the provisions of this Plan.

b.      Management. The Responsible Officer shall be authorized to (X) wind up

the affairs of Reorganized Aegis REIT and dissolve Reorganized Aegis REIT, and (Y) put into

effect and carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the

Chapter 11 Cases, without further action by its directors or stockholders. The Responsible

Officer or any officer of Reorganized Aegis REIT is hereby authorized to make, execute,

acknowledge and file a certificate of dissolution for Reorganized Aegis REIT pursuant to

applicable nonbankruptcy law at or following such time as Reorganized Aegis REIT has fully

wound up its affairs in accordance with applicable law pursuant to the provisions of the Plan.

c.      Windup Expenses. All Reorganized Aegis REIT Dissolution Costs, not

otherwise defrayed by the assets, income and revenues of Reorganized Aegis REIT or the other

Aegis REIT Parties, shall be paid by the Liquidating Debtors as a Plan Expense, provided that,

Reorganized Aegis REIT and the Liquidating Debtors shall maintain an accounting of all

Reorganized Aegis REIT Dissolution Costs. In the event that, upon the dissolution of

Reorganized Aegis REIT, there exist any remaining corporate assets of Reorganized Aegis REIT

otherwise available for distribution under this Plan, such assets shall instead be distributed to the

Liquidating Debtors (and shall constitute Plan Assets) until such time as all Reorganized Aegis

REIT Dissolution Costs have been fully reimbursed. The Disbursing Agent, in consultation with

Reorganized Aegis REIT, shall establish an appropriate reserve for anticipated Reorganized

Aegis REIT Dissolution Costs that will enable distributions under the Plan on account of

Allowed Claims in accordance with the priorities and amounts set forth in Article III.

       d.    <u>Claims Based on Aegis REIT Dissolution Option</u>.  The allowance or

disallowance of a Proof of Claim that is based on, related to or arising from any of the actions

contemplated by the Aegis REIT Dissolution option shall be determined in accordance with the

Bankruptcy Code and the resolution procedures established under the Plan.  All rights and

defenses to the allowance of such a Proof of Claim are reserved, respectively, by such Holder

and the Debtors and the Committee.

**C.**      **<u>Implementation of Certain Subordination Rights and Reallocations.</u>**

       1.    <u>CSFB</u>.  If and to the extent, upon the Final Distribution Date, the CSFB Plan

Distribution shall be less than the CSFB Minimum Recovery, Madeleine shall pay to CSFB the

CSFB Shortfall Payment by re-allocating a portion of its distribution under the Plan on account

of the Allowed Madeleine Claim.  Notwithstanding the foregoing, at the time of the Initial

Distribution Date, Madeleine shall make an estimated, interim payment on account of the CSFB

Shortfall Payment by re-allocating a portion of Madeleine's distribution under the Plan on

account of the Allowed Madeleine Claim in an amount determined by Madeleine, in its

discretion, pursuant to instructions given to the Disbursing Agent, provided that, at the time

when the aggregate Pro Rata distribution percentage applicable to the holders of Allowed Class 4

Claims shall equal or exceed ten (10%) percent, Madeleine shall pay to CSFB (by re-allocating a

portion of its distribution under the Amended Plan on account of the Allowed Madeleine Claim)

the amount of the then outstanding CSFB Shortfall Payment (less the amount of any estimated,

interim payment previously made at the time of the Initial Distribution Date).  In the event that,

following the receipt by CSFB of any CSFB Shortfall Payments, the distributions to CSFB on

account of the Allowed CSFB Warehouse Claim shall (in the aggregate, including all prior initial

or interim distributions and CSFB Shortfall Payments) exceed the CSFB Minimum Recovery,

any subsequent distributions to CSFB shall instead be re-allocated to Madeleine until such time

as Madeline has been fully reimbursed for any CSFB Reimbursement Payments.  If the

subsequent or final distributions to CSFB on account of the Allowed CSFB Warehouse Claim

are insufficient to fully satisfy the  CSFB Reimbursement Payments, CSFB shall immediately

pay any such unsatisfied CSFB Reimbursement Payments directly to Madeleine.

      2.    <u>UBS</u>.  If and to the extent, upon the Final Distribution Date, the UBS Plan

Distribution shall be less than the UBS Minimum Recovery, Madeleine shall pay to UBS the

UBS Shortfall Payment by re-allocating a portion of its distribution under the Plan on account of

the Allowed Madeleine Claim.  Notwithstanding the foregoing, at the time of the Initial

Distribution Date, Madeleine shall make an estimated, interim payment on account of the UBS

Shortfall Payment by re-allocating a portion of Madeleine's distribution under the Plan on

account of the Allowed Madeleine Claim in an amount determined by Madeleine, in its

discretion, pursuant to instructions given to the Disbursing Agent, provided that, at the time

when the aggregate Pro Rata distribution percentage applicable to the holders of Allowed Class 4

Claims shall equal or exceed ten (10%) percent, Madeleine shall pay to UBS (by re-allocating a

portion of its distribution under the Amended Plan on account of the Allowed Madeleine Claim)

the amount of the then outstanding UBS Shortfall Payment (less the amount of any estimated,

interim payment previously made at the time of the Initial Distribution Date). In the event that,

following the receipt by UBS of any UBS Shortfall Payments, the distributions to UBS on

account of the Allowed UBS Warehouse Claim shall (in the aggregate, including all prior initial

or interim distributions and UBS Shortfall Payments) exceed the UBS Minimum Recovery, any

subsequent distributions to UBS shall instead be re-allocated to Madeleine until such time as

Madeline has been fully reimbursed for any UBS Reimbursement Payments. If the subsequent

or final distributions to UBS on account of the Allowed UBS Warehouse Claim are insufficient

to fully satisfy the UBS Reimbursement Payments, UBS shall immediately pay any such

unsatisfied UBS Reimbursement Payments directly to Madeleine.

   3. <u>Limitations</u>. Notwithstanding any implication to the contrary in the Plan,

Madeleine shall have no obligation to make the CSFB Shortfall Payment or the UBS Shortfall

Payment except from, and to the extent of, its distributions under the Plan on account of the

Allowed Madeleine Claim. The receipt of the CSFB Minimum Recovery and the UBS

Minimum Recovery shall constitute a full and final settlement, satisfaction and release of any

Subordination Rights held by CSFB or UBS and neither CSFB nor UBS shall have, nor assert,

any further entitlement to benefit from any Subordination Rights against Madeleine, any other

Creditors in the Chapter 11 Cases or any other distributions made under the Plan.

   4. <u>Countrywide</u>. Countrywide shall receive the Countrywide Minimum Recovery on

account of the Countrywide Allowed Warehouse Claim at the times, in the amounts and pursuant

to the terms, conditions and limitations of the Countrywide Stipulation. The Disbursing Agent

shall be authorized to implement the re-allocation of the distributions under the Plan on account

of the Allowed Madeleine Claim to carry out the applicable terms of the Countrywide Stipulation.

5.    <u>Class 4 Creditors</u>. Madeleine agrees that, on the Final Distribution Date, an amount equal to the Class 4 Creditors Contribution that would otherwise be distributed to Madeleine on account of the Allowed Madeleine Claim shall instead be re-allocated for the benefit of the Class 4 Creditors Subgroup A, provided that, on the Initial Distribution Date, the Disbursing Agent shall re-allocate the amount of $500,000 otherwise distributable to Madeleine under the Plan on account of the Allowed Madeleine Claim for the purpose of making the initial, minimum Class 4 Creditors Contribution to the members of the Class 4 Creditors Subgroup A. At the time when the aggregate Pro Rata distribution percentage applicable to the holders of Allowed Class 4 Claims shall exceed ten (10%) percent, further distributions on account the Allowed Madeleine Claim shall be reallocated to the extent necessary to pay the increased amount of the Class 4 Creditors Contribution as contemplated in this Plan. The Disbursing Agent shall be authorized to implement the re-allocation of the Class 4 Creditors Contribution to the Class 4 Creditors Subgroup A in such manner as shall ensure that such reallocated amount shall be deducted from amounts otherwise distributed to Madeleine under the Plan and instead distributed, Pro Rata, to the members of the Class 4 Creditors Subgroup A. Notwithstanding any implication to the contrary in the Plan, Madeleine shall have no obligation to make the Class 4 Creditors Contribution except from, and to the extent of, its distributions under the Plan on account of the Allowed Madeleine Claim.

**D.      Implementation of WARN Settlement.**

Madeleine agrees that an amount equal to the WARN Contribution that would otherwise be distributed to Madeleine on account of the Allowed Madeleine Claim shall instead, on the Initial Distribution Date, be re-allocated for the benefit of the Class 4 Creditors Subgroup B. The Disbursing Agent shall be authorized to implement the re-allocation of the WARN Contribution to the Class 4 Creditors Subgroup B in such manner as shall ensure that such reallocated amount shall be deducted from amounts otherwise distributed to Madeleine under the Plan and instead distributed, Pro Rata, to the members of the Class 4 Creditors Subgroup B. Notwithstanding any implication to the contrary in the Plan, Madeleine shall have no obligation to make the WARN Contribution except from, and to the extent of, its distributions under the Plan on account of the Allowed Madeleine Claim.

**E.      Implementation of Thompson Stipulation.**

Madeleine agrees that an amount equal to the Thompson Contribution that would otherwise be distributed to Madeleine on account of the Allowed Madeleine Claim shall instead, on the Initial Distribution Date, be re-allocated for the benefit of the holder of the Thompson Claim. The Disbursing Agent shall be authorized to implement the re-allocation of the Thompson Contribution to the holder of the Thompson Claim in such manner as shall ensure that such reallocated amount shall be deducted from amounts otherwise distributed to Madeleine under the Plan and instead distributed to the holder of the Thompson Claim. Notwithstanding any implication to the contrary in the Plan, Madeleine shall have no obligation to make the

Thompson Contribution except from, and to the extent of, its distributions under the Plan on account of the Allowed Madeleine Claim.

**F.      Certain Claim Waivers.**

  a.      Madeleine. With the exception of the Allowed Madeleine Class 4 Claim, all other Claims held or asserted by Madeleine in the Chapter 11 Cases against any of the Debtors, including, without limitation, any Administrative Claim, shall be deemed disallowed without necessity of any further filings, notice or approval by the Bankruptcy Court.

  b.      CSFB. With the exception of the Allowed CSFB Class 4 Claim, the EPD/Breach Claim asserted by CSFB and the CSFB Servicing Claim, all other Claims held or asserted by CSFB in the Chapter 11 Cases against any of the Debtors, including, without limitation, any Administrative Claim, shall be deemed disallowed without necessity of any further filings, notice or approval by the Bankruptcy Court.

  c.      UBS. With the exception of the Allowed UBS Class 4 Claim, all other Claims held or asserted by UBS in the Chapter 11 Cases against any of the Debtors, including, without limitation, any Administrative Claim and any EPD/Breach Claim, shall be deemed disallowed without necessity of any further filings, notice or approval by the Bankruptcy Court.

**G.      Payment of Plan Expenses.**

  All Plan Expenses may be paid by the Disbursing Agent from the Claims Reserve Account without further notice to Creditors of the Consolidating Debtors or approval of the Bankruptcy Court. Any disputes concerning the payment of Plan Expenses shall be submitted to the Bankruptcy Court for resolution. The Disbursing Agent may also pay the Reorganized Aegis

REIT Operating Costs and Reorganized REIT Dissolution Costs from the Claims Reserve

Account from time to time as necessary, _provided that_, the Disbursing Agent shall maintain an

accounting of all such costs for purposes of potential reimbursement by Reorganized Aegis

REIT.

## H.      Litigation.

Except as otherwise provided in this Plan, all Litigation is retained and preserved

pursuant to Section 1123(b) of the Bankruptcy Code with the exception of any Avoidance

Actions that are *not* Reserved Avoidance Actions, each of which shall be deemed waived and

released by the Debtors and their Estates upon the Effective Date, without further notice to

Creditors or approval of the Bankruptcy Court.  Any Avoidance Actions commenced that are not

Reserved Avoidance Actions shall be dismissed with prejudice.  From and after the Effective

Date, all Litigation (Consolidated Debtors), vested in the Liquidating Debtors upon the Effective

Date, will be prosecuted or settled by the Liquidating Debtors.  All Litigation (Aegis REIT) will

be prosecuted or settled by Reorganized Aegis REIT, except to the extent vested in the

Liquidating Debtors upon the Effective Date in which case such litigation will be prosecuted or

settled by the Liquidating Debtors.  To the extent any Litigation is already pending on the

Effective Date, the Liquidating Debtors or Reorganized Aegis REIT, as the case may be, as

successor to the applicable Debtor, will continue the prosecution of such Litigation.  Any

Litigation commenced by the Committee shall continue to be prosecuted by the Liquidating

Debtors through special counsel.  Any Litigation Recovery on account of Litigation

(Consolidated Debtors) will be deposited in the Claims Reserve Account as Plan Proceeds.  Any

Litigation Recovery on account of Litigation (Aegis REIT) will become the property of

Reorganized Aegis REIT, except to the extent such litigation is vested in the Liquidating Debtors

upon the Effective Date in which case such litigation recoveries will be deposited in the Claims

Reserve Account as Plan Proceeds.

I.      **Reimbursement for Aegis REIT Advanced Claims.**

        In the event that either of the Aegis REIT Maintenance or Aegis REIT

Dissolution options are selected, the Disbursing Agent shall maintain an accounting of the

amount of Aegis REIT Advanced Claims for purposes of reimbursement by Reorganized Aegis

REIT from the Aegis REIT Assets.  No distribution shall be made from the Aegis REIT Assets to

the holders of Allowed Class 7 or Class 8 Claims unless and until Reorganized Aegis REIT has

first reimbursed the Liquidating Debtors for the amount of any distributions made on account of

the Aegis REIT Advanced Claims.

J.      **Liquidation and Dissolution of the Liquidating Debtors.**

        The Liquidating Debtors shall conduct no business following the Effective Date

other than winding up their affairs in accordance with applicable law and the provisions of this

Plan.  Without limiting the generality or effect of the foregoing, following the Effective Date the

Liquidating Debtors shall:  (i) undertake those transactions that are necessary, advantageous or

practicable to obtain the maximum value from the Plan Assets; and (ii) exercise their best efforts

and endeavor in good faith and without undue delay to liquidate all Claims and the Plan Assets

and to successfully prosecute the Litigation of the Liquidating Debtors.  Pursuant to applicable

bankruptcy and non-bankruptcy law, the Liquidating Debtors (acting through the Responsible

Officer) shall be authorized to (i) wind up their affairs and dissolve, and (ii) put into effect and

carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the Chapter 11

Cases, without further action by their boards of directors or stockholders.

**K.** **Power and Authority of Responsible Officer.**

From and after the Effective Date the Liquidating Debtors and Reorganized Aegis

REIT (unless the Aegis REIT Maintenance Option is selected) will be managed and governed by

the Responsible Officer who shall act as the representative of the Liquidating Debtors and

Reorganized Aegis REIT.  Activities of the Liquidating Debtors and Reorganized Aegis REIT as

permitted and limited under this Plan will be managed by the Responsible Officer.  To the extent

applicable, the Responsible Officer may use lower priced employees of his firm as he deems

appropriate.  Compensation and reimbursement of the Responsible Officer, and any lower priced

employees from his or her firm (if any), shall be considered Plan Expenses.  Confirmation of the

Plan shall constitute the appointment of the Responsible Officer by the Bankruptcy Court as the

representative of the Liquidating Debtors and Reorganized Aegis REIT (unless the Aegis REIT

Maintenance Option is selected) to (a) exercise the rights, power and authority of the Liquidating

Debtors and Reorganized Aegis REIT under applicable provisions of the Plan and bankruptcy

and non-bankruptcy law, (b) retain professionals to represent the Liquidating Debtors and

Reorganized Aegis REIT in performing and implementing the Plan, (c) marshal and liquidate the

Plan Assets and to collect the Plan Proceeds for the benefit of Creditors, (d) prosecute the

Litigation and otherwise attempt to collect or realize upon the Plan Assets, (e) resolve Disputed

Claims and effectuate distributions to Creditors of the Debtors under the Plan, and (f) otherwise

implement the Plan, wind up the affairs of the Debtors and close the Chapter 11 Cases. The

Responsible Officer shall be authorized to carry out the terms of the Plan and any orders of the

Bankruptcy Court entered in the Chapter 11 Cases with like effect as if exercised and taken by

unanimous action of the board and shareholders of the Liquidating Debtors and Reorganized

Aegis REIT. The compensation arrangements with the Responsible Officer shall be subject to

approval by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the

Responsible Officer will be deemed to have retained the Debtors' Professionals under the

arrangements existing on the Effective Date, without any need for new retention agreements or

further orders of the Bankruptcy Court. The Confirmation Order shall provide that the

Responsible Officer is authorized to execute a certificate of dissolution for the Liquidating

Debtors and Reorganized Aegis REIT pursuant to applicable non-bankruptcy law, or otherwise

take any necessary steps required to wind up the Debtors under applicable law, at such time as

the Liquidating Debtors have fully wound up their affairs in accordance with applicable law

pursuant to the provisions of the Plan. The Responsible Officer shall serve until the Liquidating

Debtors and Reorganized Aegis REIT are dissolved and a Final Decree is entered closing their

Chapter 11 Cases, unless earlier removed by the Bankruptcy Court for cause shown, after notice

and a hearing. Upon the removal of the Responsible Officer for cause, or if the sitting

Responsible Officer becomes unable, unavailable or unwilling to continue to serve, the

Bankruptcy Court will appoint a replacement upon the request of any party in interest. The

Responsible Officer shall be responsible for ensuring that the Liquidating Debtors and

Reorganized Aegis REIT comply with their obligations to pay statutory fees under 28 U.S.C. §

1930(a)(6) and the Responsible Officer shall file all post-Confirmation reports required by the Bankruptcy Rules, the Bankruptcy Court, the Local Bankruptcy Rules, or any applicable Guidelines of the United States Trustee.

**L.      Power and Authority of the Disbursing Agent.**

The Disbursing Agent may employ or contract with other entities to perform the obligations created under the Plan.  Any third party Disbursing Agent shall receive reasonable compensation for services rendered and reimbursement for expenses incurred in connection with this Plan or any functions or responsibilities adopted under the Plan which amounts may be deducted from the Claims Reserve Account as Plan Expenses.  The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, (iv) implement the re-allocation of certain distributions on account of the Allowed Madeleine Claim at the times and in the amounts set forth in Sections V(C)(i), V(C)(ii), V(C)(iii), V(C)(iv), V(D) and V(E) of the Plan, and (v) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  To the extent that the Liquidating Debtors act as the Disbursing Agent, the Liquidating Debtors shall not receive a fee for such services, although the Liquidating Debtors may employ and pay persons or entities salaries, wages or ordinary compensation for services performed.  The Disbursing Agent may also be

employed by, or on behalf of, Reorganized Aegis REIT to make the distributions contemplated by the Plan to the Holders of Allowed Class 7 and Class 8 Claims from the Aegis REIT Assets.

**M.**    **Distribution Procedures.**

Except as otherwise agreed by the Holder of a particular Claim, or as provided in this Plan, all amounts to be paid by the Disbursing Agent under the Plan shall be distributed in such amounts and at such times as is reasonably prudent. On the Effective Date, or as soon as practicable thereafter, the Disbursing Agent shall: (i) marshal all then available Plan Proceeds; (ii) establish and fund the Claims Reserve Account pursuant to Section V(P) of the Plan; (iii) promptly pay the Holders of (a) Allowed Administrative Claims, (b) Allowed Professional Fee Claims, (c) Allowed Priority Tax Claims, (d) Allowed Priority Claims; and (e) Allowed Convenience Claims, (iv) with respect to Class 2 Creditors who did not receive proceeds from the sale of their collateral, arrange for the Liquidating Debtors and Reorganized Aegis REIT to abandon to such Creditors the collateral securing their respective Claims or make a Cash payment in satisfaction of such Claims; and (v) make interim and final distributions of Net Plan Proceeds to the Holders of other Allowed Claims from the Claims Reserve Account in the amounts and according to the priorities set forth in this Plan. Additionally, notwithstanding any provision to the contrary in this Plan, distributions may be made in full or on a Pro Rata basis depending on (i) the amount of the Allowed Claim, (ii) the then available Plan Proceeds in the Claims Reserve Account, and (iii) the then anticipated Plan Proceeds. The Disbursing Agent shall make the Cash payments to the Holders of Allowed Claims: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank selected by the Disbursing Agent in its sole

discretion, or by wire transfer from a domestic bank, at the Disbursing Agent's option, and (b) by

first-class mail (or by other equivalent or superior means as determined by the Disbursing

Agent).

**N.     Full and Final Satisfaction.**

    Upon the Effective Date, all Claims against the Debtors shall be deemed fixed and

adjusted pursuant to this Plan and the Debtors shall have no further liability on account of any

Claims or Equity Interests except as set forth in this Plan.  All payments and all distributions

made by the Disbursing Agent under the Plan shall be in full and final satisfaction, settlement

and release of all Claims; provided, however, that nothing contained in this Section V(N) of the

Plan, or in any other provision of this Plan, shall be deemed to constitute or result in a discharge

of the Liquidating Debtors or Reorganized Aegis REIT (unless the Aegis REIT Maintenance

Option is selected) under Section 1141(d) of the Bankruptcy Code.

**O.     Withholding Taxes.**

    Pursuant to Section 346(f) of the Bankruptcy Code, the Disbursing Agent shall be

entitled to deduct any federal, state or local withholding taxes from any Cash payments made

with respect to Allowed Claims, as appropriate.  The Debtors shall comply with all reporting

obligations imposed on it by any Governmental Unit in accordance with applicable law with

respect to such Withholding Taxes.

**P.     Claims Reserve Account.**

    On or as soon as practicable after the Effective Date, the Disbursing Agent shall

(a) to the extent of any Available Cash, create and fund the Claims Reserve Account, and (b)

periodically deposit the Cash from Plan Proceeds into the Claims Reserve Account to satisfy the

obligations created under the Plan.  The Claims Reserve Account shall contain the following six

sub-accounts:  (1) Secured, (2) Administrative, (3) Priority Claims and Priority Tax Claims, (4)

Plan Expenses, (5) Convenience Claims, and (6) Consolidated Debtors Unsecured Claims and

EPD/Breach Claims.  Each sub-account within the Claims Reserve Account shall contain an

amount of Cash deemed sufficient by the Liquidating Debtors for the payment of Allowed

Claims in accordance with the priorities and amounts set forth in Article III, all anticipated Plan

Expenses, and Disputed Claims.  The sub-account for Plan Expenses shall also contain amounts

reserved by the Disbursing Agent on account of anticipated Reorganized Aegis REIT Operating

Costs and Reorganized Aegis REIT Dissolution Costs.  The Disbursing Agent shall be

authorized to transfer funds among sub-accounts as necessary to replenish any sub-accounts as

and when distributions are made to Creditors.  All Plan Expenses may be deducted and paid from

sub-account 4 without further order of the Bankruptcy Court.  Subject to the priorities

established under the Bankruptcy Code, the Disbursing Agent shall periodically transfer all

earnings and interest income on the Claims Reserve Account for deposit to and distribution from

sub-account 6.  In the event the Aegis REIT Dissolution option is selected, the Disbursing Agent

may also establish a separate sub-account to hold the proceeds of the Aegis REIT Assets that are

distributed to, and deemed vested in, the Liquidating Debtors under the Plan.  Unless otherwise

provided in the Confirmation Order, the Claims Reserve Account shall be invested by the

Disbursing Agent in a manner consistent with the objectives of Section 345(a) of the Bankruptcy

Code.

**Q.    Resolution of Disputed Claims.**

All objections to Claims shall be Filed not later than 180 days following the Effective Date; provided, however, such deadline may be extended by the Bankruptcy Court for cause shown. If an objection is not timely Filed by the deadline established in this Section V(Q), any remaining Disputed Claims shall be deemed to be Allowed Claims for purposes of this Plan. Unless otherwise provided in the Confirmation Order the Liquidating Debtors shall be authorized to settle, or withdraw any objections to, any Disputed Claim following the Confirmation Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of this Plan. Under no circumstances will any distributions be made on account of Disallowed Claims.

**R.    Reserve Provisions for Disputed Claims.**

The Disbursing Agent shall implement the following procedures with respect to the allocation and distribution of Cash in the Claims Reserve Account, after payment of all senior Claims, to the Holders of Disputed Claims that become Allowed Claims against the Liquidating Debtors:

1.    Cash respecting Disputed Claims shall not be distributed, but, if necessary, shall be withheld by the Disbursing Agent in an amount equal to the amount of the distributions that would otherwise be made to the Holders of such Claims if such Claims had been Allowed Claims, based on the Disputed Claims Amount.

2.    All Holders of Allowed Unsecured Claims shall be entitled to receive interim distributions under the Plan. No distributions may be made to the Holders of Allowed

Unsecured Claims unless adequate reserves are established for the payment of Disputed Claims, and sufficient funds are also reserved for payment of expected Plan Expenses.  Upon the Final Resolution Date, after payment of all senior Claims, all amounts (if any) remaining in sub-accounts 1-6 of the Claims Reserve Account, after reservation of an appropriate amount for anticipated Plan Expenses, shall be transferred to sub-account 6 for final distribution to the Holders of Allowed Class 4 and Class 5 Claims.

3.      Where only a portion of a Claim is Disputed, at the option of the Liquidating Debtors or Disbursing Agent, as applicable, interim or partial distributions may (but are not required to) be made with respect to the portion of such Claim that is not Disputed.

4.      For the purposes of effectuating the provisions of this Section V(R), the Bankruptcy Court may estimate the amount of any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to Section 502(c) of the Bankruptcy Code for purposes of distribution under this Plan.  In lieu of estimating the amount of any Disputed Claim, the Bankruptcy Court or the Disbursing Agent may determine the Disputed Claims Amount to be reserved for such Disputed Claim, or such amount may be fixed by agreement in writing by and between the Liquidating Debtors and the Holder thereof.

5.      When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the provisions of this Plan, Cash equal to a Pro Rata Share of the Cash set aside for Disputed Claims within the applicable sub-account of the Claims Reserve Account, but in no event shall such Holder be paid more than

the amount that would otherwise have been paid to such Holder if the Claim (or the Allowed portion of the Claim) had not been a Disputed Claim.

6.      Interim distributions may be made from time to time to the Holders of Allowed Claims prior to the resolution by Final Order or otherwise of all Disputed Claims, provided that the aggregate amount of Cash to be distributed at such time from the Claims Reserve Account is practicable in comparison to the anticipated costs of such interim distributions.

7.      No Holder of a Disputed Claim shall have any Claim against the Cash reserved with respect to such Claim until such Disputed Claim shall become an Allowed Claim. In no event shall any Holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) from the Debtors, the Liquidating Debtors, or the Claims Reserve Account any payment (x) which is greater than the amount reserved for such Claim by the Bankruptcy Court pursuant to this Section V(R), or (y) except as otherwise permitted under this Plan, of interest or other compensation for delays in distribution.  In no event shall the Liquidating Debtors have any responsibility or liability for any loss to or of any amount reserved under the Plan.

8.      To the extent a Disputed Claim ultimately becomes an Allowed Claim in an amount less than the Disputed Claim Amount reserved for such Disputed Claim, then the resulting surplus of Cash shall be retained in the Claims Reserve Account and shall be distributed among the Holders of Allowed Claims until such time as each Holder of an Allowed Claim has been paid the Allowed amount of its Claim.

**S.**     **Allocation of Distributions.**

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**T.**     **Rounding.**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

**U.**     **No Interim Cash Payments of $25 or Less on Account of Allowed Claims.**

If an interim distribution to be received by the Holder of an Allowed Claim against the Liquidating Debtors would be $25 or less, notwithstanding any contrary provision in the Plan, at the discretion of the Disbursing Agent, no such interim payment will be made to such Holder, and such Cash shall be held for such Holder until the earlier of (i) the next time an interim distribution is made to the Holders of Allowed Claims (unless the distribution would still be less than $25 in which case this Section V(U) shall again apply), or (ii) subject to Section V(W) below, the date on which final distributions are made to the Holders of Allowed Claims.

**V.**     **Disputed Payments.**

In the event of any dispute between and among Creditors as to the right of any Entity to receive or retain any payment or distribution to be made to such Entity under the Plan, the Disbursing Agent may, in lieu of making such payment or distribution to such entity, instead

hold such payment or distribution until the disposition thereof shall be determined by the Bankruptcy Court.

**W.     Unclaimed Property.**

Any entity which fails to claim any Cash within 120 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan.  Upon forfeiture, such Cash (including interest thereon) shall be deposited into the Claims Reserve Account to be distributed to the Holders of Allowed Claims in the manner described in Section V(R)(8) for distribution of excess amounts.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors, the Liquidating Debtors, or the Disbursing Agent or any Holder of an Allowed Claim to whom distributions are made by the Disbursing Agent.

**X.     No Distributions on Late-Filed Claims.**

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a Proof of Claim was first filed after the applicable Bar Date shall be a Disallowed Claim.  The Liquidating Debtors shall not make any distribution to a Holder of such a Claim; provided, however, that to the extent such Claim was listed in the Schedules (other than as contingent, disputed, or unliquidated) and would be an Allowed Claim but for the lack of a timely Proof of Claim, the Liquidating Debtors shall treat such Claim as an Allowed Claim in the amount in which it was so listed.

**Y.**   **De Minimis Distributions; Charitable Donation.**

Notwithstanding anything to the contrary therein, the Disbursing Agent shall not be required to make a distribution to any Creditor if the dollar amount of the distribution is so small that the cost of making that distribution exceeds the dollar amount of such distribution.  At the Final Distribution Date, the Responsible Officer may make a charitable donation to either the American Red Cross or the United Way of America of any remaining undistributed funds if, in the reasonable judgment of the Responsible Officer, the cost of calculating and making the final distribution of such remaining funds is excessive in relation to the benefits to the Creditors who would otherwise be entitled to such distribution.

**Z.**   **Setoffs.**

Nothing contained in this Plan shall constitute a waiver or release by the Debtors and/or Liquidating Debtors of any right of setoff or recoupment the Debtors and/or Liquidating Debtors may have against any Creditor or Equity Interest Holder.

**AA.**   **United States Trustee Fees.**

All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date.  Thereafter, the Liquidating Debtors shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a Final Decree or an order converting or dismissing the Chapter 11 Cases.

## ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS

**A.**     **Rejection of Executory Contracts.**

Except with respect to Executory Contracts that were (i) previously assumed or rejected by order of the Bankruptcy Court, (ii) are the subject of a pending motion to assume or reject pursuant to Section 365 of the Bankruptcy Code, or (iii) are identified on the Assumption Schedule, on the Effective Date, each Executory Contract entered into by any of the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code. Nothing in this Article VI shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such leases. The Plan shall not affect any other contracts or agreements that have been assumed, or assumed and assigned, by order of the Bankruptcy Court prior to the Confirmation Date or which are the subject of a motion seeking assumption, or assumption and assignment, which is pending on the Confirmation Date.

**B.**     **Claims Based on Rejection of Executory Contracts.**

All Proofs of Claim with respect to Claims arising from the rejection of an Executory Contract pursuant to the Confirmation Order, if any, must be Filed with the Bankruptcy Court on or before the earlier of the Rejection Bar Date or the date otherwise fixed

in an order of the Bankruptcy Court approving such rejection. Any Claims arising from the

rejection of an Executory Contract pursuant to the Confirmation Order which are not Filed

within such times will be forever barred from assertion against the Debtors, the Liquidating

Debtors, or the Estates and their property. All such Claims for which Proofs of Claim are timely

and properly Filed and ultimately Allowed will be treated as Unsecured Claims subject to the

provisions of Article III of the Plan.

**C.**     **Insurance Policies**

   To the extent that any or all of the insurance policies set forth on the Assumption

Schedule are considered to be executory contracts, then notwithstanding anything contained in

this Plan to the contrary, this Plan shall constitute a motion to assume the insurance policies set

forth on the Assumption Schedule. Subject to the occurrence of the Effective Date, the entry of

the Confirmation Order shall constitute approval of such assumption pursuant to Sections 365(a)

and 1123(b)(2) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such

assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the

Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final

Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to

cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such

insurance policy set forth on the Assumption Schedule. To the extent that the Bankruptcy Court

determines otherwise with respect to any insurance policy, the Debtors reserve the right to seek

rejection of such insurance policy or other available relief. For the avoidance of doubt, the

certain insurance policies (including any insurance policies that are not executory contracts,

insurance policies that may have expired prior to the Petition Date, insurance policies in

existence on the Petition Date, and insurance policies entered into by the Debtors after the

Petition Date) of the Debtors set forth on the Assumption Schedule and all rights thereunder and

rights under any other insurance policies under which the Debtors may be beneficiaries

(including the rights to make, amend, prosecute, and benefit from claims) are retained and will

be transferred to the Liquidating Trust pursuant to this Plan.

## ARTICLE VII

### CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND TO THE EFFECTIVE DATE

**A.**     **Conditions to Confirmation of the Plan.**

Confirmation of this Plan is conditioned upon the Court having signed the

Confirmation Order in form and substance reasonably satisfactory to the Debtors.

**B.**     **Effect of Failure of Conditions to Confirmation.**

If the condition in Section VII(A) of the Plan is not met, the Debtors may, at their

option, withdraw this Plan and, if withdrawn, this Plan shall be of no further force or effect.

**C.**     **Conditions to Effectiveness of the Plan**

Effectiveness of this Plan is conditioned upon the (i) entry of the Confirmation

Order, (ii) if the Aegis REIT Disposition option is selected, the occurrence of the closing of the

Aegis REIT Sale Agreement, and (iii) the execution and delivery of any related documents and

instruments in form and substance reasonably satisfactory to the Debtors.

**D.**     **Substantive Consolidation of the Consolidated Debtors.**

1.     Substantive Consolidation Order.

The Plan shall serve as a motion seeking entry of an order substantively

consolidating the Chapter 11 Cases of the Consolidated Debtors for purposes of carrying out the

Plan, including making distributions under the Plan.  Unless an objection to substantive

consolidation is made in writing by any Creditor affected by the Plan as herein provided on or

before the Plan Objection Deadline, an order substantively consolidating the Chapter 11 Cases of

the Consolidated Debtors may be entered by the Bankruptcy Court, which order may be the

Confirmation Order.  In the event any such objections are timely filed, a hearing with respect

thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide

with the Confirmation Hearing.

2.     Effect/Extent of Substantive Consolidation.

In effectuation of such substantive consolidation, on the Effective Date: (a) no

Distributions will be made under the Plan on account of the Intercompany Claims among the

Consolidated Debtors; (b) the guarantees of the Consolidated Debtors will be deemed eliminated

so that any Claim against the Consolidated Debtors and any guarantee thereof executed by any

Debtor and any joint and several liability of the Consolidated Debtors with one another will be

deemed to be one obligation of these Consolidated Debtors; (c) each and every Claim against the

Consolidated Debtors will be deemed asserted as a single Claim against the Liquidating Debtors

as a whole, and will be treated in the same Class regardless of the Consolidated Debtor; and (d)

all of the property of the Estates of the Consolidated Debtors that is revested in the Liquidating

Debtors shall be pooled in the Plan Assets to satisfy the Claims against the Consolidated Debtors in the amounts and at the times set forth in the Plan. Notwithstanding the substantive consolidation effectuated under the Plan, substantive consolidation shall not affect the obligation of each Consolidated Debtor under 28 U.S.C. § 1930(a)(6) until a particular Chapter 11 Case is closed, converted or dismissed. Notwithstanding the substantive consolidation of the Consolidated Debtors, nothing herein shall effect or be deemed to constitute a substantive consolidation of the Consolidated Debtors and Aegis REIT for any purpose, provided that, in the event the Aegis REIT Disposition option is selected, any co-Debtor Claims in Classes 7 and 8 of the Plan (*i.e.*, any Claim against Aegis REIT that is also a liability of any of the Consolidated Debtors) that are deemed included in Classes 4 and 5 of the Plan, respectively, shall be treated as if such claims were substantively consolidated as a single Claim against the Liquidating Debtors.

      3.    <u>Reservation of Rights.</u>

      The Debtors reserve the right, after consultation with the Committee, at any time up to the conclusion of the Confirmation Hearing to withdraw their request for substantive consolidation of the Chapter 11 Cases of the Consolidated Debtors, to seek Confirmation of the Plan as if there were no substantive consolidation, and to seek Confirmation of the Plan with respect to one Debtor even if Confirmation with respect to the other Debtors is denied.

**E.**    **Effective Date.**

      Provided no stay of the Confirmation Order is then in effect, this Plan shall become effective on the Effective Date.

## ARTICLE VIII

## EFFECTS OF CONFIRMATION

A.     **Binding Effect of Plan.**

        The provisions of the confirmed Plan shall bind the Debtors, Reorganized Aegis

REIT, the Liquidating Debtors, any Entity acquiring property under the Plan, and any Creditor or

Equity Interest Holder, whether or not such Creditor or Equity Interest Holder has filed a Proof

of Claim or Equity Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or

the Equity Interest of such Equity Interest Holder is impaired under the Plan, and whether or not

such Creditor or Equity Interest Holder has accepted or rejected the Plan.  All Claims and Debts

shall be as fixed and adjusted pursuant to this Plan.  With respect to any taxes of the kind

specified in Section 1146(c) of the Bankruptcy Code, this Plan shall also bind any taxing

authority, recorder of deeds or similar official for any county, state, or governmental unit or

parish in which any instrument related to under this Plan or related to any transaction

contemplated under this Plan is to be recorded.

B.     **Revesting of Property of Debtors.**

        Upon the Effective Date, title to all property of the Estates of the Consolidated

Debtors in their Chapter 11 Cases shall revest in the Liquidating Debtors.  Upon the Effective

Date, (i) if the Aegis REIT Disposition Option is selected, title to all Aegis REIT Assets

Remainder shall be deemed vested in the Liquidating Debtors, (ii) if the Aegis REIT

Maintenance Option is selected, title to all Aegis REIT Assets shall revest in Reorganized Aegis

REIT, or (iii) if the Aegis REIT Dissolution Option is selected, title to all Aegis REIT Assets

shall be deemed vested in the Liquidating Debtors, in each case, free and clear of any Liens or

Claims except those Liens and Claims expressly preserved by this Plan or the Confirmation Order. All such property shall be retained either by (a) the Liquidating Debtors as Plan Assets for the purposes contemplated under the Plan, or (b) Reorganized Aegis REIT for the conduct of its ongoing business. Without limiting the generality of the foregoing, all Litigation Recoveries, rights to Liquidation Proceeds, and all resulting Plan Proceeds earmarked for disbursement to Creditors under the Plan, shall vest in the Liquidating Debtors upon the Effective Date and shall no longer constitute property of the Estates.

**C.    Property Free and Clear.**

Following the Effective Date, the Liquidating Debtors and Reorganized Aegis REIT may transfer and dispose of their property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

**D.    Limitations of Liability.**

1.    Exculpation.

The Debtors, the Committee, CSFB, UBS, Madeleine, Cerberus and each of their respective Agents will neither have nor incur, and are hereby released from, any liability to any Entity for any action in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Cases or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Cases; provided,

however, that this limitation will not affect or modify the obligations created under this Plan, or

the rights of any Creditor or Equity Interest Holder to enforce its rights under the Plan and shall

not release any action (or inaction) constituting willful misconduct or gross negligence.

      2.    Releases.

      As part of the Plan, the releases set forth below shall be granted pursuant to this

Plan and the Confirmation Order:

      a.    Debtors' Release of Agents.

      On the Effective Date, subject to the Preserved Setoff Rights, the Debtors (for and

on behalf of their respective Estates), the Liquidating Debtors and Reorganized Aegis REIT,

shall release and be permanently enjoined from any prosecution or attempted prosecution of any

and all Litigation or potential Litigation which any of them has or may have against any of their

Agents as of the Confirmation Date; provided, however, that the foregoing shall not operate as a

waiver of or release from any Litigation or potential Litigation arising out of (i) any express

contractual obligation owing by any such Agents, or (ii) the willful misconduct or gross

negligence of any such Agents in connection with, related to, or arising out of the Chapter 11

Cases, the pursuit of Confirmation of the Plan, the Consummation of the Plan, the administration

of the Plan, or the property to be distributed under the Plan.

      b.    Certain Mutual, General Release.

      On the Effective Date, the Debtors (for and on behalf of their respective Estates),

the Liquidating Debtors, Reorganized Aegis REIT, the Committee, CSFB, UBS, Madeleine and

Cerberus, and each of their respective Affiliates and Agents, shall be deemed to have released

each other, and each of their respective Affiliates and Agents ("Released Parties"), from any and all debts, claims, damages and causes of action (including any Litigation), whether known or unknown, which each of them now has or may have against each other by reason of any transaction, occurrence, act or omission giving rise to any Claim or Equity Interest that is treated in the Plan, the ownership of any of the Debtors, the business or contractual arrangements between any Debtor and any Released Party, or the Chapter 11 Cases, except for the rights and Claims established by the Plan or other stipulation approved by the Bankruptcy Court.  It is the intention of the Released Parties that this release shall be effective as a full and final release of all claims, debts, rights and obligations against each other arising out of the matters described, except for the rights and Claims established by the Plan or other stipulation approved by the Bankruptcy Court.  In furtherance of this intention, the Released Parties waive the benefit of the provisions of California Civil Code § 1542 (or, if inapplicable, any other similar applicable statute), which provides as follows:  *"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."*  The releases set forth in this Section VIII(D)(2)(b) are an integral component of the expeditious Confirmation of the Plan and the implementation of the restructuring contemplated by the Plan, particularly the allowance and treatment under the Plan of certain Claims of CSFB, UBS and Madeleine (pursuant to Sections II(E), III(B)(4)(d) and III(B)(5)(f) of the Plan), and the resolution of certain Subordination Rights asserted by CSFB and UBS against Madeleine (pursuant to Section V(C) of the Plan).  Pursuant to Section 1123(b)(3)(A) of the Bankruptcy

Code, the foregoing provisions constitute a compromise of certain rights and claims by and among the Released Parties. The Debtors request that the Bankruptcy Court approve this compromise at the Confirmation Hearing. The Confirmation Order shall constitute the determination by the Bankruptcy Court that this compromise is approved.

      c.    <u>Third Party Releases.</u>

      In consideration for the obligations of the Debtors, the Liquidating Debtors and Reorganized Aegis REIT under the Plan, and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Entity that affirmatively votes to accept the Plan, for itself and its respective successors, assigns, transferees and current and former Affiliates and Agents, shall, by virtue of Sections 1126(c) and 1141(a) of the Bankruptcy Code, be deemed to have released any and all debts, claims, damages and causes of action related to any transaction, occurrence, act or omission giving rise to any Claim or Equity Interest that is treated in the Plan, the ownership of any of the Debtors, the business or contractual arrangements between any Debtor and any such Entity, or the Chapter 11 Cases (but excluding, and not releasing, any right to enforce the obligations under the Plan and the other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan), against (A) the Debtors, the Liquidating Debtors, Reorganized Aegis REIT and each of their respective Agents, (B) the Committee and its Agents, and (C) CSFB, UBS, Madeleine, Cerberus and each of their respective Agents.

**E.**     **Optional Discharge of Aegis REIT.**

            In the event the Aegis REIT Maintenance option is selected, except as specifically

provided in this Plan or in the Confirmation Order, effective on the Effective Date, Confirmation

shall discharge Aegis REIT and Reorganized Aegis REIT from any and all Claims including any

Claim of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or

not (i) a Proof of Claim based on such Claim was filed or deemed filed under Section 501 of the

Bankruptcy Code, or such Claim was listed on the Schedules of the Debtor, (ii) such Claim is or

was Allowed under Section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has

voted on or accepted this Plan.  Except as specifically provided in this Plan to the contrary, the

rights that are provided in this Plan shall be in complete discharge of all Claims against and

Liens on the assets and properties of Aegis REIT and Reorganized Aegis REIT.

**F.**     **Injunction.**

            *In implementation of the Plan, except as otherwise expressly provided in the*

*Confirmation Order or the Plan, and except in connection with the enforcement of the terms of*

*the Plan or any documents provided for or contemplated in the Plan, **all Entities who have held,***

***hold or may hold Claims against or Equity Interests in the Debtors or their Estates that arose***

***prior to the Effective Date** are permanently enjoined from: (a) commencing or continuing in any*

*manner, directly or indirectly, any action or other proceeding of any kind against the Debtors,*

*the Liquidating Debtors, Reorganized Aegis REIT, the Estates, or any property of the Debtors or*

*their Estates, with respect to any such Claim or Equity Interest; (b) the enforcement, attachment,*

*collection or recovery by any manner or means, directly or indirectly, of any judgment, award,*

*decree, or order against the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, the*

*Estates, or any property of the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, or the*

*Estates, with respect to any such Claim or Equity Interest; (c) creating, perfecting or enforcing,*

*directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Liquidating*

*Debtors, Reorganized Aegis REIT, the Estates, or any property of the Debtors, the Liquidating*

*Debtors, Reorganized Aegis REIT, or the Estates, with respect to any such Claim or Equity*

*Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of*

*any kind against any obligation due the Debtors, the Liquidating Debtors, Reorganized Aegis*

*REIT, the Estates, or any property of the Debtors, the Liquidating Debtors, Reorganized Aegis*

*REIT, or the Estates, with respect to any such Claim or Equity Interest; and (e) any act, in any*

*manner, in any place whatsoever, that does not conform to or comply with the provisions of the*

*Plan with respect to such Claim or Equity Interest.*

**G.    Post-Confirmation Liability of Responsible Officer and Disbursing Agent.**

The Responsible Officer, the Committee and the Disbursing Agent and their

consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and

the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be

liable for any and all liabilities, losses, damages, claims, causes of action, costs and expenses,

including but not limited to attorneys' fees arising out of or due to their actions or omissions, or

consequences of such actions or omissions, to the Holders of Claims or Equity Interests for any

action or inaction taken in good faith in connection with the performance or discharge of his or

her duties under this Plan, except the Indemnified Parties will be liable for actions or inactions

that are grossly negligent or which constitute willful misconduct. However, any act or omission

taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be

conclusively deemed not to constitute gross negligence or willful misconduct. In addition, the

Liquidating Debtors and the Estates shall, to the fullest extent permitted under applicable law,

indemnify and hold harmless the Indemnified Parties from and against and with respect to any

and all liabilities, losses, damages, claims, costs and expenses, including but not limited to

attorneys' fees arising out of or due to their actions or omissions, or consequences of such

actions or omissions, with respect to the Liquidating Debtors and the Estates or the

implementation or administration of the Plan if the Indemnified Party acted in good faith and in a

manner reasonably believed to be in or not opposed to the best interest of the Liquidating

Debtors and the Estates. To the extent the Liquidating Debtors indemnify and hold harmless the

Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the

Responsible Officer in monitoring and participating in the defense of such claims giving rise to

the right of indemnification shall be paid as Plan Expenses. All rights of the Persons exculpated

and indemnified pursuant hereto shall survive confirmation of the Plan.

**H.      Insurance.**

On or after the Effective Date, the Responsible Officer and the Disbursing Agent

shall obtain a fidelity bond or similar insurance. In addition, the Responsible Officer may obtain

(if available) directors' and officers' liability insurance or errors and omission insurance (or

equivalent insurance), provided that such insurance is available at a reasonable price. The cost

of any fidelity bond or insurance obtained under this Section VIII(H) shall be a Plan Expense.

## ARTICLE IX

## RETENTION OF JURISDICTION

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

9. To hear and determine any and all objections to the allowance of a Claim, actions to equitably subordinate a Claim, or any controversy as to the classification of a Claim in a particular Class under the Plan;

10. To administer the Plan, the Plan Assets, and the Plan Proceeds;

11. To liquidate any Disputed Claims;

12. To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date;

13. To hear and determine any and all motions and/or objections to fix and allow any Claims arising therefrom;

14. To hear and determine any and all applications by Professionals for an award of Professional Fees;

15. To enable the Liquidating Debtors to commence and prosecute any Litigation which may be brought after the Effective Date;

16. To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document or instrument contemplated by the Plan;

17. To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified or vacated;

18.    To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

19.    To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code; and

20.    To close the Chapter 11 Cases when administration of the case has been completed.

## ARTICLE X

## MISCELLANEOUS

### A.    Revocation of Plan of Reorganization.

The Debtors reserve the right, after consultation with the Committee, to revoke and withdraw the Plan at any time on or before the Confirmation Date.  If the Debtors revoke or withdraw the Plan pursuant to this section, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any entity in any further proceedings involving the Debtors.

**B.** **Severability of Plan Provisions.**

In the event that, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**C.** **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware.

**D.** **Exhibits.**

All exhibits attached to this Plan, the Plan Supplement, or the Disclosure Statement, as well as the Assumption Schedule, are, by this reference, hereby incorporated into the Plan. The final version of all Exhibits to the Plan, the Plan Supplement, and the Disclosure Statement will be substantially in the forms attached hereto or thereto. Any Plan Supplement

will be filed with the Bankruptcy Court no later than then (10) days prior to commencement of the Confirmation Hearing. The Debtors reserve the right to make nonsubstantive changes and corrections to such Exhibits in advance of the Confirmation Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

**E.**    **Notices.**

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first class mail or via facsimile with electronic confirmation of receipt as follows:

> If to the Debtors
> (By Mail or Facsimile)
>
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market Street, 17th Floor
> Wilmington, DE 19899-8705 (Courier 19801)
> Tel. 302-652-4100, Fax. 302-652-4400
> Attn: Laura Davis Jones, Esquire
>
> With a copy to the Committee
> (By Mail or Facsimile)
>
> Hahn & Hessen LLP
> 488 Madison Avenue
> New York, NY 10022
> Tel. 212-478-7350, Fax. 212-478-7400
> Attn: Mark T. Power, Esquire

**F.**    **Reservation of Rights.**

Neither the filing of the Plan nor any statement or provision contained in the Plan or in the Disclosure Statement, nor the taking by any party in interest of any action with respect

to the Plan, shall (a) be or be deemed to be an admission against interest, and (b) until the

Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i)

against any other party in interest, or (ii) in any of the assets of any other party in interest, and,

until the Effective Date, all such rights are specifically reserved.  In the event that the Plan is not

confirmed or fails to become effective, neither the Plan nor the Disclosure Statement nor any

statement contained in the Plan or in the Disclosure Statement may be used or relied upon in any

manner in any suit, action, proceeding or controversy within or without these Chapter 11 Cases

involving the Debtors, except with respect to Confirmation of the Plan.

## G.    **Computation of Time Periods.**

In computing any period of time prescribed or allowed by the Plan, the day of the

act, event, or default from which the designated period of time begins to run shall not be

included.  The last day of the period so computed shall be included unless it is a Saturday, a

Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in the Bankruptcy

Court, a day on which weather or other conditions have made the clerk's office inaccessible, in

which event the period runs until the end of the next day which is not one of the aforementioned

days.

## H.    **Defects, Omissions and Amendments.**

The Debtors may, with the approval of the Bankruptcy Court and without notice

to all Holders of Claims or Equity Interests, insofar as it does not materially and adversely affect

Holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and

to such extent as may be necessary or desirable to expedite the execution of the Plan.  The Plan

may be altered or amended before or after Confirmation as provided in Section 1127 of the

Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially

and adversely affect the interests of Holders of Claims, so long as the Plan, as modified,

complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtors has complied

with Section 1125 of the Bankruptcy Code.  The Plan may be altered or amended before or after

the Confirmation Date but, prior to substantial consummation, in a manner which, in the opinion

of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the Plan,

as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code, the Debtors has

complied with Section 1125 of the Bankruptcy Code and, after notice and a hearing, the

Bankruptcy Court confirms such Plan, as modified, under Section 1129 of the Bankruptcy Code.

**I.      Filing of Additional Documents.**

The Debtors shall file with the Bankruptcy Court such agreements or other

documents as may be necessary or appropriate to effectuate and further evidence the terms and

conditions of the Plan.

**J.      Successors and Assigns.**

The rights, benefits and obligations of any entity named or referred to in this Plan

shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators,

successors and/or assigns of such entity.

**K.      Setoffs and Recoupments.**

The Disbursing Agent may, but shall not be required to, set off against or recoup

from the payments to be made pursuant to this Plan in respect of a Claim, any claim of any

nature whatsoever that the Debtors, the Liquidating Debtors, or the Estates, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Liquidating Debtors, or the Estates, against such Holder.

**L.      Securities Exemption.**

Any rights issued under, pursuant to or in effecting this Plan, and the offering and issuance thereof by any party, including without limitation, the Liquidating Debtors, Reorganized Aegis REIT or the Disbursing Agent, shall be exempt from Section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, Section 1145 of the Bankruptcy Code.

**M.      Plan Interest Rate.**

If and to the extent it is determined by the Bankruptcy Court that interest is required to be paid on an Allowed Claim other than as set forth in this Plan, the interest rate to be used shall be determined by the Bankruptcy Court.

**N.      Implementation.**

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

O.    **Record Date.**

　　　　To the extent a record date is required for implementation of this Plan or for

purposes of determining the Entities entitled to receive and vote on the Plan, the record date shall

be (i) pursuant to Bankruptcy Rules 3017(d) and 3018(a), the date of entry of the Bankruptcy

Court's order approving the Disclosure Statement, or (ii)such other date as the Bankruptcy Court

may set.

P.    **Certain Actions.**

　　　　By reason of entry of the Confirmation Order, prior to, on or after the Effective

Date (as appropriate), all matters provided for under the Plan that would otherwise require

approval of directors or stockholders of the Debtors under the Plan, including, without limitation,

(i) the distribution of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and

implementation of all contracts, leases, instruments, releases, and other agreements or documents

related to the Plan, and (iii) the adoption, execution, and implementation of other matters

provided for under the Plan involving the company or organizational structure of the Debtors,

shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as

appropriate), pursuant to the applicable general corporation, limited liability, or partnership law

of the states in which any of the Debtors are chartered, organized or incorporated, without any

requirement of further action by the directors and stockholders of the Debtors.

　　　　Effective upon the Effective Date, each Debtor's Charter shall be deemed

amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required

under Section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Responsible Officer shall be authorized to cancel, annul and extinguish all Consolidated Debtor Equity Interests.

**Q.** **Dissolution of Committee.**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases.  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to Section II(C) of the Plan.

**R.** **Waiver of Ten (10) Day Stay.**

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the ten (10) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the ten (10) day stay of Bankruptcy Rule 6004(g).

Dated: July 12, 2010                    Respectfully submitted,

                                        AEGIS MORTGAGE CORPORATION


                                        By: _____
                                        Its: President


                                        AEGIS WHOLESALE CORPORATION


                                        By: _____
                                        Its: President


                                        AEGIS LENDING CORPORATION


                                        By: _____
                                        Its: President


                                        AEGIS CORRESPONDENT CORPORATION


                                        By: _____
                                        Its: President


                                        AEGIS FUNDING CORPORATION


                                        By: _____
                                        Its: President


                                        AEGIS MORTGAGE LOAN SERVICING
                                        CORPORATION


                                        By: _____
                                        Its: President


*Signature Pages to Plan*

SOLUTIONS SETTLEMENT SERVICES OF
AMERICA CORPORATION

By: _Michael C. Balog_

Its: _President_

SOLUTIONS TITLE OF AMERICA CORPORATION

By: _Michael C. Balog_

Its: _President_

AEGIS REIT CORPORATION

By: _Michael C. Balog_

Its: _President_

Submitted by:

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
Henry C. Kevane (CA Bar No. 125757)
David M. Bertenthal (CA Bar No. 167624)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Counsel for Debtors and Debtors in Possession

*Signature Pages to Plan*

# EXHIBIT A

## EPD/BREACH CLAIM PROTOCOL

I.    **EPD/FPD Claims**.

EPD and FPD Claims are Claims based on a provision in a loan purchase agreement that obligated a Debtor to repurchase a loan if the borrower defaulted on his or her first loan payment after the loan was sold (a First Payment Default or "FPD"), or defaulted on a payment due within a period of time (usually 30 or 60 days) after the loan was sold (an Early Payment Default or "EPD"). The loan purchase agreements varied as to whether the EPD/FPD provision was set forth as a standalone provision of the agreement or was styled as a representation or warranty. A Claim based on either is treated as an EPD/Breach Claim for purposes of this protocol.

Each Creditor that establishes a valid EPD or FPD provision under the applicable loan purchase agreement will receive a distribution under the Plan premised upon damages assessed based upon the borrower payment history and the unpaid principal balance ("UPB") for the loan, in both cases measured as of August 31, 2007, according to the following grid:[1]

- Current:  5% of UPB
- 31 – 60 days delinquent:  15% of UPB
- 61 – 90 days delinquent:  20% of UPB
- 91 or more days delinquent:  30% of UPB
- Borrower in bankruptcy:  35% of UPB
- In foreclosure[2]:  40% of UPB
- Real estate owned (including liquidations of such real estate )("REO"):  45% of UPB
- Second liens:  70% of UPB

---

[1] The applicable category that would lead to the highest calculation takes precedence. For example, if as of 8/31/07 a loan was 61 days delinquent and the borrower was in bankruptcy, the applicable percentage is 35% of UPB.

[2] In foreclosure means that the period set in a notice of intent to foreclosure during which the borrower has the ability to bring the loan current has expired.

If the Creditor sold the loan prior to August 31, 2007, and does not know the loan status as of August 31, 2007, the damage assessment will be measured as of the date of sale. If a loan has been foreclosed, the measurement will consider the property to be REO and the measurement will be based on the UPB at the time of foreclosure.

If subsequent to the sale of the loan by a Debtor and prior to August 31, 2007, the borrower and the owner of a loan agreed to modify the payment (principal or interest) terms of the loan, then the loan will be treated under the next most severe category in the grid. For example, if a Creditor and borrower agreed in April 2007 to relax the borrower's payment obligations under a loan, and on August 31, 2007, the borrower was current on the modified schedule, this loan will be treated as though the borrower was 31 – 60 days delinquent. Similarly, if on August 31, 2007, that same borrower was 40 days delinquent under the modified payment schedule, the loan will be treated as though the borrower was 61 – 90 days delinquent.

In order to establish the validity of the EPD/FPD Claim and to apply the grid, each EPD/FPD claimant must provide to the Debtors the information requested set forth in the EPD/Breach Claim Questionnaire for those loans on which it asserts an EPD/FPD claim. This information includes:

- The payment history for each loan for which an EPD or FPD is asserted in electronic format, including identification of the payment status as of August 31, 2007.

- Identification of the loan purchase agreement pursuant to which the loan was sold by a Debtor, including a copy of the relevant EPD/FPD payment provisions (note: the length of time for EPD and FPD claims varied among the master loan purchase agreements).

II.      **Breach Claims**.

    A.      <u>Methodology</u>.

        The damages resulting from breach Claims will be calculated based upon the simplifying assumptions that: (i) .478% of the loans in any pool will at some point be subject to a breach that would have caused the selling Debtor to have repurchased the loan, (ii) the "seasoning" of loans will be taken into account so that this .478% incidence is spread over the life of the pool based on the Debtors' historic data concerning the timing of when breach claims are asserted, and (iii) damages resulting from breaches will be set at 28% of the UPB of the loan as of August 31, 2007.  The following table sets forth the calculation methodology based on the quarter when the Debtors transferred or sold the applicable mortgage loans:

| Year | Quarter | % Incidence | Damages |
|------|---------|-------------|---------|
| 2007 | 1 Qtr | .478% | 0.1338% |
| 2006 | 4 Qtr | .382% | 0.1071% |
| 2006 | 3 Qtr | .357% | 0.0999% |
| 2006 | 2 Qtr | .271% | 0.0758% |
| 2006 | 1 Qtr | .217% | 0.0607% |
| 2005 | All Qtrs | .096% | 0.0270% |
| 2004 | All Qtrs | .026% | 0.0069% |
| 2003 | All Qtrs | .013% | 0.0035% |

        If an applicable loan purchase agreement between a Debtor and a non-affiliate of the Debtors did not contain an EPD provision, but did allow the purchaser to cause a Debtor to repurchase loans based on breaches of other types of representations and warranties, the damage calculations set forth in the foregoing table will be multiplied by 1.68.

        Damages, for purposes of distributions under the Plan, will be measured by applying the percentage factor in the final column of this table against the August 31, 2007 UPB of the loans purchased from a Debtor; provided, however, that in no case will the damage calculation for any pool be less than $5,000.

If the Creditor sold the loan prior to August 31, 2007, and does not know the UPB as of August 31, 2007, the damage assessment will be based on the UPB as of the date of sale. If a loan has been foreclosed, the measurement will be based on the UPB at the time of foreclosure. Loans that were paid-in-full or repurchased or replaced by one of the Debtors shall not be included in measuring the applicable UPB.

B.      Interaction with EPD/FPD Claims.

EPD/FPD claims will take precedence over breach claims. Thus, to the extent that a creditor establishes a valid EPD or FPD claim for a loan, that loan's UPB as of August 31, 2007 will be subtracted from the pool of loans for which breaches are computed.

This methodology is designed to avoid the need to resolve disputes over individual breach claims that are presently being asserted and to establish a methodology for assessing unliquidated claims based upon breaches that come to the fore when borrowers default in the future. Accordingly, this statistical approach will be used both with respect to individual breach claims presently being asserted by creditors and to assess unliquidated breaches to be discovered in the future; both types of breaches are subsumed within the statistical analysis set forth above.

III.    **Information**.

In order to receive a distribution under the Plan, each Holder of an EPD/Breach Claim (Submitted) must supply information to the Debtors that enables the Debtors to calculate the damages that result from this protocol and to ensure that multiple creditors are not asserting overlapping claims. That information will be set forth in the EPD/Breach Claim Questionnaire that the Debtors will submit to each Creditor that has asserted an EPD/Breach Claim.