# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEGIS MORTGAGE CORPORATION, et al.,[1] | ) | Case No. 07-11119 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**Objection Deadline: August 10, 2010 at 4:00 p.m. E.T.**
**Hearing Date: August 17, 2010 at 2:45 p.m. E.T.**

## MOTION OF THE DEBTORS FOR AN ORDER
## (A) APPROVING SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO SECTIONS 105 AND 363(b), (f) AND (m) OF THE BANKRUPTCY CODE; (B) APPROVING RELIEF RELATED TO ASSUMPTION OF LIABILITIES; (C) APPROVING CERTAIN BID PROTECTIONS; AND (D) GRANTING RELATED RELIEF

The above captioned debtors and debtors-in-possession ("Aegis" or the

"Debtors") hereby move this Court for entry of an order (A) Approving Sale of Certain Assets

Free and Clear of All Liens, Claims and Encumbrances Pursuant to Sections 105 and 363(b), (f)

and (m) of the Bankruptcy Code; (B) Approving Relief Related to Assumption of Liabilities; (C)

Approving Certain Bid Protections; and (D) Granting Related Relief (the "Motion").  By this

Motion, the Debtors seek authority (a) to sell certain assets of one of the Debtors and a non-

debtor subsidiary to, and to provide for the assumption of certain liabilities by, Chotin

Acquisition Company LLC ("Chotin", or an affiliate of Chotin designated by Chotin,[2] together

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Aegis Mortgage Corporation (9883); Aegis Wholesale Corporation (9888); Aegis Lending Corporation (9884); Aegis Correspondent Corporation (0359); Aegis Funding Corporation (9886); Aegis Mortgage Loan Servicing Corporation (0515); Solutions Settlement Services of America Corporation (6879); Solutions Title of America Corporation (7045); and Aegis REIT Corporation (3436).  The address for all Debtors is 11381 Meadowglen, Ste. 1, Houston, TX 77042.

[2]  Chotin has identified Spyridon Financial Corporation, a Delaware corporation, a REIT (as defined below) and an entity in which Chotin owns all of the common stock, as a possible designee.

with Chotin, the "Buyer"), and (b) to deem those portions of the Certificate Trustees' (as defined herein) claims filed in these cases that may constitute Released Claims (as defined herein) to be withdrawn with prejudice.  In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2).

2.     Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 105 and 363 of the Bankruptcy Code, Rules 2002(a)(2), 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Summary of Relief Requested

4.     By this Motion, the Debtors seek approval of the sale (the "Sale") of certain assets (the "Purchased Assets") described in Section 2.1(a) of an asset purchase agreement (the "Agreement") between Debtor Aegis Mortgage Corporation ("AMC") and its non-debtor subsidiary Aegis Equity Holding Corporation ("AEHC" and, together with AMC the "Sellers") and the Buyer, free and clear of liens, claims and encumbrances (collectively "Interests") in accordance with sections 105 and 363 of the Bankruptcy Code.  A copy of the

Agreement, in substantially final form, is attached hereto as <u>Exhibit A</u>.[3]  An executed copy of the Agreement will be filed with the Court prior to the hearing on the Sale.

5.    The proposed Sale was negotiated over an extensive period of time in consultation with the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the "<u>Committee</u>").  The Committee supports the relief requested in this Motion because the Committee believes it will provide certainty to creditors in resolving what it believes is the last major hurdle in these cases, thereby permitting the Debtors to proceed with confirmation of a consensual plan.

6.    The Sale provides for a payment by the Sellers to the Buyer which, if approved and consummated, will benefit the estate by enabling the Sellers to be relieved of significant liabilities and ongoing obligations as more fully described below.  In addition, the transfer of the Purchased Assets to an entity that is (a) a "real estate investment trust" within the meaning of Section 856 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") (such entity, a "<u>REIT</u>"), (b) a "qualified REIT subsidiary" within the meaning of Section 856(l) of the Code (a "<u>Qualified REIT Subsidiary</u>"), or (c) an entity owned by a REIT that is disregarded for U.S. federal income tax purposes (a "<u>Disregarded Entity</u>") (any of a REIT, a Qualified REIT Subsidiary, or a Disregarded Entity, a "<u>Qualified REIT Entity</u>"), in each case controlled by Chotin, subject to the entry of the proposed order submitted in connection with this Motion, will also provide for portions of certain claims filed against the estate to be deemed withdrawn and the Debtors' ongoing liability with respect to the Assumed Liabilities as defined in section 2.1(c)

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Agreement.

of the Agreement to be eliminated. The qualification of an entity as a Qualified REIT Subsidiary or as a Disregarded Entity is, among other things, dependent upon a direct or indirect parent entity of either such entity qualifying as a REIT.

7.       The Debtors own certain assets which can only be owned by a Qualified REIT Entity. The retention of certain of the Purchased Assets (the "REIT Sensitive Assets") by the Debtors or their affiliates will require the Debtors to incur substantial expenses and performance obligations over a long period of time and will require the Debtors to maintain status as Qualified REIT Entity. The Debtors also have determined that if the Qualified REIT Entity status of the current owner of the REIT Sensitive Assets is not maintained, certain large unsecured claims potentially could be triggered as a result of a breach of representations and other obligations relating to the maintenance of Qualified REIT Entity status by the relevant Seller entities.[4] In order to relieve the Debtors of the substantial expense related to performing the obligations tied to the Purchased Assets (including the REIT Sensitive Assets) and the corresponding obligation to maintain the Qualified REIT Entity status of the owner of the REIT Sensitive Assets and to perform related obligations, which could entail significant expense over a lengthy period, and to avoid the risk that certain large unsecured claims may be triggered for failure to maintain Qualified REIT Entity status and to perform related obligations, the Debtors and certain non-debtor subsidiaries found a buyer to acquire the Purchased Assets. The Buyer will relieve the Debtors and certain non-debtor subsidiaries of these obligations and assume them as Assumed Liabilities under the Agreement.

---

[4] Certain of the Purchased Investment Certificate Trustees (the "Certificate Trustees") have filed claims in these cases which potentially assert, at least in part, contingent claims which could be construed to include claims of this nature.

8.     The major economic benefit to the Debtors and certain non-debtor subsidiaries will be the assumption of the Assumed Liabilities and the deemed withdrawal of certain Released Claims (as defined herein) contemplated by the proposed order approving the Sale. Pursuant to the Agreement, the Sellers will pay $2,205,000 to the Buyer (as described in more detail herein below) to be relieved of the burden of retaining the Purchased Assets and the obligations that go with them.

9.     The Debtors believe that the Qualified REIT Entity status of the current owners of the REIT Sensitive Assets has been maintained for all relevant times and no such maintenance claims should currently exist nor will such claims exist in the future because the Buyer is assuming the obligations at issue, assuming the Sale is approved. Because this Sale avoids the triggering of any such claims against the Seller in the future, as part of this Sale, the Debtors seek an order that will (A) deem those portions of the Certificate Trustees' claims filed with respect to the Released Claims (as defined herein) (and any other Assumed Liabilities, as defined in the Agreement) to be withdrawn with prejudice but without effecting the balance of the Certificate Trustees' claims and (B) release the Debtors and certain non-debtor subsidiaries from any liability arising in the future with respect to any Assumed Liability.

10.    In addition, the Debtors seek an order approving certain bid protections for the Buyer in the form of a Break-Up Fee and reimbursement of certain expenses in the event that a transaction in respect of a Superior Offer (as defined in the Agreement) is consummated.

11.    The Debtors also request authority pursuant to Section 363(b) of the Bankruptcy Code to pay a Surety Bond Premium (as defined herein below) and certain expenses incidental to approval of the contemplated Sale.

12. In short, if the Sale is approved as proposed, the Purchased Assets will be conveyed to the Buyer, a portion of certain pending claims will be deemed withdrawn and the Debtors will be relieved of any current or future exposure on the Assumed Liabilities.

13. The Debtors submit that the Sale represents a significant economic benefit to the Debtors and their estates.

### Background

14. Prior to filing for bankruptcy, the Debtors and their non-debtor affiliates were a full service residential mortgage company with lending operations in 29 states and offices in 24 states. As of August 1, 2007, the Debtors employed approximately 1,302 employees who, depending upon their location, worked at the Debtors' corporate headquarters in Houston, Texas, or at 33 branches located throughout the nation. At the close of July 2007, the Debtors generated approximately $800 million in monthly loan originations and were servicing, and/or interim servicing, approximately $3.6 billion of mortgage loans.

15. Prior to the close of business on August 3, 2007, a portion of the Debtors' business involved loans to borrowers with good credit scores, with a majority of the Debtors' business involved in the origination of wholesale loans to borrowers with credit scores below what is required to obtain a prime loan (the "Alt A Loans") and borrowers with lesser credit scores generally identified as "sub-prime." These sub-prime borrowers generally are unable to obtain financing from traditional banks or savings and loan associations. In addition, the Debtors also originated retail loans through a call center located in Baton Rouge, Louisiana.

16. Extreme changes in market conditions, coupled with the rapid decline in the secondary mortgage market severely impacted the Debtors' operations. In particular, in

2007, the Debtors experienced significant increases in early payment defaults upon their loans, and a corresponding increase in the number of repurchase requests submitted to the Debtors as a result of such defaults, which siphoned cash away from the Debtors. Moreover, as the value of the loans declined on an accelerated pace, as set forth in detail below, substantial demands were made on the Debtors for an unprecedented amount of capital calls which were due and payable on August 3, 2007. After a thorough review of the Debtors' capacity to meet the significantly expanded capital requirements and the lack of liquidity in the markets, the Debtors were forced to cease all mortgage origination activity after the close of business on August 3, 2007.

17.     On Monday, August 6, 2007, the Debtors advised their employees that they had ceased originations of mortgage loans. As a result of the cessation of the mortgage loan origination business, the Debtors were compelled to terminate approximately 782 of their employees on August 7, 2007.

18.     After the Debtors had already voluntarily stopped all loan originations, the State of Connecticut Department of Banking issued a cease and desist order on August 8, 2007, pursuant to which the Debtors were, among other things, ordered to stop making further loans.[5]

19.     As a result of the above-noted rapid and devastating market changes and events, the Debtors were not able to develop plans or raise sufficient capital that would have allowed the Debtors to continue their ordinary operations. The Debtors, therefore, sought bankruptcy protection by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on August 13, 2007 (the "Petition Date").

---

[5] Similar actions were taken by Massachusetts, California, Iowa and Tennessee.

20.     On August 24, 2007, the Office of the United States Trustee appointed the Committee.

### **Prepetition Business Operations**

21.     Prior to the Petition Date, the Debtors had 3 main components to their business: (1) wholesale loan originations; (2) retail loan originations; and (3) loan servicing.

22.     <u>Wholesale Loan Originations</u>.  The largest and most profitable component of the Debtors' business was their wholesale loan originations, wherein the Debtors worked with a network of independent mortgage brokers to provide financing for consumer borrowers on Alt A and sub-prime residential loans.  The Debtors originated prime wholesale loans, Alt A wholesale loans and sub-prime retail and wholesale loans to consumer borrowers who were unable to qualify for prime lending on residential mortgages.

23.     <u>Retail Loan Originations</u>.  In addition to originating wholesale loans through mortgage brokers, the Debtors also originated retail loans directly to consumers through the use of a call center located in Baton Rouge, Louisiana (the "<u>Call Center</u>").  Potential borrowers would contact the Call Center to ascertain if they were eligible for receiving mortgage loans.  The Call Center would take the information necessary to prepare a loan application and, if the potential borrower qualified for a loan, would then direct the potential borrower to the nearest branch office for closing upon the loan.  The Debtors discontinued their retail loan operations in July 2007.

24.     <u>Loan Servicing</u>.  Finally, the Debtors provided loan servicing as set forth above.

25.     The Debtors also established Aegis REIT Corporation ("Aegis REIT"), a Maryland real estate investment trust.  Aegis REIT owns all of the equity in AEHC, a Delaware corporation, and, therefore AEHC is a Qualified REIT Subsidiary of Aegis REIT.  AEHC is not a Debtor.  Aegis REIT and certain significant shareholders of Aegis REIT (Debtors Aegis Correspondent Corporation, Aegis Funding Corporation and Aegis Lending Corporation), prepetition made contractual commitments to creditors and other parties that did business with AEHC to maintain its status as a Qualified REIT Entity.

### The Debtors' Marketing Efforts Prepetition and Prior Asset Sales

26.     Prior to filing these cases, the Debtors marketed the Purchased Assets extensively as part of a larger asset sale which also included all of the Debtors' mortgage servicing rights and licenses.  The larger sale was not concluded prepetition.  Postpetition, the Debtors have sold their mortgage servicing platform and certain mortgage servicing rights.

27.     During the prepetition period, the Debtors engaged the firm of PiperJaffray ("PJ") to market certain of the Debtors' assets including the Purchased Assets.  PJ initially identified 111 parties including hedge funds, private equity groups, mortgage servicers/service providers, banks/mortgage companies and investment banks as potential purchasers and notified those parties of the availability of the assets in question for purchase.  After the initial contact, 52 parties expressed some interest and received basic information and a request to enter into confidentiality agreements.  Thirty-one parties entered into confidentiality agreements and received a confidential memorandum detailing the assets available for sale.  As of June 28, 2007, eight parties submitted an indication of interest and an additional three parties indicated they were likely to submit an indication of interest.

28.   After June 28, 2007, the Debtors and PJ worked with various interested parties but only one party submitted a bid for certain assets of the Debtors not including the Purchased Assets.

29.   The Debtors, with the assistance of their investment bankers in these cases, Phoenix Capital, Inc., marketed certain of their assets including the Purchased Assets extensively after the Petition Date. Phoenix Capital, Inc. initially identified 85 parties including hedge funds, private equity groups, mortgage servicers/service providers, banks/mortgage companies and investment banks as potential purchasers and notified those parties of the availability of the Purchased Assets for purchase. After the initial contact, 25 parties entered into confidentiality agreements and received a confidential memorandum detailing the assets including the Purchased Assets available for sale. Of those, 25 parties undertook some due diligence investigation of the Debtors' assets. The Debtors did not receive a satisfactory offer for the purchase of the Purchased Assets as a result of that effort.

30.   After that effort concluded, the Debtors continued to look for possible alternatives for disposition of the Purchased Assets. At the time the Debtors were marketing the Purchased Assets, there was very little interest in such assets and the Debtors determined that the Purchased Assets had very little value if any. Since the Petition Date, the Debtors continued to work to locate a purchaser of the Purchased Assets. The Debtors found that the Buyer was willing to propose a suitable arrangement which will provide a significant economic benefit to the Debtors, their estates and certain non-debtor subsidiaries.

31.   This Court approved three prior significant asset sales in these cases: (i) the sale of certain assets associated with the Debtors' loan servicing platform (Docket No.

218); (ii) the sale of certain mortgage servicing rights owned by the Debtors (Docket No. 1980); and (iii) the sale of certain securitization advances owned by the Debtors (Docket No. 5078). Additionally, the Court approved certain smaller sales and established procedures for de minimis asset sales.

**Relief Requested**

32.    The Debtors seek the Court's approval of the Sale free and clear of all Interests pursuant to sections 105 and 363 of the Bankruptcy Code. The Debtors also seek approval of certain bid protections for the Buyer. In addition, the Debtors seek an order authorizing assumption of the Assumed Liabilities, barring all parties in interest from asserting any claims against the Debtors and their non-debtor affiliates with respect to the Assumed Liabilities and deeming the Released Claims filed in these cases by the Certificate Trustees against the Debtors and their affiliates to be withdrawn with prejudice. For avoidance of doubt, this Motion, and the order sought in connection with this Motion, are not intended to address or affect claims other than the narrowly defined Released Claims. Finally, the Debtors seek authority pursuant to Section 363(b) of the Bankruptcy Code to pay a Surety Bond Premium (as defined herein below) which will be required to close on the contemplated Sale, and certain expenses incidental to obtaining Court approval of the Sale.

**Terms of the Sale**

**Purchased Assets and Assumed Liabilities**

33.    The Sellers propose to sell and the Buyer agrees to purchase the following Purchased Assets (more fully described in section 2.1 of the Agreement):

a.     all of the issued and outstanding shares of the capital stock of Aegis Investments Corporation (the "AIC Shares"),

b.     the AEHC Purchased Investment Certificates, and

c.     the minute books, stockholder and transfer records, Tax Returns and accounting records of AIC and the AIC Purchased Investment Certificates.

34.     In addition, at the Closing, upon the terms and subject to the conditions of the Agreement, the Buyer agrees to assume the following liabilities and obligations to the extent such liabilities or obligations relate to the Purchased Assets which are transferred and assigned to Buyer (or its designee) (the "Assumed Liabilities", as more fully described in section 2.1(c) of the Agreement):

a.     All liabilities and obligations of AIC except for any liabilities which AIC owed to any of its Affiliates prior to the Closing (such intercompany liabilities, if any, will be released by such Affiliates immediately prior to the Closing); and

b.     All Purchased Investment Certificate Obligations other than those arising due to acts, omissions or misrepresentations occurring prior to, or applicable to periods prior to, the Closing.

35.     The consideration provided to the Sellers for the Purchased Assets (and the Cash Payment described below) shall be the assumption of the Assumed Liabilities by the Buyer.

36.     Subject to the terms and conditions of the Agreement, in consideration of the assumption of the Assumed Liabilities by the Buyer, the Sellers shall at the Closing (i) transfer, assign, convey and deliver the Purchased Assets to Buyer and (ii) pay to Buyer by wire transfer in immediately available funds, $2,205,000 (the "Cash Payment").

37.     Each of the Buyer and the Sellers are also making certain representations and warranties and entering into certain covenants and agreements under the Agreement.  For further description of the terms of the Sale, please consult the proposed form of the Agreement which is attached hereto as Exhibit A.  The Sellers' representations expire upon the closing of the Sale.

## Break-Up Fee

38.     The Agreement is being entered into by the Sellers and the Buyer with the express understanding that it is subject to approval of the Bankruptcy Court and all applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the Local Rules.

39.     In accordance with section 9.2 of the Agreement, if the Sellers terminate the Agreement because they consummate a transaction in respect of a Superior Offer (as defined in the Agreement), the Sellers shall pay the Buyers a break-up fee (the "Break-Up Fee") of $50,000.00 and reimburse the Buyer for up to $100,000.00 of the reasonable and documented expenses (the "Expense Reimbursement") of the Buyer.

## Withdrawal of Released Claims

40.   In connection with approval of the Sale, the Debtors also seek to have the Released Claims (as defined herein below) filed in the Bankruptcy Case deemed withdrawn with prejudice.

41.   The Certificate Trustees have asserted claims in the Bankruptcy Case, and in the bankruptcy cases of certain other Affiliates of the Sellers who are debtors in cases jointly administered with the Bankruptcy Case, that could be construed to include claims with respect to, or based upon, the non-maintenance by AEHC (or any of the Sellers or their affiliates) of the requirement that AEHC (or any of the Sellers or their affiliates), as the holder of certain Purchased Investment Certificates, be a Qualified REIT Entity through the date of transfer to Buyer.

42.   Upon the transfer of the Purchased Assets to Buyer, and assumption of the Assumed Liabilities by Buyer, the Sellers, their Affiliates and their estates are relieved from the Assumed Liabilities, including any liability or obligation relating to any acts, omissions or misrepresentations by the Buyer, including without limitation any claim by a Certificate Trustee or any other party in interest, based upon or relating to the Assumed Liabilities. Each of the four Certificate Trustees has received full and adequate notice of the relief sought by this provision of the Motion and the Sale Order.[6]

---

[6] Prior to filing the Motion the Debtors provided copies of the Motion and the proposed Sale Order to the Certificate Trustees.  Certain of the Certificate Trustees provided comments to the Motion or Sale Order and those comments have been discussed and the Motion and Sale Order have been modified to include certain of the comments provided.

43.     Upon the Closing of the transactions contemplated by the Agreement, the Buyer shall be solely liable for the payment and performance of the Assumed Liabilities, and the Sellers and their Affiliates are relieved from any liability or obligation, present or future, in any way relating to, involving, referring to, arising out of, or based upon, directly or indirectly, the Purchased Investment Certificate Obligations, including as a result of any failure by the Buyer or any holder of any Purchased Investment Certificate (including the Sellers and their Affiliates prior to the Closing) (i) to pay or perform (or to cause to be paid or performed) any Purchased Investment Certificate Obligation; (ii) to comply with the representations and covenants required to be made by a transferee in the applicable transfer documents for each Purchased Investment Certificate; or (iii) to establish or maintain its qualification as a Qualified REIT Entity (the claims described in paragraph 41 and the liabilities or obligations described in paragraph 42 and this paragraph 43 are defined collectively as the "Released Claims").

44.     Based on the evidence presented to it at the hearing pertaining to the Sale, the Debtors request that the Court find that no present basis for any such Released Claims exists, that pursuant to the assumption of the Assumed Liabilities by the Buyer neither the Sellers nor their Affiliates shall have any liability on account of any such Released Claims in the future, and that such Released Claims against the Sellers and their affiliates (including any related contingent/unliquidated claims related thereto) shall be deemed withdrawn by each of the Certificate Trustees with prejudice, effective upon the transfer to Buyer of the Purchased Investment Certificate Contracts.

## Lost Certificates & Incident Expenses

45.    In accordance with Section 2.2 of the Agreement, the Sellers must deliver to the Buyer the Purchased Assets which are the subject of the Sale.  Two of the Purchased Investment Certificates to be delivered with the Purchased Assets, however, have been lost and must be replaced.  They are: AIC Certificate No. R-1 originally issued in 2004 for Aegis Asset Backed Securities Trust 2004-5 ("AABST 2004-5") and AEHC Ownership Certificate No. 1 originally issued in 2005 for Aegis Asset Backed Securities Trust 2005-1 ("AABST 2005-1") (AIC Certificate No. R-1 and AEHC Ownership Certificate No. 1 are referred to together as the "Lost Certificates").

46.    Under the transaction documents which govern the Purchased Investment Certificates, the Sellers can obtain replacement Purchased Investment Certificates for the Lost Certificates.  Typically, a party requesting a replacement certificate would be obligated to provide appropriate documentation and a surety bond to each of the applicable Certificate Trustees (or certificate registrars).   In this instance, the Sellers can provide the documentation necessary and the Sellers and the Buyer have arranged with the Surety (defined below) to provide the surety bond.

47.     In consideration of the issuance of the surety bonds, the Sellers must pay a bond premium (the "Surety Bond Premium") to ACE Indemnity Insurance Company (the "Surety") in the amount of not more than $200,000.00.  The Debtors also request authorization to pay certain expenses incidental to obtaining Court approval of the Sale including, but not limited to any additional noticing costs (the "Incidental Expenses").  The Debtors request authority from the Court pursuant to Section 363(b) of the Bankruptcy Code to pay the Surety Bond Premium in an amount of not more than $200,000.00 and to pay the Incidental Expenses.

## Notice to Investors

48.     The Certificate Trustees have agreed to or may provide notice of this Motion to the investors in the applicable securitizations (the "Investors").  Based on the Certificate Trustees' provision of notice of this Motion to the Investors, the Certificate Trustees also request that the Investors be barred from asserting claims against the Certificate Trustees with respect to the Motion, including but not limited to the relief sought herein and the withdrawal of the Released Claims.  A suggested form of notice is attached hereto as <u>Exhibit B</u>. In order to obtain the relief requested by the Certificate Trustees, the Certificate Trustees will provide notice to the Investors substantially in the form of Exhibit B and will file with the Court prior to the date of the hearing on the Sale evidence (which may be in the form of an affidavit) of delivery of such notice.

## Provisions to Highlight in the Bidding Procedures and Sale

49.     In accordance with Local Rule 6004-1 (b) and (c), the Debtors highlight the following provisions in the Bidding Procedures and request approval of them as proposed:

**Break-Up Fee and Expense Reimbursement**: The motion seeks approval of a Break-Up Fee of $50,000.00 and Expense Reimbursement of up to $100,000.00 if a transaction in respect of a Superior Offer is consummated.

**Proceeds/Good Faith Deposit**. The Sale is not expected to yield any proceeds and a good faith deposit was not required of the Buyer. If approved and consummated, the Sale will yield substantial economic benefit to the Debtors and certain non-debtor subsidiaries by alleviating ongoing expense and avoiding the triggering of potentially large unsecured claims against the estate.

**Private Sale**: A private sale is contemplated.

**Releases**: If approved, the Agreement and the Sale Order ( ¶¶ 12 - 14) contain certain provisions that would deem certain claims filed in these cases withdrawn in part. In addition, the Debtors and certain non-debtor subsidiaries would be released from any future liabilities and/or obligations with respect to the Assumed Liabilities as well as any claims based upon such future liabilities/obligations.

### Approval of the Sale

50.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

51.     A sale of the Debtors' assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996), citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R.

396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value. 124 B.R. at 176.

52.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

53.     The Debtors have articulated sound business reasons for a sale of the Purchased Assets. The Debtors are liquidating their assets and have no continuing need to retain the Purchased Assets. In fact, the Sellers' retention of the Purchased Assets requires significant expenditures by the Debtors to, among other things, maintain the relevant Seller's status as a Qualified REIT Entity. Further, if there was a failure by the owner of the REIT Sensitive Assets to maintain its Qualified REIT Entity status there could be substantial claims asserted against the Debtors on account of such failure and related to the breach of certain representations made in connection with the establishment of the relevant trusts for which the Certificate Trustees are trustees.

54.     To eliminate the expense of maintaining Qualified REIT Entity status and
to avoid the risk of failing to maintain Qualified REIT Entity status and the possible
consequences of such failure, the Debtors propose that the Sellers convey the Purchased Assets
to the Buyer, and the Buyer assume the Assumed Liabilities, and the Sellers are willing to pay
the Cash Payment as an inducement for the transaction.  The Buyer has also covenanted to
maintain its Qualified REIT Entity status as follows:

> Buyer covenants that, for so long as it or its Affiliate holds any
> Purchased Investment Certificate that requires the holder thereof to
> maintain its qualification as a REIT, a Qualified REIT Subsidiary
> or a Disregarded Entity (as each such term is defined in the
> applicable Purchased Investment Certificate Contracts), Buyer or
> such Affiliate shall maintain its qualification as a REIT, a
> Qualified REIT Subsidiary or a Disregarded Entity, as the case
> may be. (Agreement ¶ 5.12)

55.     In the exercise of their business judgment, the Debtors have determined
that the benefits to the Debtors and the Sellers warrant the payment to the Buyers of the Cash
Payment and that the Sale is in the best interest of the Debtors' estates and their creditors.  The
Committee agrees with this assessment and supports the Sale as proposed in this Motion.

56.     Accordingly, the Debtors request approval of the Sale under Bankruptcy
Code sections 363(b) and 105.

### The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Interests

57.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section
> free and clear of any interest in such property of an entity other than the
> estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

58. Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *See Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only <u>in rem</u> interests in Acquired Assets," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the Acquired Assets." *Id.* at 258 (*citing* 3 *Collier on Bankruptcy* 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258; *See also, In re TWA*, 322 F. 3d 283, 289-290 (3d Cir. 2003) (permitting unsecured claims to follow the assets into the hands of the purchaser under

successor liability theory would amount to reordering of priorities and would be inconsistent with the statute.)

59.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Purchased Assets free and clear of all Interests, except with respect to any Interests that are Assumed Liabilities under the Agreement.  *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).  The Debtors submit that each Interest that is not an Assumed Liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code[7].  The Debtors accordingly request authority to convey the Purchased Assets to the Buyer free and clear of all Interests.

60.     Accordingly, this Court should approve the sale of the Purchased Assets to the Buyer free and clear of Interests under Bankruptcy Code section 363(f) other than the Assumed Liabilities.

### Good Faith Under Section 363(m) of the Bankruptcy Code

61.     Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a Buyer act in good faith ...speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the

---

[7] The Debtors are unaware of any liens asserted against the Purchased Assets.

misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

62.     The Agreement was negotiated at arm's length between the parties. The Debtors' intend to make an appropriate showing at the sale hearing that the Agreement was a negotiated, arm's-length transaction, in which the Buyer acted in good faith in compliance with the *Abbotts Dairy* standards. The Debtors thus request that the Court find that the Buyer has purchased the Purchased Assets in good faith.

### The Provisions of the Sale Order with Respect to the Assumed Liabilities and Certain Claims Being Deemed Withdrawn Are Consistent in all Respects with Prior Precedent

63.     The proposed sale order contains the following provisions:

11. The portion of the Certificate Trustees' asserted claims in the Bankruptcy Case, and in the bankruptcy cases of certain other Affiliates of the Sellers who are debtors in cases jointly administered with the Bankruptcy Case, that could be construed to include claims with respect to, or based upon, the non-maintenance by AEHC (or any other of the Sellers or their Affiliates) of the requirement that AEHC (or any other of the Sellers or their Affiliates), as holder of certain Purchased Investment Certificates, be a REIT, a Qualified REIT Subsidiary or a Disregarded Entity (each as defined in the relevant Purchased Investment Certificate Contracts, and each a "Qualified REIT Entity") shall be deemed withdrawn with respect to all Sellers and their Affiliates by each Certificate Trustee with prejudice, effective upon the transfer to Buyer of the Purchased Assets. The Certificate Trustees received full and adequate notice of the relief sought by this provision of this Sale Order.

12. Upon the transfer of the Purchased Assets to Buyer, and assumption of the Assumed Liabilities by Buyer, the Sellers, their Affiliates and their estates are relieved from the Assumed

Liabilities, including any liability or obligation relating to any acts, omissions or misrepresentations by the Buyer with respect to such Assumed Liabilities, including without limitation any such claim by a Certificate Trustee or any other party in interest, based upon or relating to the Assumed Liabilities. The Certificate Trustees received full and adequate notice of the relief sought by this provision of this Sale Order. The Debtors release the Certificate Trustees from any claim they may have with respect to the Assumed Liabilities.

13. Upon the Closing of the transactions contemplated by the Agreement, Buyer shall be solely liable for the payment and performance of the Assumed Liabilities and the Sellers and their Affiliates are relieved from any liability or obligation, present or future, in any way relating to, involving, referring to, arising out of, or based upon, directly or indirectly, the Purchased Investment Certificate Obligations, including as a result of any failure by the Buyer or any holder (including the Sellers and their Affiliates prior to the Closing) of any Purchased Investment Certificate (i) to pay or perform (or to cause to be paid or performed) any Purchased Investment Certificate Obligation; (ii) to comply with the representations and covenants required to be made by a transferee in the applicable transfer documents for each Purchased Investment Certificate; or (iii) to establish or maintain its qualification as a Qualified REIT Entity. (For the avoidance of doubt, the Assumed Liabilities do not include, and the Buyer will not assume, any liability of the Sellers or any of their affiliates or investors arising due to acts, omissions or misrepresentations of the Sellers or any of their affiliates occurring prior to, or applicable to periods prior to, the closing related to the establishment or maintenance of the REIT Entity Status of any of the Sellers or any of their relevant affiliates or investors.)[8]

14. To the extent any claim asserted in a proof of claim filed by any Certificate Trustee in the Bankruptcy Case, or the bankruptcy cases of any Affiliates of the Sellers, contained, or could be deemed to contain, any claim based upon, or arising from, the Released Claims, including any claims denominated as contingent and/or unliquidated, such claim(s) shall, with respect to the Sellers and any of their affiliates, including all of the above-captioned Debtors, be deemed withdrawn with prejudice, effective upon the Closing of the transactions contemplated by the Agreement. For the avoidance of doubt, this Order is not intended to address or affect claims other than the Released Claims. [The Investors are

---

[8] The Sellers believe there is no such liability and will provide evidence to support this position in connection with the hearing on the Motion.

barred from asserting claims against the Certificate Trustees with respect to the Motion, including, but not limited to the relief sought therein and the Released Claims.]

64.     Prior Courts, including Courts in this District, have approved language similar, if not identical to the enforcement language above in the proposed Sale Order. For instance, in *In re Cone Mills Corp.*, Case No. 03-12944 (MFW) (Bankr. D. Del. Feb 10, 2004) [Docket No. 509], the Court approved a sale order that provided that "after the Closing, the Debtors and their estates shall not have further liabilities or obligations with respect to any Assumed Liabilities, and all holders of such claims are forever barred and stopped from asserting such claims against the Debtors, their successors or assigns, their property or their assets or estates." *See also*; *In re SHC, Inc.*, Case No. 03-12002 (MFW) (Bankr. D. Del. Sept. 4, 2003) [Docket No. 276] (approving nearly identical language). Accordingly, the provisions of the Sale Order as they relate to the Assumed Liabilities and Released Claims are appropriate and warranted under the circumstances.

65.     Further, the Court has the equitable power under Bankruptcy Code section 105 to carry out the provisions of Title 11 when necessary, including sales under certain terms. This authority is implicit in the court's general equitable powers and in its duty to distribute a debtor's assets and determine controversies thereto. Authority to conduct such sales is within the court's equitable powers when necessary to carry out the provisions of Title 11. *See MacArthur Co. v. Johns-Manville Corp.*, 837 F. 2d 89 (2d Cir. 1988) (Bankruptcy Court's power extends to channeling or confining claims as well as liens and interests).

### The Debtors Should Be Granted the Authority to Pay the Break-Up Fee and Expense Reimbursement, the Surety Bond Premium and the Incidental Expenses

66. · The Debtors submit that the Break-Up Fee, the Expense Reimbursement, the Surety Bond Premium and the Incidental Expenses are reasonable under the circumstances and the Debtors request authority to pay these items if warranted.

67. The Purchased Assets are fairly unique and the Buyer has invested a considerable amount of time and energy in working with the Debtors to reach the terms of the proposed Sale. Now that the terms have been reached, it would be easier for another party who may be interested in such a transaction to step forward and submit a bid for the Purchased Assets. Accordingly, Buyer, having established a base line for the terms of such a sale, warrants some protection. The Break-Up Fee of $50,000 and the Expense Reimbursement of up to $100,000 are each reasonable under the circumstances.

68. Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

69. The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *In re Calpine Corp.* v.

*O'Brien Envtl. Energy, Inc.,* 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id.* at 533.

70.     The *O'Brien* court identified at least two instances in which bidding incentives such as expense reimbursements and break-up fees may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

71.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the payment of the Break-Up Fee and the Expense Reimbursement passes muster. The Debtors' agreement to pay the Break-Up Fee and Expense Reimbursement offers protection to the Buyer and will ultimately result in a benefit to the estates by ensuring the Buyer that should another party step forward and bid on the assets, the Buyer's initial efforts in working with the Debtors to develop the proposed Sale will not go uncompensated and result in a loss for the Buyer. If a transaction in respect of a Superior Offer is consummated, the Buyer's efforts at being the first to set the mark for the sale will be

compensated in the form of the Break-Up Fee and Expense Reimbursement. The proposed

Break-Up Fee and Expense Reimbursement are fair and reasonable in amount, and are

reasonably intended to compensate for the risk to the Buyer being used as a stalking horse

bidder. Moreover, the Break-Up Fee and Expense Reimbursement will only be paid for the sale

of the Purchased Assets in connection with a Superior Offer as defined in the Agreement.

72.     Bankruptcy courts in this District have approved protections similar to the

proposed protections requested herein as reasonable and consistent with the type and range of

bidding protection typically approved. *See, e.g., In re EZ Lube, LLC*, Ch.11 Case No. 08-13256

(CSS) (Bankr. D. Del. December 9, 2008); *In re Linens Holding Co.*, Ch. 11 Case No. 08- 10832

(CSS) (Bankr. D. Del. Nov. 12, 2008) (authorizing the debtor to pay "stalking horse" a break-up

fee, subject to court approval); *In re LandSource Communities Development LLC*, Case No. 08-

11111 (KJC) (Bankr. D. Del. June 8, 2008) (same); *In re Sharper Image Corporation*, Ch. 11

Case No. 08- 10322 (KGG) (Bankr. D. Del. May 14, 2008) (authorizing break-up fee and

reimbursement of expenses for initial bidder); *In re Wickes Holdings, LLC, et al.*, Case No. 08-

10212 (KJC) (Bankr. D. Del. Feb. 19, 2008) (authorizing debtor to enter into stalking horse

agreement); *In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787 (PJW) (Bankr.

D. Del. July 13, 2007) (authorizing the payment of a termination fee to the "stalking horse"

bidder); *In re Riverstone Networks, Inc.*, Ch. 11 Case No. 06-10110 (CSS) (Bankr. D. DeL Feb.

24, 2006) (authorizing termination fee and reimbursement of expenses for initial buyer).

73.     Given the economic benefit to the Debtors which would result if the Sale

is approved and closed, the Debtors assert that payment of the Surety Bond Premium and the

Incidental Expenses is also warranted and appropriate and the Court should authorize such expenditures under Section 363(b) of the Bankruptcy Code.

74.     The Debtors request approval of the Sale as proposed herein, including approval of the Break-Up Fee and Expense Reimbursement and payment of the Surety Bond Premium and Incidental Expenses and the relief requested with respect to the Assumed Liabilities.

## Relief Under Bankruptcy Rule 6004(h) is Appropriate

75.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Sale (if and to the extent that Bankruptcy Rule 6004 is applicable thereto), be deemed effective immediately by providing that the 10-day stay under said rule is waived.

76.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed.R.Bankr.P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, commentators suggest that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6064.09 (L.King, 15th rev. ed.). Given that the Debtors will provide notice of the Motion in a manner that is reasonable under the circumstances, the Debtors submits that good cause exists for the Court to waive the 10-day stay period under Bankruptcy Rule 6004(h). The Debtors have also filed their *Amended Chapter 11 Plan of Aegis*

*Mortgage Corporation, et al.* (the "Plan") which provides for several alternative treatments for

Debtor Aegis REIT Corporation ("Aegis REIT"). One of the proposed alternative treatments is a

disposition of Aegis REIT prior to the effective date of the Plan (such as the Sale proposed in

this Motion.) Waiver of the 10-day stay period will also allow the Debtors time to consummate

the Sale prior to the effective date of the Plan and will assist the Debtors in the confirmation

process.

### Notice

77.     The Debtors have served this Motion by mail on the following parties:

(i) the Office of the United States Trustee; (ii) the Debtors' warehouse lenders and servicing

advance creditors, Bear Stearns Mortgage Capital Corporation, Credit Suisse First Boston

Mortgage Capital, LLC, and Lehman Brothers Bank, FSB; (iii) the Debtors' additional

warehouse lenders, Residential Funding Company, LLC, IXIS Real Estate Capital, Countrywide

Warehouse Lending, Liquid Funding Limited, Morgan Stanley Bank, and UBS Real Estate

Securities, Inc; (iv) Madeleine L.L.C.; (v) the Committee through its counsel; (vi) the Certificate

Trustees; (vii) parties known by the Debtors to assert liens, claims, rights, interests or

encumbrances of record in any of the Purchased Assets; (viii) parties known by the Debtors to

have expressed an interest in purchasing the Purchased Assets; (ix) federal, state and local taxing

authorities who have a reasonably known interest in the relief requested by this Motion; (x) the

United States Attorney for the District of Delaware; (xi) the Internal Revenue Service; (xii) the

United States Department of Justice; and (xiii) those persons who have requested notice pursuant

to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the parties referred to in the

preceding clauses (i) through (xiii) are referred to herein as the "Notice Parties"). The Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be given. As noted above, the Certificate Trustees may provide further notice of the relief request in the Motion to the Investors.

## Conclusion

78.     The Debtors' proposed Sale of the Purchased Assets as described in the Motion is supported by sound business reasons, as set forth above. The proposed Sale is proper, necessary and serves the best interests of the Debtors, their estates, creditors and all parties in interest. The Debtors thus request that the Court enter an order approving the proposed Sale of the Purchased Assets, free and clear of all Interests, including successor liabilities, as requested, to the Buyer and deeming the Released Claims withdrawn with prejudice.

## No Prior Request

79.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form of the proposed order attached hereto as Exhibit C (i) authorizing the Sale of the Purchased Assets to the Buyer pursuant to the terms and conditions of the Agreement; and (ii) grant such other and further relief as is just and proper.

Dated: July 27, 2010

PACHULSKI STANG ZIEHL & JONES LLP

*James E. O'Neill*

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
James E. O'Neill (Bar No. 4042)
Joshua M. Fried (CA Bar No. 181541)
Curtis A. Hehn (Bar No. 4264)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        joneill@pszjlaw.com
        jfried@pszjlaw.com
        chehn@pszjlaw.com
        tcairns@pszjlaw.com

Counsel for the Debtors and
Debtors in Possession