## THIS DISCLOSURE STATEMENT HAS
## NOT YET BEEN APPROVED BY THE COURT

{This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the *Second Amended Chapter 11 Plan of Aegis Mortgage Corporation, et al.* Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under Bankruptcy Code § 1125. This proposed Disclosure Statement is being submitted for approval only, and it has not yet been approved by the Bankruptcy Court.}

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AEGIS MORTGAGE CORPORATION, *et al.*[1] | ) Case No. 07-11119 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

Plan Objection Deadline: September 28, 2010
Confirmation Hearing: October 20, 2010

## DISCLOSURE STATEMENT IN RESPECT OF SECOND AMENDED CHAPTER 11 PLAN OF AEGIS MORTGAGE CORPORATION, ET AL.

### IMPORTANT DATES

- **Date by which Ballots must be received: September 28, 2010, at 7:00 p.m.**
- **Date by which objections to Confirmation must be filed and served: September 28, 2010, at 4:00 p.m.**
- **Hearing on Confirmation of the Plan: October 20, 2010, at 10:00 a.m.**

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
Henry C. Kevane (CA Bar No. 125757)
David M. Bertenthal (CA Bar No. 167624) )
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Counsel for Debtors and Debtors in Possession

Dated: August 13, 2010

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Aegis Mortgage Corporation (9883); Aegis Wholesale Corporation (9888); Aegis Lending Corporation (9884); Aegis Correspondent Corporation (0359); Aegis Funding Corporation (9886); Aegis Mortgage Loan Servicing Corporation (0515); Solutions Settlement Services of America Corporation (6879); Solutions Title of America Corporation (7045); and Aegis REIT Corporation (3436). The address for all Debtors is 11381 Meadowglen, Suite 1, Houston, TX 77042.

# TABLE OF CONTENTS

| | Page |
|---|---|
| I. PREFATORY STATEMENT AND DEFINITIONS | 1 |
| II. INTRODUCTION AND OVERVIEW | 1 |
| A. Introduction | 1 |
| B. Disclaimers | 2 |
| C. An Overview of the Chapter 11 Process | 3 |
| D. Plan Overview | 3 |
| E. Voting on the Plan | 11 |
| Who May Vote | 12 |
| How to Vote | 12 |
| F. Confirmation of the Plan | 13 |
| Generally | 13 |
| Objections to Confirmation | 13 |
| Hearing on Confirmation | 14 |
| III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS | 14 |
| A. Overview of the Debtors | 14 |
| Introduction | 14 |
| Business Operations | 15 |
| The Debtors' Corporate Structure and Management | 17 |
| B. Financing and Significant Indebtedness | 19 |
| The Warehouse Lender Claims | 19 |
| Other Indebtedness | 20 |
| Velazquez Litigation Claims | 20 |
| Loan Purchaser Claims | 22 |
| C. Circumstances Leading to the Commencement of the Chapter 11 Cases | 22 |
| Increase in Early Payment Defaults and Repurchase Requests | 23 |
| The Funding Crisis | 23 |
| Impact on Servicing | 23 |
| D. The Filing of the Chapter 11 Cases | 24 |
| E. First Day Motions and Other Relief | 25 |
| Employees | 25 |
| Cash Management | 25 |
| Taxes | 26 |
| Utilities | 26 |
| Interim Compensation for Professionals | 27 |

| | | |
|---|---|---|
| Lease Rejection | | 27 |
| Sale of Loans | | 27 |
| Retention of Key Professionals | | 28 |
| Ordinary Course Professionals | | 28 |
| Appointment of Committee | | 28 |
| Sale of Loan Servicing Platform | | 28 |
| Motions to Establish Management Incentive Plan | | 29 |
| F. | Bar Date for Filing Proofs of Claim | 30 |
| G. | Filing of Statements and Schedules | 30 |
| H. | Other Postpetition Activities | 30 |
| Consolidation of Operations and Costs Savings | | 30 |
| Mortgage Servicing Rights Sale | | 31 |
| Objections to Claims | | 32 |
| Extensions of Exclusivity | | 32 |
| Extension of Removal Deadlines | | 32 |
| Avoidance Actions | | 32 |
| Moulton Commutation Arrangements | | 33 |
| I. | Memorandum of Understanding | 33 |
| J. | WARN Litigation and Settlement | 36 |
| K. | Thompson Litigation and Settlement | 37 |
| L. | Federal Tax Refund | 38 |
| M. | Sale of Aegis REIT Related Assets | 39 |
| IV. PLAN OVERVIEW | | 40 |
| A. | Debtor Groups/Substantive Consolidation | 41 |
| B. | Treatment Options for Aegis REIT | 42 |
| C. | EPD/Breach Claim Protocol | 44 |
| V. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS | | 47 |
| A. | Introduction | 47 |
| B. | Administrative Claims | 48 |
| C. | Professional Fee Claims | 48 |
| D. | Priority Tax Claims | 49 |
| E. | Other Administrative Expenses | 49 |
| VI. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS | | 49 |
| A. | Summary | 49 |
| B. | Classification and Treatment of Claims against the Debtors | 50 |

|  |  |  |
|---|---|---|
| Class 1 – Priority Claims | | 50 |
| Class 2 – Secured Claims | | 51 |
| Class 3 – Convenience Claims | | 51 |
| Class 4 – Consolidated Debtors Unsecured Claims | | 52 |
| Class 5 – Consolidated Debtors EPD/Breach Claims | | 52 |
| Class 6 – Velazquez Claims | | 54 |
| Class 7 – Aegis REIT Unsecured Claims | | 55 |
| Class 8 – Aegis REIT EPD/Breach Claims | | 55 |
| Class 9 – Intercompany Claims | | 56 |
| Class 10 – Consolidated Debtors Equity Interests | | 57 |
| Class 11 – Aegis REIT Preferred Stock Equity Interests | | 57 |
| Class 12 – Aegis REIT Common Stock Equity Interests | | 58 |

VII. ACCEPTANCE OR REJECTION OF THE PLAN ........ 58

A. Voting Classes ........ 58

B. Acceptance by Impaired Classes ........ 58

C. Presumed Acceptance/Rejection of Plan ........ 58

D. Nonconsensual Confirmation ........ 59

E. How to Vote ........ 59

VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ........ 60

A. Revesting of Plan Assets and Collection of Plan Proceeds ........ 60

B. Aegis REIT Alternative Means of Implementation ........ 60

C. Implementation of Certain Subordination Rights and Reallocations ........ 62

D. Payment of Plan Expenses ........ 63

E. Litigation ........ 64

F. Reimbursement for Aegis REIT Advanced Claims ........ 64

G. Liquidation and Dissolution of the Liquidating Debtors ........ 64

H. Power and Authority of the Responsible Officer ........ 65

I. Power and Authority of the Disbursing Agent ........ 66

J. Distribution Procedures ........ 66

K. Sole Source of Distributions ........ 67

L. Withholding Taxes ........ 67

M. Claims Reserve Account ........ 67

N. Resolution of Disputed Claims ........ 68

O. Reserve Provisions for Disputed Claims ........ 68

P. Allocation of Distributions ........ 69

Q. Rounding ........ 69

| | | |
|---|---|---|
| R. | No Interim Cash Payments of $25 or Less on Account of Allowed Claims | 69 |
| S. | Disputed Payments | 70 |
| T. | Unclaimed Property | 70 |
| U. | Late-Filed Claims | 70 |
| V. | De Minimus Distributions; Charitable Donation | 70 |
| W. | Setoffs | 71 |
| X. | United States Trustee Fees | 71 |

IX. TREATMENT OF EXECUTORY CONTRACTS | | 71

| A. | Rejection of Executory Contracts | 71 |
| B. | Claims Based on Rejection of Executory Contracts | 71 |
| C. | Insurance Policies | 72 |

X. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND TO THE EFFECTIVE DATE | | 72

| A. | Conditions to Confirmation of the Plan | 72 |
| B. | Effect of Failure of Conditions to Confirmation | 72 |
| C. | Conditions to Effectiveness of the Plan | 72 |
| D. | Substantive Consolidation of the Consolidated Debtors | 73 |

| Substantive Consolidation Order | 73 |
| Effect/Extent of Substantive Consolidation | 73 |
| Reservation of Rights | 73 |

| E. | Effective Date | 74 |

XI. EFFECTS OF CONFIRMATION | | 74

| A. | Binding Effect of Plan | 74 |
| B. | Revesting of Property of Debtors | 74 |
| C. | Property Free and Clear | 74 |
| D. | Limitations of Liability | 75 |

| Exculpation | 75 |
| Releases | 75 |

| E. | Optional Discharge of Aegis REIT | 76 |
| F. | Injunction | 76 |
| G. | Post-Confirmation Liability of Responsible Officer and Disbursing Agent | 77 |
| H. | Insurance | 78 |

XII. RETENTION OF JURISDICTION | | 78

iv

XIII. MISCELLANEOUS                                                79

  A.   Revocation of Plan of Reorganization              79

  B.   Severability of Plan Provisions                   79

  C.   Governing Law                                     79

  D.   Exhibits                                          79

  E.   Notices                                           80

  F.   Reservation of Rights                             80

  G.   Computation of Time Periods                       80

  H.   Defects, Omissions and Amendments                 81

  I.   Filing of Additional Documents                    81

  J.   Successors and Assigns                            81

  K.   Setoffs and Recoupments                           81

  L.   Securities Exemption                              81

  M.   Plan Interest Rate                                82

  N.   Implementation                                    82

  O.   Record Date                                       82

  P.   Certain Actions                                   82

  Q.   Dissolution of Committee                          82

  R.   Waiver of Ten (10) Day Stay                       83

XIV. SUMMARY OF DISTRIBUTABLE ASSETS                               83

XV. RANGE OF RECOVERIES/RISK FACTORS                               83

XVI. BEST INTEREST OF CREDITORS TEST                               84

  A.   Chapter 7                                         84

  B.   Liquidation Analysis                              85

XVII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN          86

  A.   Consequences to Debtors                           87

      Treatment as Liquidation                       87
      Impact on Tax Attributes                       87
      Alternative Minimum Tax                        88

  B.   Consequences to Holders of Claims                 89

  C.   Withholding                                       90

XVIII. CONCLUSION

## I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Aegis Mortgage Corporation, *et al.* (the "Debtors"), the Debtors and debtors in possession in the above-captioned case, hereby submit this disclosure statement (the "Disclosure Statement") in support of the *Second Amended Chapter 11 Plan of Aegis Mortgage Corporation, et al.* (the "Plan"). The Plan amends and supersedes the *Chapter 11 Plan of Aegis Mortgage Corporation, et al.* previously filed by the Debtors on October 14, 2008, and the *Amended Chapter 11 Plan of Aegis Mortgage Corporation, et al.* filed by the Debtors on July 12, 2010. The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article I of the Plan shall also apply to capitalized terms used herein that are not otherwise defined.

## II.

## INTRODUCTION AND OVERVIEW

### A.    Introduction

On August 13, 2007 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by filing a voluntary petition under chapter 11 of the Bankruptcy Code. This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of and pending litigation of and against the Debtors; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtors strongly urge you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

On {August 17, 2010}, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not considered the Plan itself nor conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays in payment or a chapter 7 liquidation for the Debtors. These alternatives may not provide for a distribution of as much value to the Holders of Allowed Claims as does the

Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than **September 28, 2010, at 7:00 p.m. Eastern Time.**

## B. Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF THE HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR EQUITY

2

INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C. An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the Debtors with a "breathing spell" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy "estate" comprised of all of the property interests of the Debtors. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), debtors typically remain in possession and control of their assets as "debtors in possession." The debtors may continue to operate their business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions outside the ordinary course of the Debtors' business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by the Debtors prior to the commencement of the Chapter 11 Cases. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or equity interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. An official committee has been appointed in these Chapter 11 Cases to represent the collective interests of general unsecured creditors (the "Committee").

Chapter 11 debtors emerge from bankruptcy by successfully confirming a plan of reorganization or liquidation. Alternatively, the assets of debtors may be sold and the proceeds distributed to creditors through a plan of liquidation, as contemplated by the Plan. A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants. The provisions of the Plan are summarized below.

## D. Plan Overview

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. The Plan is a plan of liquidation (except with respect to the assets of Aegis REIT, if a reorganization option is selected for Aegis REIT) and provides for the distribution of the proceeds from the Debtors' various sales of their assets (and the further liquidation of any remaining assets) among the Creditors of the Consolidated Debtors (as discussed below). The Plan proposes to substantively consolidate the Estates of each of the Consolidated Debtors – namely, all of the Debtors except Aegis REIT. As a result of this partial substantive consolidation, each Claim against any of the Consolidated Debtors will be deemed asserted as a single Claim against the Liquidating Debtors (i.e., the Consolidated Debtors following the Effective Date of the Plan) as a whole, and will be treated in the same Class

regardless of the particular Consolidated Debtor against which it was asserted. The assets and creditors of Aegis REIT, however, are separately classified and treated under the Plan (*i.e.*, Aegis REIT is not one of the Consolidated Debtors). Under certain circumstances, namely a disposition by Aegis REIT of substantially all of its assets prior to the Effective Date of the Plan, the creditors of Aegis REIT will, however, receive the same treatment as the creditors of the Consolidated Debtors and any remaining assets of Aegis REIT will be included with the assets of the Consolidated Debtors. Otherwise, the creditors of Aegis REIT will receive only a *de minimus* distribution from the available assets of Aegis REIT.

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. The Plan designates various separate Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests. Pursuant to the Plan, the Debtors will ultimately be dissolved and all existing interests in the Debtors (including all issued and outstanding preferred and common stock, except as otherwise provided in the Plan) will be extinguished and cancelled.

The following chart[2] briefly summarizes the treatment of Creditors and Equity Interest Holders under the Plan. Amounts listed below are **estimated**. Actual Claims and distributions under the Plan will vary depending upon, among other things, the outcome of objections to Claims, the amount of post-confirmation Plan Expenses, the Aegis REIT Treatment Election that is selected (*i.e.*, in the event the Aegis REIT Maintenance option is selected, the Liquidating Debtors shall be responsible for the Reorganized Aegis REIT Operating Costs), recoveries on Reserved Avoidance Actions and the collection of Liquidation Proceeds (*i.e.*, the Cash derived from the liquidation of all Plan Assets). Moreover, the following estimates do *not* include the Tax Refund discussed in greater detail below (at such time as the Tax Refund becomes available for distribution in the discretion of the Liquidating Debtors, the recovery amounts set forth below may potentially increase).

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| N/A | Administrative Claims  Estimated Recovery: 100% | $220,000 | The Liquidating Debtors shall pay each Holder of an Allowed Administrative Claim in full in the amount of its Allowed Claim from the Claims Reserve Account, without interest, in Cash on the later of (a) the Effective Date or (b) the date such Claim becomes an Allowed Claim. The Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by such |

---

[2]  This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | | | Holder and the Liquidating Debtors. |
| N/A | Priority Tax Claims<br><br>Estimated Recovery: 100% | $680,000 | The Liquidating Debtors shall pay each Holder of an Allowed Priority Tax Claim in full in the amount of its Allowed Priority Tax Claim from the Claims Reserve Account, without interest, in Cash on the later of (a) the Effective Date or (b) the date such Claim becomes an Allowed Claim. |
| N/A | Professional Fee Claims<br><br>Estimated Recovery: 100% | $546,000[3] | The Liquidating Debtors shall pay Professionals from the Claims Reserve Account all of their respective accrued and Allowed Professional Fee Claims arising prior to the Effective Date. |
| 1 | Priority Claims<br><br>Estimated Recovery: 100% | $1,150,000 | **Classification**: Class 1 consists of Priority Claims against any of the Debtors (*including* Aegis REIT).<br>**Treatment**: The Liquidating Debtors shall pay from the Plan Proceeds the Allowed Amount of each Class 1 Priority Claim to each Creditor holding a Class 1 Priority Claim as soon as practicable following the later of (a) the Effective Date and (b) the date such Claim becomes an Allowed Claim (or as otherwise permitted by law).<br>**Voting**: Class 1 is an Impaired Class and Holders of Class 1 Claims are entitled to vote to accept or reject the Plan. |
| 2 | Secured Claims<br><br>Estimated Recovery: 100% | <$100,000 | **Classification**: Class 2 consists of any Secured Claims against any of the Debtors (*including* Aegis REIT). Each Holder of a Class 2 Claim constitutes a separate subclass under the Plan.<br>**Treatment**: To the extent any Secured Claims exist, at the option of the Debtors, Reorganized Aegis REIT or the Liquidating Debtors, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such Allowed Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which |

---

[3] The estimated amount of outstanding Professional Fee Claims is based on an anticipated Effective Date of November 1, 2010; this amount will vary based on interim payments made prior to the Effective Date, additional unanticipated services rendered or expenses incurred prior to the Effective Date, and possible delays in the occurrence of the Effective Date.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | | | the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the holder of such Claim and the Liquidating Debtors, the Holder of such Secured Claim will receive a Cash payment (from the Plan Proceeds) equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Secured Claim. **Voting**: Class 2 is an Impaired Class and Holders of Class 2 Claims are entitled to vote to accept or reject the Plan. |
| 3 | Convenience Claims Estimated Recovery: 20% | $5.7 million[4] | **Classification**: Class 3 consists of Convenience Claims against any of the Consolidated Debtors less than or reduced to $25,000. Class 3 does ***not*** include any Class 7 Creditors against Aegis REIT that, under certain circumstances, are deemed included in Class 4 of the Plan. **Treatment**: Each Holder of an Allowed Convenience Claim shall receive, in exchange for and in full satisfaction of such Claim, a Cash payment from the Plan Proceeds equal to 20% of the amount of such Claim. **Voting**: Class 3 is an Impaired Class and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. |
| 4 | Consolidated Debtors Unsecured | $182.5 million[5] | **Classification**: Class 4 consists of the |

[4] For purposes of the estimated amount of Convenience Claims, the Debtors have assumed that each Class 4 Creditor holding Claims in an aggregate amount up to $62,500 would exercise the election to reduce such Claims to a single Convenience Claim of $25,000 under Class 3 of the Plan (this assumes an 8% distribution to the Holder of a Class 4 Claim – if such Holder remained in Class 4, then it would receive a distribution of $5,000, the same amount that the Holder of a Convenience Claim in the amount of $25,000 would receive in Class 3 at a 20% distribution). As of July 13, 2010, it appears that there are approximately 1,600 existing Unsecured Claims under $25,000, for an aggregate amount of approximately $3.1 million. If Creditors with Unsecured Claims between $25,000 and $62,500 elected to reduce their claims to Convenience Claims of $25,000, the aggregate amount of claims in Class 3 would increase to approximately $5.7 million, with a corresponding reduction of the aggregate amount of claims in Class 4.

[5] This estimate includes the $133 million Madeleine Claim allowed by the Plan (following the reduction of such claim from $135 million as a result of the transfer of $2 million of such claim under the Thompson Stipulation) and an additional $13.9 million in miscellaneous Unsecured Claims that are not Convenience Claims. In addition, under the Plan and certain Claim settlements, (i) the Unsecured Claim of UBS (defined below) will be Allowed in the amount of $14.1 million, (ii) the Unsecured Claim of CSFB (defined below) will be Allowed in the amount of $12.2 million, (iii) the Unsecured Claim of Countrywide (defined below) will be Allowed in the amount of $2.3 million,

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | Claims<br><br>Estimated Recovery: approximately 5-15% | | Claims of Holders of Unsecured Claims against any of the Consolidated Debtors, but excludes EPD/Breach Claims.<br>**Treatment:** Each Holder of an Allowed Class 4 Claim shall receive a Pro Rata share (with the Holders of Class 5 Claims) of the remaining available Net Plan Proceeds. In addition (i) each Holder of an Allowed Unsecured Claim in Class 4 Creditors Subgroup A shall receive a Pro Rata share of the Class 4 Creditors Contribution, and (ii) each Holder of an Allowed Unsecured Claim in Class 4 Creditors Subgroup B shall receive a Pro Rata share of the WARN Contribution.<br>**Voting:** Class 4 is an Impaired Class and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan. |
| 5 | Consolidated Debtors EPD/Breach Claims<br><br>Estimated Recovery: approximately 5-15% | $55 million | **Classification:** Class 5 consists of the Claims of Holders of EPD/Breach Claims against any of the Consolidated Debtors.<br>**Treatment:** The allowance or disallowance of Class 5 EPD/Breach Claims (Submitted) shall be determined in accordance with the EPD/Breach Protocol if the EPD/Breach Claim Protocol Conditions are satisfied. If the EPD/Breach Claim Protocol Conditions are not satisfied, the allowance or disallowance of such claims will be determined in accordance with the Bankruptcy Code and the resolution procedures established under the Plan. The allowance or disallowance of Class 5 EPD/Breach Claims (Opt Out) shall be determined in accordance with the Bankruptcy Code and the resolution procedures established under the Plan. Each Holder of an Allowed Class 5 EPD/Breach Claim (Submitted and Opt Out) shall receive a Pro Rata share (with the Holders of Class 4 Claims) of the remaining available Net Plan Proceeds.<br>**Voting:** Class 5 is an Impaired Class and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan. |
| 6 | Velazquez Claims<br><br>Estimated Recovery: Not | Not applicable | **Classification:** Class 6 consists of the Claims asserted, or which could have been asserted, in the Velazquez Class Action or |

and (iv) the Unsecured Claim of Thompson will be Allowed in the amount of $7 million (including the $2 million transferred to Thompson by Madeleine).

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | applicable | | the Velazquez Class Claim. **Treatment:** Holders of Velazquez Claims that are Velazquez Class Members will be treated *outside the Plan* pursuant to the terms and conditions of the Velazquez Settlement. Holders of Velazquez Claims that are Velazquez Excluded Class Members will be treated as Class 4 Creditors, *provided that*, such Holders obtain leave of the Bankruptcy Court to file a late Proof of Claim. **Voting:** Class 6 is an Unimpaired Class and Holders of Class 6 Claims are deemed to accept the Plan. Accordingly, the Holders of Class 6 Claims are not entitled to vote on the Plan. |
| 7 | Aegis REIT Unsecured Claims<br><br>Estimated Recovery: de minimus | \$<100,000[6] | **Classification:** Class 7 consists of the Claims of Holders of Unsecured Claims against Aegis REIT, but excludes EPD/Breach Claims. **Treatment:** Each Holder of an Allowed Class 7 Unsecured Claim shall receive one of the following alternative treatments: (i) if the Aegis REIT Disposition option is selected, each Holder of an Allowed Class 7 Unsecured Claim shall receive the same treatment as the Holders of Allowed Class 4 Unsecured Claims (and such claims shall be deemed classified in Class 4); (ii) if the Aegis REIT Maintenance option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Operating Costs, each Holder of an Allowed Class 7 Unsecured Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by Reorganized Aegis REIT, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim; or (iii) if the Aegis REIT Dissolution option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Dissolution Costs, each Holder of an Allowed Class 7 Unsecured Claim |

[6] Under the MOU, described below, pursuant to the Plan the \$178 million Claim of Madeleine will be allowed and treated as a Class 4 Claim against the Consolidated Debtors in the amount of \$133 million; hence, the remaining amount of Unsecured Claims asserted against Aegis REIT is negligible.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | | | shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by the Liquidating Debtors, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim. **Voting:** Class 7 is an Impaired Class and Holders of Class 7 Claims are entitled to vote to accept or reject the Plan. |
| 8 | Aegis REIT EPD/Breach Claims  Estimated Recovery: de minimus | $<55 million[7] | **Classification:** Class 8 consists of the Claims of Holders EPD/Breach Claims against Aegis REIT. **Treatment:** The allowance or disallowance of Class 8 EPD/Breach Claims shall be determined in accordance with the EPD/Breach Protocol if the EPD/Breach Claim Protocol Conditions are satisfied. If the EPD/Breach Claim Protocol Conditions are not satisfied, the allowance or disallowance of such claims will be determined in accordance with the Bankruptcy Code. Each Holder of an Allowed Class 8 EPD/Breach Claim shall receive one of the following alternative treatments: (i) if the Aegis REIT Disposition option is selected, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive the same treatment as the Holders of Allowed Class 5 Unsecured Claims (and such claims shall be deemed classified in Class 5); (ii) if the Aegis REIT Maintenance option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Operating Costs, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by Reorganized Aegis REIT, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim; or (iii) if the Aegis REIT Dissolution option is selected, then, following the |

---

[7] This estimate assumes that Aegis REIT may be jointly and severally liable for the EPD/Breach Claims asserted against the Consolidated Debtors. The Debtors have not determined what portion of such claims, if any, is **not** a potential obligation of Aegis REIT. On the other hand, the Debtors are not aware of any EPD/Breach Claims that are solely the potential obligation of Aegis REIT. Hence, the Debtors estimate that the amount of EPD/Breach Claims in Class 8 of the Plan is possibly less than the same Claims in Class 5 of the Plan.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | | | establishment of appropriate reserves for the Reorganized Aegis REIT Dissolution Costs, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by the Liquidating Debtors, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim. **Voting**: Class 8 is an Impaired Class and Holders of Class 8 Claims are entitled to vote to accept or reject the Plan. |
| 9 | Intercompany Claims<br><br>Recovery: $0 | $0 | **Classification**: Class 9 consists of all Intercompany Claims against any of the Debtors. **Treatment**: There shall be no distribution on account of any Intercompany Claims. **Voting**: The Holders of Class 9 Claims will receive no distribution under the Plan and therefore are deemed to reject the Plan. Accordingly, the Holders of Class 9 Claims are not entitled to vote on the Plan. |
| 10 | Consolidated Debtors Equity Interests<br><br>Recovery: $0 | | **Classification**: Class 10 consists of Equity Interests in any of the Consolidated Debtors. **Treatment**: There shall be no distribution on account of Class 10 Equity Interests. Upon the Effective Date, all Class 10 Equity Interests will be terminated and canceled and will cease to exist. However, if and to the extent that the Disbursing Agent shall have any remaining Net Plan Proceeds on the Final Distribution Date following (and subject to) the payment in full of all Unsecured Claims against all of the Liquidating Debtors, plus the payment of interest on such claims to the extent allowed by law, any such residual assets shall be distributed to the former holders of Class 10 Equity Interests as of the Effective Date. **Voting**: The Holders of Class 10 Equity Interests will receive no distribution under the Plan and therefore are deemed to reject the Plan. Accordingly, the Holders of Class 10 Equity Interests are not entitled to vote on the Plan. |
| 11 | Aegis REIT Preferred Stock Equity Interests | | **Classification**: Class 11 consists of Aegis REIT Preferred Stock Equity Interests. **Treatment**: The Holders of the Aegis |

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | Estimated Recovery: $0 or de minimus | | REIT Preferred Stock Equity Interests shall receive one of the following treatments: (i) if the Aegis REIT Disposition option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist; (ii) if the Aegis REIT Maintenance option is selected, the Holders of the Aegis REIT Preferred Equity Interests shall retain their Equity Interests; or (iii) if the Aegis REIT Dissolution option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist. **Voting**: Class 11 is an Impaired Class and Holders of Class 11 Equity Interests are entitled to vote to accept or reject the Plan. |
| 12 | Aegis REIT Common Stock Equity Interests  Recovery: $0 | | **Classification**: Class 12 consists of Aegis REIT Common Stock Equity Interests. **Treatment**: No distribution shall be made to the Holders of the Aegis REIT Common Stock Equity Interests. The Holders of the Aegis REIT Common Stock Equity Interests shall receive one of the following treatments: (i) if the Aegis REIT Disposition option is selected, all Class 12 Equity Interests will be terminated and cancelled and will cease to exist; (ii) if the Aegis REIT Maintenance option is selected, then, at the time and subject to the provisions of Section V(B)(2)(d) of the Plan, the Holders of the Aegis REIT Common Stock Equity Interests may assign and transfer their Equity Interests to the Reorganized Aegis REIT Common Stock Transferee; or (iii) if the Aegis REIT Dissolution option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist. **Voting**: The Holders of Class 12 Equity Interests will receive no distribution under the Plan and therefore are deemed to reject the Plan. Accordingly, the Holders of Class 12 Equity Interests are not entitled to vote on the Plan. |

## E.  Voting on the Plan

**Who May Vote**

The Plan divides Allowed Claims and Equity Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which case the Class is conclusively deemed not to have accepted the Plan). A Class is impaired if the legal, equitable or contractual rights attaching to the Claims or Equity Interests of the Class are modified, other than by curing defaults and reinstating maturities. Under the Plan, Administrative Claims, Professional Fee Claims and Priority Tax Claims are unclassified and are not entitled to vote. Class 6 (Velazquez Claims) is Unimpaired and is therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and the Holders of Class 6 Claims are not entitled to vote under the Plan. Classes 9, 10 and 12 will receive nothing under the Plan and are therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote under the Plan. Accordingly, only Classes 1, 2, 3, 4, 5, 7, 8 and 11 are Impaired and entitled to vote to accept or reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether a sufficient number of acceptances have been received to obtain Confirmation of the Plan.

**How to Vote**

All votes to accept or to reject the Plan must be cast by using the appropriate form of Ballot. No votes other than ones using such Ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of Ballot is being provided to Creditors in Classes 1, 2, 3, 4, 5, 7, 8 and 11 by which Creditors and Holders of Equity Interests in such Classes may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives Holders of Class 1, 2, 3, 4, 5, 7, 8 and 11 Claims and Equity Interests one important choice to make with respect to the Plan – whether to vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed Ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the Ballot in the envelope provided for this purpose. Epiq Bankruptcy Solutions, LLC ("Epiq"), as the balloting agent for the Debtors, will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE DEBTORS' BALLOTING AGENT, EPIQ, NO LATER THAN 7:00 P.M. EASTERN TIME ON SEPTEMBER 28, 2010 AT THE FOLLOWING ADDRESS:

**If by first class mail or USPS Express Mail:**

Aegis Mortgage Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

**If by overnight courier or hand delivery:**

Aegis Mortgage Ballot Processing Center

c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd floor
New York, NY 10017

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED
AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR
LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST
TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY
TRANSMITTED BALLOTS WILL NOT BE COUNTED.

## F.    **Confirmation of the Plan**

### Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of
reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy
Court in deciding whether to confirm a plan of reorganization are discussed in Article VI below.

### Objections to Confirmation

Any objections to Confirmation of the Plan must be in writing and must be filed with the
Clerk of the Bankruptcy Court and served on counsel for Debtors and the United States Trustee
on or before the date set forth in the notice of the Confirmation Hearing sent to you with this
Disclosure Statement and the Plan. Bankruptcy Rule 3007 governs the form of any such
objection.

Counsel on whom objections must be served are:

> Counsel for the Debtors
> Laura Davis Jones
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market St., 17th Floor
> Wilmington, DE 19801
>
> Henry C. Kevane
> Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, CA 94111
>
> United States Trustee
> 844 King Street, Room 2207
> Lockbox #35
> Wilmington, DE 19899-0035

13

**Hearing on Confirmation**

The Court has set October 20, 2010, at 10:00 a.m. ET for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom 1, 824 Market Street, 6th Floor, Wilmington, DE 19801, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Court confirms the Plan, it will enter the Confirmation Order.

## III.

## HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS

### A. <u>Overview of the Debtors</u>

**Introduction**

Prior to filing for bankruptcy, the Debtors and their non-debtor affiliates[8] were a full service residential mortgage company with lending operations in 49 states and offices in 24 states. As of August 1, 2007, the Debtors employed approximately 1,302 employees who, depending upon their location, worked at the Debtors' corporate headquarters in Houston, Texas, or at 33 branches located throughout the nation. As of that date, the Debtors generated approximately $800 million in monthly loan originations and were servicing, and/or interim servicing, approximately $3.6 billion of mortgage loans.

Although some of the Debtors' business involved loans to borrowers with good credit scores, the substantial majority of the Debtors' business involved the origination of wholesale loans to borrowers with credit scores below what is required to obtain a prime loan (generally identified as "Alt A loans") and borrowers with lesser credit scores generally identified as "sub-prime." These sub-prime borrowers generally are unable to obtain financing from traditional banks or savings and loan associations. In addition, the Debtors also originated retail loans through a call center located in Baton Rouge, Louisiana.

As further explained below, extreme changes in market conditions, coupled with the rapid decline in the secondary mortgage market, severely impacted the Debtors' operations. In particular, in 2007, the Debtors experienced significant increases in early payment defaults under their loans, and a corresponding increase in the number of repurchase requests submitted to the Debtors as a result of such defaults, which siphoned cash away from the Debtors. Moreover, as the value of the loans declined at an accelerated pace, substantial demands were made on the

---

[8] The four non-debtor affiliates are: Moulton Reinsurance, Ltd. ("Moulton"); Aegis Asset Backed Securities Corporation ("AABSC"); Aegis Investment Corporation ("AIC"); and Aegis Equity Holding Corporation ("AEHC'). None of the non-debtor affiliates has any employees. Moulton is a captive reinsurance company; AABSC holds asset backed securities; AIC holds the residual interests of certain asset backed securities; and AEHC holds the ownership and other residual interest certificates in certain REIT trusts and REMIC transactions. Under the Plan, AABSC, AEHC and AIC (together with Aegis REIT), are referred to collectively as the "Aegis REIT Parties."

Debtors for an unprecedented amount of capital calls which were due and payable on August 3, 2007. After a thorough review of the Debtors' capacity to meet the significantly expanded capital requirements and the lack of liquidity in the markets, the Debtors were forced to cease all mortgage origination activity after the close of business on August 3, 2007.

## Business Operations

Prior to the Petition Date, the Debtors had three main components to their business: (1) wholesale loan originations; (2) retail loan originations; and (3) loan servicing. The Debtors also established a real estate investment trust, Aegis REIT, whose operations are discussed below.

        a.     Wholesale Loan Originations

The largest and most profitable component of the Debtors' business was their wholesale loan originations, wherein the Debtors worked with a network of independent mortgage brokers to provide financing for consumer borrowers on Alt A and sub-prime residential loans. The Debtors originated prime wholesale loans, Alt A wholesale loans and sub-prime retail and wholesale loans to consumer borrowers who were unable to qualify for prime retail lending on residential mortgages.

The Debtors obtained the funds needed for their loan originations from several warehouse lines of credit and master repurchase agreements (the "Warehouse Credit Facilities") provided by UBS Real Estate Securities, Inc., formerly known as UBS Warburg Real Estate Securities, Inc. ("UBS"), Lehman Brothers Bank FSB and affiliates ("Lehman"), Bear Stearns Mortgage Capital Corporation ("Bear Stearns"), IXIS Real Estate Capital Inc. ("Ixis"), Credit Suisse First Boston Mortgage Capital, LLC ("CSFB"), Liquid Funding, Ltd. ("Liquid Funding"), Morgan Stanley Bank ("Morgan"), Residential Funding Company, LLC, formerly known as Residential Funding Corporation ("RFC"), and Countrywide Warehouse Lending ("Countrywide," and, collectively with UBS, Lehman, Bear Stearns, Ixis, CSFB, Liquid Funding, Morgan and RFC, the "Warehouse Lenders"). As of the Petition Date, there were no outstanding advances under the Warehouse Credit Facilities between the Debtors and either Liquid Funding or Morgan. As discussed further below, other Warehouse Lenders asserted significant claims against the Debtors under their respective Warehouse Credit Facilities.

The Debtors' Warehouse Credit Facilities with UBS, Lehman, Bear Stearns, Ixis, CSFB, Morgan and Liquid Funding (the "Repo Lenders") were structured as committed and uncommitted master repurchase agreements. Under these agreements, a loan originated by the Debtors is sold to the Repo Lender that provided the financing for such loan for a purchase price prescribed under the agreement. The sale is subject to an obligation of the Debtors to repurchase the loans at a price equal to the original purchase price, plus a differential representing the time value of money, and is subject to an obligation on the part of the purchaser to resell the loan to the Debtors at that price. In addition, the Debtors are obligated to maintain certain loan to value ratios whereby the value of the loans must exceed the amount of borrowed funds used to purchase such loans by a fixed percentage – based on product type and age on the warehouse line. The Repo Lenders are generally permitted to periodically mark the purchased loans to market. If the value of the marked loans has declined beyond the percentage prescribed by the master repurchase agreement, then the Repo Lender may demand payment (a "Margin Call")

from the Debtors. If the Debtors fail to pay the Margin Call within a certain period, usually 24 hours, the Repo Lender is entitled to declare an event of default and accelerate the Debtors' obligation to repurchase the loans.

The Debtors also originated loans pursuant to conventional secured lending facilities with RFC and Countywide. Pursuant to these facilities, RFC and Countrywide obtained a security interest in the mortgage loan originated by the Debtors with such lender's funds. These secured facilities also permitted these Warehouse Lenders to mark the collateral securing their loans to market and demand additional funds (via a Margin Call) if the loan to value ratio dropped below the percentage prescribed under the Warehouse Credit Facility.

After originating wholesale loans, the Debtors then sold substantially all of such loans to their Warehouse Lenders and/or certain other third parties, including Freddie Mac and Fannie Mae (collectively, the "Loan Purchasers"). Certain of these Loan Purchasers would bundle the purchased loans and issue securities backed by these loans and mortgages to private investors. The Debtors also securitized loans.

Prior to voluntarily ceasing the origination of loans due to the extreme conditions they faced, the Debtors originated loans pursuant to certain guidelines and made customary representations and warranties as set forth in the sale contracts to the Loan Purchasers. Pursuant to such sale contracts (and in the case of the Repo Lenders, the master repurchase agreements), the Debtors may prepetition have been required to repurchase loans or reimburse Loan Purchasers for a breach of a representation or warranty. In addition, prepetition, the Debtors could be required to return a portion of the proceeds from a sale if a loan was prepaid during a limited period of time after sale, usually 6 to 12 months. The Debtors could also be required to repurchase loans ("Repurchase Requests") if a default occurred within a brief period following the loan origination date ("Early Payment Defaults" or "EPDs"), or if loans were alleged to contain misrepresentations by borrowers.

b.      Retail Loan Originations

In addition to originating wholesale loans through mortgage brokers, the Debtors also originated retail loans directly to consumers through the use of a call center located in Baton Rouge, Louisiana (the "Call Center"). Potential borrowers would contact the Call Center to ascertain if they were eligible for receiving mortgage loans. The Call Center would take the information necessary to prepare a loan application and, if the potential borrower qualified for a loan, would then direct the potential borrower to the nearest branch office for closing upon the loan. The Debtors discontinued their retail loan operations in July 2007.

c.      Loan Servicing

Finally, the Debtors provided loan servicing on an interim basis for the loans they originated, prior to the sale of such loans, and on a full time basis for certain of their Warehouse Lenders, certain third parties, Fannie Mae, and Aegis REIT (a debtor herein which holds interests in asset backed securities). Prior to the Petition Date, the Debtors serviced approximately $3.6 billion of loans. Typical loan services provided by the Debtors included, without limitation: billing; collections; processing mortgage payments and loan payoffs received

from borrowers; remitting payments to the appropriate entities; processing tax and insurance payments received from borrowers and remitting such funds to the appropriate taxing authorities and insurers; maintaining records; engaging in collection efforts; foreclosing on delinquent loans; and performing accounting and reporting services. The Debtors were paid a certain number of basis points (usually between 37 to 50) on the outstanding principal balance for each loan they serviced, pursuant to the terms of the servicing agreements with their loan servicing clients.

The Debtors also served as a subservicer of loans with respect to a significant portion of their servicing portfolio. Prior to the Petition Date, the Debtors, as subservicer, in an effort to protect their various lenders and borrowers, and pursuant to the terms of various loan agreements, notified Ocwen Loan Servicing, LLC ("Ocwen"), that the Debtors would not be making certain advances, delinquency advances, servicing advances or other payments as may be required pursuant to the Subservicing Agreement and/or the Transfer and Servicing Agreement between the Debtors and Ocwen. Shortly after the Petition Date, the Debtors arranged with Ocwen to smoothly transition the servicing obligations with respect to such loans.

### d.  Aegis REIT

One of the Debtors, Aegis REIT, is a Maryland real estate investment trust. Aegis REIT owns the equity in Aegis Equity Holding Corporation ("AEHC"). AEHC is a Delaware corporation that is a qualified REIT subsidiary. AEHC is not a Debtor. Aegis REIT and the parents of Aegis REIT (the sole shareholders of the Aegis REIT Common Stock Equity Interests are AMC, ACC and ALC, each a Debtor in these Chapter 11 Cases), made certain prepetition contractual commitments to creditors and other parties that did business with AEHC, pursuant to which it was agreed that Aegis REIT would maintain its status as a real estate investment trust (referred to under the Plan as a "REIT Entity").

In order to preserve its status as a REIT Entity during the pendency of the Chapter 11 Cases, on February 7, 2008, the Debtors filed a motion seeking authority (both retroactively and prospectively), to make certain dividend payments to the holders of the Aegis REIT Preferred Stock Equity Interests (paid in cash in the amount of approximately $6,500 in the aggregate, or $62.50 per shareholder) and the Aegis REIT Common Stock Equity Interests (not paid in cash but reflected as a book entry). The Court granted the motion by its *Order Approving the Payment of Dividends to Preferred and Common Shareholders of the REIT* entered on March 12, 2008 [Docket No. 1440] (the "REIT Dividend Order").

### The Debtors' Corporate Structure and Management

The Debtors and their non-debtor affiliates presently consist of 13 separate entities incorporated and/or located in the United States and, with respect to the non-debtor affiliate Moulton, in the Turks and Caicos Islands. In April 2007, a former non-debtor affiliate, UC Insurance Corporation, was dissolved under applicable law. Two former debtors, Aegis Loan Servicing, L.P., and AMC Insurance Agency of Texas, Inc., were sold under the Platform Sale Motion (discussed below) and their Chapter 11 cases were dismissed in October 2007.

The name Debtor for these Chapter 11 Cases is Aegis Mortgage Corporation ("AMC"). AMC is the parent company for all of the Debtors and non-debtor affiliates and holds all of the equity in such entities.[9] AMC provides corporate services to the other Debtors. Madeleine, L.L.C. ("Madeleine") holds approximately 81% of the equity for AMC.

In connection with the substantial, above-noted changes facing the secondary mortgage market in early 2007, the Debtors began exploring certain strategic opportunities, including a possible merger that would allow the Debtors to better respond to such changing conditions. During this process, the Debtors performed due diligence on certain investments that were of potential interest to the Debtors and Cerberus Capital Management L.P. ("Cerberus"), which is an affiliate of Madeleine, AMC's primary equity holder. From February 2007 through approximately June 2007, certain of the Debtors' employees and consultants performed due diligence activities on behalf of the Debtors and Cerberus in connection with a potential merger transaction between certain companies and the Debtors. The fees and expenses for the consultants, which included amounts paid to certain individuals in their capacities as consultants who later became employees of the Debtors, were advanced by the Debtors and charged back to Cerberus. Time spent by the Debtors' employees in connection with these due diligence activities was not charged back to Cerberus. In total, the Debtors charged back to Cerberus $362,818.60 in consulting fees and expenses. In order to provide assistance to the Debtors at the cost of Cerberus, certain Cerberus employees have provided postpetition assistance to the Debtors, but their salaries and expenses are being paid by Cerberus.

In connection with such potential transactions, Cerberus retained Daniel Gilbert, Ed Robertson and Andy James as consultants in the first quarter of 2007. Gilbert provided consulting services for Cerberus for approximately 10 weeks, Robertson for 9 weeks, and James for 8 weeks. Subsequently, on April 17, 2007, Gilbert became the Chief Executive Officer for AMC and was a member of the board of directors for AMC. Gilbert did not provide services to Cerberus and after the commencement of his employment by Aegis. Gilbert resigned from all offices with AMC and its affiliates on December 31, 2007. On April 30, 2007, Robertson became the Chief Financial Officer for AMC. Robertson did not provide services to Cerberus after the commencement of his employment by Aegis. Robertson resigned from all offices with AMC and its affiliates on December 31, 2007. On April 30, 2007, James became the Executive Vice President of Credit Risk Management. James did not provide services to Cerberus after the commencement of his employment by Aegis. James resigned from all offices with AMC and its affiliates on October 19, 2007.

AMC's directors as of the Petition Date were: Daniel Gilbert; Mark A. Neporent; Ronald Goldstein; Hootan Yaghoobzadeh; Drew Tanzman; and Claus H. Lund. As noted above, Gilbert was employed by AMC and did not provide services to Cerberus while employed by AMC. Neporent, Goldstein and Yaghoobzadeh were employed by Cerberus and were paid by Cerberus. Tanzman and Lund were independent directors whose board fees and expenses were paid by AMC. Tanzman resigned from AMC's board, effective June 30, 2010

---

[9] As noted, the equity interests in Aegis REIT are held by AMC (as a holder of both common and preferred stock), the debtors Aegis Correspondent Corporation and Aegis Lending Corporation, and 104 individual holders of preferred stock. As disclosed in connection with the REIT Dividend Order, two of the individual holders of the preferred stock are currently employed by the Debtors – Mickey C. Yung and Michael C. Balog.

As of the date of this filing, AMC's directors are: Neporent, Goldstein, Lund, Yaghoobzadeh and Michael C. Balog ("Balog"). Balog has been an employee of AMC since 1999 and has never been employed or paid by Cerberus.

## B.    Financing and Significant Indebtedness

As noted above, the Debtors' wholesale and retail loan origination businesses were primarily financed through the Warehouse Credit Facilities provided by the Warehouse Lenders. The Warehouse Lenders would make advances to the Debtors, who in turn would use such funds to originate loans. The funds advanced by the Warehouse Lenders were secured by the mortgages from the borrowers, or, in the case of the Repo Lenders, used to purchase the mortgage loans originated by the Debtors.

The Debtors employed both "wet" and "dry" funding to finance their loan originations. Wet funding occurs when a lender advances money to fund loans prior to receiving the collateral package (*i.e.*, executed loan agreement, note, mortgage and deed) securing such loans. Dry funding occurs when a lender advances money after receiving the full collateral package securing the loan.

For the reasons set forth below, the Debtors' ability to obtain financing from its Warehouse Lenders to support loan origination ceased prior to the Petition Date.

### The Warehouse Lender Claims

As of the Petition Date, the Debtors estimated that they owed their Warehouse Lenders approximately $412.5 million (the "Warehouse Lenders' Claims"). The Debtors took responsible and expeditious steps to reduce the amount of the Warehouse Lenders' Claims by voluntarily surrendering collateral and otherwise cooperating with the Warehouse Lenders to minimize their damages. For instance, the Debtors entered into voluntary foreclosure agreements with Countrywide and RFC. As part of such agreements, Countrywide and RFC have provided the Debtors with concessions on their anticipated deficiency claims. Nevertheless, the Warehouse Lenders have filed, in the aggregate, Warehouse Lenders' Claims aggregating approximately $40 million.

To date, the Debtors have filed objections to the Warehouse Lenders' Claims asserted by CSFB and Countrywide, each of which has since been resolved, as discussed below. The Debtors anticipate filing additional objections if consensual resolutions with other holders of Warehouse Lenders' Claims cannot be reached.

As discussed in greater detail below in connection with the *Memorandum of Understanding*, the Warehouse Lenders' Claims asserted by CSFB and UBS have been reduced and allowed as a general, unsecured, non-priority claim under 11 U.S.C. § 502 against the Consolidated Debtors in the fixed, liquidated amounts of, respectively, $12.2 million and $14.1 million.

The Debtors and RFC have also entered into that certain *Settlement Stipulation Among the Debtors, Residential Funding Company, LLC, the Committee and Madeleine, L.L.C.* ("RFC Stipulation"). Under the RFC Stipulation (and subject to its terms and conditions), the

Warehouse Lenders' Claim asserted by RFC have been consensually amended to withdraw all claims asserted by RFC except for claims based on the Debtors' repurchase obligations to RFC. Such remaining claims would be treated as an EPD/Breach Claim (Submitted) under the Plan. Hence, RFC agrees to adhere, and will not object, to the treatment of its EPD/Breach Claim pursuant to the EPD/Breach Claim Protocol. The RFC Stipulation was approved by the Bankruptcy Court on August 12, 2009.

The Debtors and Countrywide have also entered into that certain *Settlement Stipulation Under Bankruptcy Rule 9019 Among the Debtors, Countrywide, the Committee and Madeleine, L.L.C.* ("Countrywide Stipulation"). The Countrywide Stipulation also addresses claims asserted by Countrywide's affiliate, Countrywide Home Loans, Inc. Under this agreement, the Warehouse Lenders' Claim of Countrywide will be allowed as a general, unsecured, non-priority claim under 11 U.S.C. § 502 against the Consolidated Debtors in the fixed, liquidated amount of \$2.3 million. The agreement also resolves any subordination rights asserted by Countrywide under certain agreements with Madeleine. The Plan will require the reallocation to Countrywide of distributions otherwise payable to Madeleine on account of its claim until Countrywide has received a minimum recovery on its allowed claim of at least \$1.25 million. Madeleine has no obligation to make payments to Countrywide except from, and to the extent of, its distributions under the Plan on account of its allowed claim. Countrywide has agreed that the receipt of the foregoing minimum recovery under the Plan shall be a full and final settlement and release of any subordination rights. The settlement also provides that the EPD/Breach Claim asserted by Countrywide Home Loans, Inc., will be treated as an EPD/Breach Claim (Submitted) under the Plan. In other words, Countrywide Home Lending, Inc., agrees to adhere, and will not object, to the treatment of its EPD/Breach Claim pursuant to the EPD/Breach Claim Protocol. The Countrywide Stipulation was approved by the Bankruptcy Court on December 1, 2009.

## Other Indebtedness

As of the Petition Date, the Debtors owed approximately \$178 million on account of unsecured, subordinated debt payable to Madeleine L.L.C. (the "Madeleine Claim"), and additional amounts on account of other unsecured indebtedness (such as trade obligations, repurchase obligations and severance liability to employees terminated prepetition). As discussed below in connection with the *Memorandum of Understanding*, the Madeleine Claim has been reduced and allowed as a general, unsecured, non-priority claim under 11 U.S.C. § 502 against the Consolidated Debtors in the fixed, liquidated amount of \$135,000,000 (the "Allowed Madeleine Claim"), provided that, following the approval of the Thompson Settlement (discussed below), the amount of the Allowed Madeleine Claim was further reduced to \$133,000,000 as a result of the transfer of \$2,000,000 of the Allowed Madeleine Claim to Thompson pursuant to such settlement.

## Velazquez Litigation Claims

On or about June 11, 2007, a class action complaint was filed against the Debtors entitled *Maria Velazquez, on behalf of herself and others similarly situated vs. Aegis Wholesale Corporation, Aegis Mortgage Corporation, and Does 1 through 100,* Case No. CV 07-3784 DSF JTLX, in the United States District Court, Central District of California (the "Velazquez Class Action"). The plaintiff seeks to represent a class defined as all individuals who received an

20

Option ARM through Aegis on their primary residence located within California between June 1, 2003 and May 31, 2007 (9,280 putative class members). The plaintiff claims that Aegis failed to clearly and conspicuously disclose the actual interest rates of the adjustable rate loans in the loan documents and the required disclosure statements accompanying the loans in violation of the Federal Truth in Lending Act, the California Unfair Competition Law, and the California Consumers Legal Remedy Act. Plaintiff further claims that Aegis breached an implied covenant of good faith and fair dealing. Plaintiffs and the putative class are seeking actual damages, compensatory damages, consequential damages, punitive damages, rescission of loan agreements, reasonable attorneys' fees and costs, and such other relief as is just and proper. The Debtors have been presented with no information at present to believe that the Velazquez Class Action have merit. The asserted damages in the action, however, are not less than $150 million in the aggregate.

On or about February 6, 2008, the plaintiffs in the Velazquez Class Action also filed a proof of claim in the Chapter 11 cases (claim number 1490) ("Velazquez Class Claim"). The proof of claim mirrors the allegations made by the plaintiffs in the Velazquez Class Action.

The Debtors and the plaintiff in the Velazquez Class Action have since entered into that certain *Class Action Settlement Agreement and Release* ("Velazquez Settlement"), dated as of February 2, 2010, under which all claims asserted in the Velazquez Class Action and the Velazquez Class Claim have been compromised. Under the Velazquez Settlement, which remains subject to the final approval of the Bankruptcy Court, the Velazquez Class Claim will be certified as a class proof of claim under Federal Rule of Civil Procedure 23 purely for purposes of settlement. Once approved, the Debtors will make a full and final settlement payment of $275,000 (less the costs of notice and approval of the Velazquez Settlement), and the Velazquez Class Action will be dismissed with prejudice. The settlement also contemplates mutual, general releases among all parties, including the Debtors, the Velazquez Class Members, Madeleine and Cerberus. The Velazquez Settlement payment will be used for, among other purposes, an award of attorney's fees to counsel in the Velazquez Class Action (in the amount of $68,750), an incentive payment of $5,000 to the Class Representative, and payment of costs of administering the distributions to the Settlement Class Members (not to exceed $25,000).

The approval process for the Velazquez Settlement will mirror the settlement approval process for class actions generally and will provide the members of the putative Velazquez class with notice of the settlement terms and an opportunity to opt-out of the settlement class. If the number of persons that opt-out of the settlement exceed more than 5% of the total number of holders of Velazquez Class Claims (*i.e.*, approximately 9,280), the Debtors may withdraw from the settlement (or waive the right to withdraw from the settlement).

The Claims of the Velazquez Class Members are not impaired by the Plan and will be treated strictly in accordance with the terms and conditions of the Velazquez Settlement. If, however, the Holder of a Velazquez Class Claim elects to opt-out of the settlement, such Holder may seek to file an individual Proof of Claim, subject to the Debtors' objections to an extension of the Bar Date for such purpose. If an individual Holder is permitted by the Bankruptcy Court to file an individual Proof of Claim, such claim shall be treated as a Class 4 Claim under the Plan. The allowance or disallowance of an individual Proof of Claim permissibly filed by a Velazquez Excluded Class Member shall be determined in accordance with the Bankruptcy Code

and the resolution procedures established under the Plan. All rights and defenses to the allowance of an individual Proof of Claim permissibly filed by a Velazquez Excluded Class Member are reserved, respectively, by such member, the Debtors and the Committee.

On February 3, 2010, the Debtors and the plaintiff in the Velazquez Class Action (the "Class Representative") filed the *Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Release* ("Preliminary Motion"). The Preliminary Motion was granted by the Court pursuant to the *Order Granting Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Release* ("Preliminary Approval Order"), entered by the Court on March 10, 2010. The Preliminary Order (i) preliminarily approved the Velazquez Settlement, (ii) provisionally certified the Class (for settlement purposes only), (iii) approved the form and manner of the Class Notice and the procedures pursuant to which Class members could choose to opt out of the Settlement and/or object to the Settlement or the disclosure of certain confidential information, (iv) appointed Class Counsel (Brown Woods George LLP and Arbogast & Berns LLP), a Settlement Administrator (Gilardi & Co., LLC) and a Class Representative (Ms. Velazquez), and (v) scheduled a Final Approval Hearing to consider the Velazquez Settlement for June 30, 2010.

On June 9, 2010, the Debtors and the Class Representative filed the *Joint Motion for Final Approval of Class Action Settlement Agreement and Release*. The Velazquez Settlement was finally approved by the Bankruptcy Court on June 25, 2010. The parties anticipate that distributions from the Settlement Fund (*i.e.*, the $275,000 settlement payment less the fees paid to Class Counsel, the incentive award paid to the Class Representative, and the costs of the Settlement Administrator) will be made in Fall 2010.

**Loan Purchaser Claims**

Parties to whom the Debtors sold loans have claims for breaches of warranties and early payment defaults as discussed below. These claims are referred to as EPD/Breach Claims under the Plan, and are separately classified from the Unsecured Claims against the Consolidated Debtors and Aegis REIT.

## C.     Circumstances Leading to the Commencement of the Chapter 11 Cases

In 2007, unprecedented changes in the mortgage loan market, coupled with the rapid decline in the secondary mortgage markets severely impacted the Debtors' ability to obtain financing for the origination of loans. In particular, and as set forth in greater detail below, the Debtors experienced extraordinary increases in Early Payment Defaults, and a corresponding increase in the number of Repurchase Requests, which siphoned available cash away from the Debtors. In addition, as set forth in detail below, the Debtors received substantial Margin Calls that they were unable to satisfy. Despite the Debtors' efforts to obtain capital and manage costs, the accelerated demands for large amounts of capital as the market for the sale of loans decreased at an unprecedented pace led to Margin Calls that were due and payable on or about August 3, 2007. Thus, these factors resulted in the termination of the Debtors' funding by the Warehouse Lenders, caused the Debtors to cease originating loans and significantly scale back their operations, and forced the Debtors to file for bankruptcy protection.

### Increase in Early Payment Defaults and Repurchase Requests

As noted above, the Debtors sold a majority of the loans they originated to their Warehouse Lenders and certain other third parties (the "Loan Purchasers"). Pursuant to the terms of these sales, the Loan Purchasers could, under certain circumstances set forth in the sale contracts, and in the master repurchase agreements in the case of the Repo Lenders, submit Repurchase Requests to the Debtors in the event that, among other things, there were Early Payment Defaults on the purchased loans. Starting in March 2007, the non-prime market experienced a substantial increase in the number of Repurchase Requests. As the number of Repurchase Requests increased, the Debtors had to expend a significant amount of cash in order to "buy back" the loans that were subject of such Repurchase Requests. In March 2007, the Debtors received approximately $30 million worth of Repurchase Requests. These amounts increased to approximately $60 million in April 2007, and approximately $70 million in June 2007. By April 30, 2007, there was $155 million of unsettled outstanding repurchase requests from previous months' sales. This was expected to grow by an additional $250 million by year end.

### The Funding Crisis

As a result of the unprecedented decline in market conditions noted above, the value of the property securing the loans originated by the Debtors decreased. This rapid decrease in value affected the loan to value ratios prescribed under the terms of certain of the Warehouse Credit Facilities and, as a result, caused the Debtors to experience an increase in Margin Calls, starting on or about May 2007, from certain of the Warehouse Lenders. The Debtors were ultimately unable to satisfy each of the Margin Calls they received and defaulted on their obligations under their Warehouse Credit Facilities. Each of the Debtors' Warehouse Credit Facilities contains cross default provisions, such that a default under one Warehouse Credit Facility is also a default under the others. Accordingly, upon the Debtors' default with respect to the Margin Calls, all of the Debtors' Warehouse Lenders terminated their financing with the Debtors. As a result of such terminations and the resulting impact on funding availability for the Debtors' loan origination business, the Debtors voluntarily ceased all loan originations effective at the close of business on August 3, 2007.

On August 8, 2007, the State of Connecticut Department of Banking issued a Temporary Order to Cease and Desist against the Debtors (the "Cease and Desist Order"). On or about the same time, additional Cease and Desist Orders were received by the Debtors from Massachusetts, California, Iowa and Tennessee. Pursuant to the Cease and Desist Orders, the Debtors were ordered, among other things, to stop further lending activity and to obtain replacement funding for the unfunded loan commitments.

### Impact on Servicing

The impact of the Debtors' defaults on their Warehouse Credit Facilities was not limited to the Debtors' loan origination business. The Warehouse Credit Facilities for UBS and RFC were cross-defaulted with the loan servicing agreements pursuant to which the Debtors' serviced loans for UBS and RFC. Both UBS and RFC provided the Debtors with notice purportedly terminating their respective servicing agreements. Fannie Mae also provided the Debtors with

notice purportedly terminating its servicing agreement with the Debtors. In addition, as a result of the Debtors' default on the Warehouse Credit Facilities, the Debtors lost their lines of credit for servicing certain advances pursuant to the Servicing Advance Agreements.

## D.    The Filing of the Chapter 11 Cases

As indicated, the confluence of the above-noted changing market conditions, including the increase in Early Payment Defaults and Reimbursement Requests, the continuing defaults on Margin Calls and the resulting termination of financing by the Warehouse Lenders, and the Cease and Desist Orders effectively foreclosed any opportunity for the Debtors to continue their ordinary course operations.

The Debtors ceased originating loans effective as of the close of business on August 3, 2007. On Monday, August 6, 2007, the Debtors advised their employees that they had ceased originations of mortgage loans. As a result of such extreme and unprecedented market changes, and the cessation of the mortgage loan origination business, the Debtors were compelled to terminate approximately 782 of their employees on August 7, 2007. On August 7, 2007, the Debtors sent notices of planned employee terminations pursuant to the Workers Adjustment and Retraining Notification Act (the "WARN Act").

After the Debtors had already voluntarily stopped all loan originations, the State of Connecticut Department of Banking issued its Cease and Desist Order (defined above) on August 8, 2007, pursuant to which the Debtors were, among other things, ordered to stop making further loans.[10]

As a result of the above-noted rapid and devastating market changes and events, the Debtors were not able to develop plans or raise sufficient capital that would have allowed the Debtors to continue their ordinary operations. The Debtors, therefore, sought bankruptcy protection by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code

As noted above, the Debtors prepetition loan originations were financed by its Warehouse Lenders. With respect to the non-Repo Lenders, this financing was collateralized by the mortgage loans originated by the Debtors, pursuant to the terms of the applicable Warehouse Credit Facilities. (None of the Warehouse Lenders, however, has a blanket lien upon all of the Debtors' cash or accounts.)

In order to liquidate in an orderly manner, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware on August 13, 2007. No trustee or examiner has been appointed in the Chapter 11 Cases. The Committee was appointed on August 24, 2007 to represent the interests of Debtors' general unsecured creditors. The Debtors continue to operate as Debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.

---

[10] Similar actions were taken by Massachusetts, California, Iowa and Tennessee.

## E.     First Day Motions and Other Relief

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, its voluntary petition. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the chapter 11 filing, to establish procedures in the Chapter 11 Cases regarding the administration of the Chapter 11 Cases and interim compensation for Estate professionals, and to facilitate reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Cases addressed the following issues, among others:

**Employees**

On the Petition Date, the Debtors filed their *Motion of the Debtors Pursuant to Bankruptcy Code Sections 105(a), 363 and 507 (a) for an Order Authorizing the Debtors to: (I) Pay Prepetition Wages, Salaries and Bonuses; (II) Pay Severance to Non-Insider, Postpetition Employees Upon Their Termination; (III) Remit Withholding Obligations; (IV) Maintain Certain Employee Benefits Programs and Pay Related Administrative Obligations; and (V) Authorize Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests* (the "Wages Motion") [Docket No. 10].

As of the Petition Date, the Debtors employed 523 full and part time employees in hourly, salaried, supervisory, management and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' operations (collectively, the "Employees"). To minimize the personal hardships the Employees would suffer if prepetition employee-related obligations were not paid when due or honored as expected, and to maintain the morale of the remaining Employees, the Debtors, by the Wages Motion, sought authority, in their discretion, to pay and/or honor, as the case may be, certain prepetition claims for, among other items, wages, salaries, and other compensation solely for continuing Employees, as well as to honor paid time off, fixed holidays, medical benefits, contributions to employee benefit plans, and other employee benefits offered by the Debtors for employees that the Debtors historically had paid in the ordinary course of its business, to reimburse certain reimbursable unpaid employee reimbursement obligations solely for continuing Employees, and to pay all costs incident to the foregoing.

On August 15, 2007, the Court entered its order authorizing the payment of certain prepetition employees' related claims and the continuation of certain employee benefits postpetition [Docket No. 39].

**Cash Management**

On the Petition Date, the Debtors filed their *Motion of Debtors for Order Under 11 U.S.C. § 105, 345, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (V) Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 5].

Prior to the commencement of the Chapter 11 Cases, the Debtors, in the ordinary course of their business, maintained various bank accounts from which they managed their cash receipts and disbursements. The Debtors' cash management system is an integrated network of bank accounts that facilitates the timely and efficient collection, management and disbursement of funds used by the Debtors in their business. Because of the nature of the Debtors' loan servicing business, the massive disruption to the Debtors' business if it had been forced to close the accounts that comprise the cash management system and the approximately two months it would have taken the Debtors to open a new cash management system, it was critical that the existing cash management system remain in place. Absent an immediate order from the Court at the commencement of the Chapter 11 Cases, the Debtors faced the risk of the suspension of its cash management system. The Debtors also needed authority to maintain existing bank accounts and business forms in order to minimize disruptions and make the transition to chapter 11 smoother and more orderly. The Debtors further requested that they be excused from compliance with certain aspects of section 345(b) of the Bankruptcy Code, requiring certain deposit or investment procedures.

The Court entered its interim order granting the relief requested by the Debtors in respect of their cash management system and related relief on August 15, 2007 [Docket No. 40]. The Court entered its final order granting the relief requested by the Debtors in respect of their cash management system and related relief on September 5, 2007 [Docket No. 136].

### Taxes

On the Petition Date, the Debtors filed their *Motion for an Order (I) Authorizing the Debtors to Pay Prepetition Sales and Use and Similar Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* [Docket No. 16].

In connection with the normal operation of its business, the Debtors pay an assortment of sales and use, business and occupations, gross receipts, business privilege and similar taxes (the "Taxes") to various federal, state and local taxing authorities (collectively, the "Taxing Authorities") and pay various regulatory fees ("Regulatory Fees") to federal, state and local regulatory authorities (collectively, the "Regulatory Authorities," and together with the Taxing Authorities, the "Taxing and Regulatory Authorities").

The Court granted the Debtors the authority to make certain prepetition payments to the Taxing and Regulatory Authorities by order entered on August 15, 2007 [Docket No. 38].

### Utilities

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 9].

In the normal course of business, the Debtors have relationships with various utility companies and other providers for the provision of telephone, gas, electricity and related services. Inasmuch as the Debtors did business with many utilities, it was imperative that

"additional assurance" procedures be established for efficient administration of the Debtors' responsibilities under section 366 of the Bankruptcy Code.

On August 15, 2007, the Court entered its interim order implementing the procedures proposed by the Debtors to ensure adequate assurance of future payment to utility service providers [Docket No. 36]. A final order was entered on September 5, 2007 [Docket No. 133].

## Interim Compensation for Professionals

On the Petition Date, the Debtors filed their *Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code* [Docket No. 12]. The Debtors sought authority to implement procedures for the application, interim allowance and payment of Estate Professionals on a monthly basis.

On September 5, 2007, the Court entered its order approving the monthly compensation procedures proposed by the Debtors [Docket No. 131].

## Lease Rejection

On the Petition Date, the Debtors filed their *Motion for Order Under Sections 365(a) and 554(a) of the Bankruptcy Code Authorizing the Debtors to (1) Reject Certain Unexpired Leases of Nonresidential Real Property, and (2) Abandon any Personal Property Located at Such Premises* [Docket No. 11].

The Debtors, after consideration of their current and expected future business objectives, and in connection with efforts to reduce costs, determined that certain leases were unnecessary to the continued operation of the Debtors' business, had no value to the estate, and should therefore be rejected. The leased premises may also have contained various items of personal property owned by the Debtors. The Debtors believed that any personal property at these locations had inconsequential value to the estate when considered in relation to the anticipated expense of sale and any carrying costs associated therewith.

The Bankruptcy Court entered an order granting the relief requested on September 5, 2007 [Docket No. 132].

## Sale of Loans

On the Petition Date, the Debtors filed their *Motion for Order Authorizing the Debtors to (A) Sell Loans Owned by the Debtors and Loans Which are Part of the Debtors' Warehouse Lenders' Portfolio and (B) Honor Existing Obligations and Incur New Obligations in the Ordinary Course of Their Business in Connection with the Servicing of Loans* [Docket No. 15].

By this motion, the Debtors sought entry of an order by the Court authorizing the Debtors to (a) sell loans that had closed and been funded, (b) honor those prepetition loan commitments upon which the Debtors closed but was unable to fund, and (c) honor existing obligations and incur new obligations in the ordinary course of business in connection with the servicing of loans. The Debtors, in the ordinary course of their business, regularly sold the loans that they originated. The Debtors sought authority to sell their Owned Loans and Warehouse Loans. To

maximize the value of these loans, the Debtors needed to sell the Owned Loans and Warehouse Loans in accordance with customary industry practices. In addition, the Debtors' servicing business was important to their creditors and the servicing platform may have value as a marketable asset, as servicing generated significant revenues. The Debtors therefore sought to continue to service loans in the ordinary course of their businesses.

The Bankruptcy Court entered an order granting the relief requested in this motion on August 15, 2007 [Docket No. 35].

**Retention of Key Professionals**

The Debtors sought to employ and retain the firm of Pachulski Stang Ziehl & Jones LLP as its bankruptcy counsel with regard to the filing and prosecution of its Chapter 11 Cases. An order was entered authorizing that retention, effective as of the Petition Date on September 5, 2007 [Docket No. 135].

Debtors also sought to employ Epiq Bankruptcy Solutions as Noticing, Claims and Balloting Agent. An order was entered authorizing that retention on August 15, 2007 [Docket No. 41].

**Ordinary Course Professionals**

On the Petition Date, the Debtors filed their *Motion of the Debtors Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [Docket No. 8], without having to file applications to employment and compensation with respect to such professionals. The "Ordinary Course Professionals" consisted primarily of different professional firms that provided, among other things, various ongoing legal, actuarial and employee benefit consulting services.

On September 5, 2007, the Court entered its order authorizing the employment of ordinary course professionals using the procedures outlined by the Debtors [Docket No. 134].

**Appointment of Committee**

On August 24, 2007, the U.S. Trustee appointed the Committee as the representative of the Debtors' general unsecured creditor constituency in the Chapter 11 Cases. The Committee was composed of Credit Suisse First Boston Mortgage Capital LLC, UBS Real Estate Securities Inc., and Aurora Loan Services, LLC. The Committee retained Landis Rath & Cobb LLP and Hahn & Hessen LLP as counsel and Capstone Advisory Group as its financial advisors to assist in the Committee's involvement in the Chapter 11 Cases.

**Sale of Loan Servicing Platform**

On August 30, 2007, the Debtors filed their *Motion of the Debtors for an Order (A) Approving the Sale of Loan Servicing Platform Assets Free and Clear of all Liens, Claims and Encumbrances; (B) Approving the Assumption and Assignment of Certain Executory Contracts*

*and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 99] (the "Platform Sale Motion").

Through the Platform Sale Motion, the Debtors sought Court approval of a sale of the assets used in their loan servicing operations (the "Loan Platform Assets") to Ranieri & Co., Inc., its designee or affiliate, in accordance with the terms outlined in a certain term sheet which was attached as an exhibit to the Platform Sale Motion. The Loan Platform Assets had been marketed extensively prepetition but no sale was consummated prepetition. The Loan Platform Assets included, but were not limited to, (a) computer hardware and other office equipment, proprietary software of the Debtors used in the Debtors' loan servicing operations, and (b) the issued and outstanding stock of Debtors Aegis Loan Servicing, L.P. and AMC Insurance Agency of Texas, Inc., including, to the extent transferrable, certain mortgage banking, mortgage lending licenses and insurance licenses owned by these two Debtors. The proposed purchase price for the transaction was $500,000.00 and was subject to higher and better bids.

The Debtors afforded interested potential purchasers a fair and reasonable opportunity to submit competing bids but, ultimately, no qualified competing bid was submitted and on September 19, 2007, the Court approved the Platform Sale Motion and entered its *Order Granting Motion of the Debtors for an Order (A) Approving the Sale of Loan Servicing Platform Assets Free and Clear of all Liens, Clams and Encumbrances; (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 218] and the transaction subsequently closed.

The Debtors and the Platform Purchaser also agreed that the Debtors would seek the dismissal of the bankruptcy cases of Aegis Loan Servicing, L.P. and AMC Insurance Agency of Texas, Inc., and on October 15, 2007, the Court entered an order dismissing these two cases.

## Motions to Establish Management Incentive Plan

On August 31, 2007, the Debtors filed their *Motion for an Order Approving an Incentive Plan and Authorizing Payments Thereunder* [Docket No. 104]. The Motion provided twenty nine of the Debtors' remaining employees with incentives in order to maximize the sale value of the Debtors' remaining assets as of the Petition Date. These assets included (i) approximately $595 million in mortgage loans; (ii) other loans being serviced and/or interim serviced by the Debtors in the approximate amount of $3.6 billion (with the exception of $60 million of such loans).[11] These employees were also charged with implementing aggressive cost reductions to eliminate administrative expenses while the above-noted sales and transfers occurred.

On October 17, 2007, the Bankruptcy Court entered its order approving the Incentive Plan and authorizing payments thereunder [Docket No. 392].

On March 27, 2008 the Debtors filed their *Motion to Authorize the Debtors to (I) Implement a Severance Plan Applicable to All of the Debtors Employees and (II) Approve Bonus Payments for Seven Rank and File Employees* through which they sought to implement a

---

[11] As of the Petition Date, there were approximately $60 million of permanently internally funded loans, with approximately $57 million of such loans serviced by the Debtors and approximately $3 million serviced by third parties.

severance plan applicable to the Debtors' 24 remaining employees and provide $5,000 bonuses to seven rank and file employees. This motion was approved on April 15, 2008 [Docket No. 1664]. As of the time of filing this motion, the Debtors' workforce had been reduced from 1,302 employees to 24 employees. These remaining employees were providing services which were critical to the Debtors' ability to maximize the value of the remaining assets for the benefit of creditors.

## F.     Bar Date for Filing Proofs of Claim

On November 9, 2007, the Debtors filed a motion requesting that the Court set a deadline by which parties, including governmental units, must file proofs of claim. The motion was granted by the Court on November 26, 2007 (the "Bar Date Order") and established February 1, 2008, as the deadline for filing Proofs of Claim with the Court for any claims against the Debtors arising prior to the Petition Date (the "Bar Date"). A schedule of the filed Proofs of Claims is being maintained by Epiq, the Debtors' noticing and claims agent. A bar date for Prepetition Tax Claims/Governmental Unit Claims of February 11, 2008, was also established.

## G.     Filing of Statements and Schedules

On September 28, 2007, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records.

## H.     Other Postpetition Activities

Subsequent to the Petition Date, the Debtors directed substantially all of their efforts, and all of the efforts of their professionals, towards streamlining and reducing operations, reducing costs and the liquidation of their hard assets and remaining servicing operations. The Debtors' overarching goal was to maximize the value of such assets while minimizing the expenses associated with maintaining such assets.

### Consolidation of Operations and Costs Savings

Following the Petition Date, the Debtors rejected their former real property lease at 3010 Briarpark, which was used prepetition in the Debtors' operations. As a result of the rejection of the Briarpark lease, the Debtors saved approximately $1,020,000 in annual rental payments and were able to consolidate their postpetition operations to one location at 3250 Briarpark (the "Headquarters"). By November 2007, the Debtors had further consolidated their rented office space by entering into a lease amendment with the landlord of the Headquarters facility through the end of the year in order to significantly reduce the amount of space previously leased as well as to reduce the $114,000 monthly payment otherwise due under the Headquarters lease to approximately $52,000 per month. As of January 1, 2009, the Debtors vacated their former Headquarters space and leased much smaller space nearby at a cost of approximately $5,800 per month.

**Mortgage Servicing Rights Sale**

On January 25, 2008, the Debtors filed their *Motion of the Debtors for an Order (A) Approving Sale of Servicing Rights Owned by the Debtors Free and Clear of all Liens, Claims, Encumbrances and Other Interests and (B) Granting Related Relief* [Docket No. 1070] (the "Mortgage Servicing Rights Sale Motion"). Pursuant to the Mortgage Servicing Rights Sale Motion, the Debtors sought to sell, to the successful bidder at auction, the Debtors' servicing rights for eight loan pools as further described in an exhibit attached to the Mortgage Servicing Rights Sale Motion and certain other related assets (the "Mortgage Servicing Rights Assets").

The Debtors, at the time of the securitization of each loan pool to investors, retained the rights to service the loans following the securitization of such loans to the investors. The loan servicing provided by the Debtors included, without limitation: billing; collections; processing mortgage payments and loan payoffs received from borrowers; remitting payments to the appropriate entities; processing tax and insurance payments received from borrowers and remitting such funds to the appropriate taxing authorities and insurers; maintaining records; engaging in collection efforts; foreclosing on delinquent loans; and performing accounting and reporting services. The Debtors were paid a servicing fee on the outstanding principal balance for each loan they serviced, pursuant to the terms of certain servicing agreements entered into with the indenture trustee of each loan pool. The Debtors contracted with third parties to perform the loan servicing function, under contracts that the Debtors could terminate in connection with any proposed sale. Under a servicing agreement, the servicer was obligated to make certain delinquency advances and servicing advances (collectively, the "Servicing Advances") with respect to the loans in that loan pool. In addition to the servicing rights, the Mortgage Servicing Rights Assets consisted of the Debtors' right to receive payment of servicing fees and certain other related rights from parties to servicing agreements. The Debtors marketed the Mortgage Servicing Rights Assets extensively prior to filing the Mortgage Servicing Rights Sale Motion but did not obtain any offers to purchase prior to filing the Mortgage Servicing Rights Motion.

On January 31, 2008, the Court entered its *Order Approving (A) Sales Procedures in Connection with Sale of Servicing Rights Owned by the Debtors; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; (C) Approving Notice of Respective Dates, Times and Places For Auction and for Hearing on Approval of Sale; (D) Approving Form of Notice; and (E) Granting Related Relief* [Docket No. 1092] which, among other things, scheduled an auction for February 14, 2008, which was subsequently adjourned to May 12, 2008.

All parties that expressed an interest in bidding on all or any portion of the Mortgage Servicing Rights Assets were provided sufficient information by the Debtors to make an informed judgment as to whether to bid. After filing the Mortgage Servicing Rights Sale Motion, one qualified bid was received from Ocwen Loan Servicing LLC (the "Servicing Rights Purchaser") and, at an auction on May 12, 2008, the Servicing Rights Purchaser was confirmed as the highest and best bidder for the Mortgage Servicing Rights Assets. The purchase price was a multiple of the aggregate principal balances for the mortgage loans related to the Mortgage Servicing Rights Assets, plus reimbursement to the Debtors of certain Servicing Advances, plus $50,000.00.

## Objections to Claims

After entry of the Bar Date Order, the Debtors commenced the reconciliation and review of claims asserted against the Debtors' estates. Approximately 1,800 proofs of claim were filed in the Chapter 11 cases. At present, all proofs of claim have been reviewed. As of October 1, 2009, the Debtors had filed nine omnibus claim objections seeking to reduce, reclassify or expunge certain claims. The Debtors anticipate filing several additional omnibus claim objections. In addition, the Debtors also entered into negotiations with their Warehouse Lenders in order to attempt to consensually resolve the Debtors' objections to the various claims asserted by the Warehouse Lenders. The Debtors did file formal objections to the claims of two of their Warehouse Lenders, CSFB and Countrywide, but, as discussed above, these claim disputes have since been resolved.

## Extensions of Exclusivity

Section 1121 of the Bankruptcy Code grants a debtor in possession the exclusive right to file a plan of reorganization for 120 days after the filing of a voluntary petition for relief under chapter 11 (the "Exclusive Filing Period") and the exclusive right to solicit acceptances of that filed plan for 180 days after the filing of such plan (the "Exclusive Solicitation Period"). The Bankruptcy Code allows the Court to extend the Exclusive Filing Period and Exclusive Solicitation Period for cause shown. The Court has entered orders extending the Exclusive Filing Period and Exclusive Solicitation Period from time to time in the Debtors' cases. On October 15, 2008, the Court entered an order extending the Debtors' Exclusive Filing Period through and including November 5, 2008, and the Exclusive Solicitation Period through and including January 5, 2009. On December 16, 2008, the Court entered a further order extending the Debtors' Exclusive Filing Period through and including February 13, 2009, and the Exclusive Solicitation Period through and including April 13, 2009.

## Extension of Removal Deadlines

The Bankruptcy Court has entered various orders extending the time by which the Debtors may remove (i) civil actions that were pending in other forums on the Petition Date (the "Prepetition Removal Deadline") and (ii) civil actions initiated in non-bankruptcy forums after the Petition Date (the "Postpetition Removal Deadline"). The current Prepetition Removal Deadline is June 29, 2010. The current Postpetition Removal Deadline is the later of June 29, 2010, or the time period set forth in Bankruptcy Rule 9027(a)(3)(A).

## Avoidance Actions

The statute of limitations under section 546(a)(1) of the Bankruptcy Code for the commencement of Avoidance Actions expired on August 13, 2009, two years following the commencement of the Chapter 11 Cases. Prior to that date, the Debtors carefully analyzed certain potentially avoidable transfers and ultimately determined to file seventy (70) Avoidance Actions pursuant to Sections 547 or 548 of the Bankruptcy Code. In addition, the Committee commenced one additional Avoidance Action. As of October 15, 2009, the complaints for the Avoidance Actions had not yet been served on the applicable defendants. Moreover, in certain cases, the Debtors entered into consensual tolling agreements with selected

32

parties under which all applicable statutes of limitation were extended (several of these tolling agreements have since been further extended in order to preserve the Debtors' rights).

**Moulton Commutation Arrangements**

As noted above, one of the four non-debtor affiliates is Moulton Reinsurance, Ltd. ("Moulton"). Moulton is a captive reinsurance company. Moulton was a party to certain reinsurance agreements with three mortgage guaranty insurance companies: Radian Guaranty, Inc. ("Radian"), United Guaranty and MGIC (collectively, the "Mortgage Insurers"). Generally speaking, under the reinsurance agreements, Moulton agreed to reimburse the Mortgage Insurers for certain excess losses incurred by the insurers under certain specified mortgage guaranty insurance policies issued by the insurers. In exchange, the Mortgage Insurers paid Moulton certain reinsurance premiums. Moulton also established a separate trust account for the benefit of each insurer to secure the obligations assumed by Moulton under the reinsurance agreements.

Recently, Moulton and Radian entered into that certain *Commutation and Release Agreement* dated as of December 31, 2009 ("Radian Agreement"). Generally speaking, under the Radian Agreement, Radian terminated Moulton's future obligations under its reinsurance agreement with Radian. Moulton, in turn, agreed to disburse the balance of the trust fund to Radian and waived any right to future reinsurance premiums. The parties also exchanged mutual general releases (of behalf of themselves and their respective affiliates which, in Moulton's case, included the Debtors). The Radian Agreement was effectively cash neutral to Moulton. In connection with the agreement, on February 12, 2010, the Debtors filed the *Debtors' Motion Under 11 U.S.C. §§ 105, 363, 1107(A) and 1108 Authorizing the Debtors to Grant the Releases Contained in That Certain Commutation and Release Agreement Between Radian Guaranty Inc. and Moulton Reinsurance. Ltd.* seeking the approval of the Bankruptcy Court to grant the releases contemplated by the Radian Agreement. The Court approved the motion and entered its *Order Under 11 U.S.C. §§ 105, 363, 1107(A) and 1108 Authorizing the Debtors to Grant the Releases Contained in That Certain Commutation and Release Agreement Between Radian Guaranty Inc. and Moulton Reinsurance. Ltd.* on March 4, 2010.

Effective as of December 31, 2009, the Debtors entered into similar commutation and release arrangements with the other two Mortgage Insurers (United Guaranty and MGIC) in an effort to relieve the Estates from further expense associated with the maintenance of Moulton. As with the Radian Agreement, these commutation and release agreements were effectively cash neutral as to Moulton. Additionally, the Debtors have begun dissolution and liquidation proceedings for Moulton in the Turks & Caicos Islands, Moulton's domiciliary jurisdiction.

## I.    **Memorandum of Understanding**

In late 2008, Madeleine, the Debtors, and certain of its principal Warehouse Lenders, with the participation of the Committee, reached an agreement in principle for the resolution under the Plan of certain rights, claims and defenses held by Madeleine, CSFB and UBS (among others). This agreement was set forth in that certain *Memorandum of Understanding* dated as of June 15, 2009 ("MOU"), among AMC, the Committee, Madeleine, CSFB and UBS. Under the MOU, the Debtors agreed to amend the plan of reorganization previously filed by the Debtors on October 14, 2008, to reflect certain consensual terms and conditions. The current Plan is

intended to reflect the terms and conditions of the MOU. Under the MOU, each of the Committee, Madeleine, CSFB and UBS agree to support the Plan insofar as it remains consistent in all material respects with the terms of the MOU. If so, each of the foregoing parties agrees not to object to the Plan and will not support or participate in the filing of any other plan in respect of the Debtors in the Chapter 11 Cases.

In consideration for the release of the Estates' potential challenges to the various claims resolved by the MOU, the MOU provides that (i) the claims of CSFB under its Warehouse Credit Facilities with the Debtors, originally filed in the approximate amount of $13.2 million, will be liquidated and allowed under the Plan as a general, unsecured claim in the amount of $12.2 million, (ii) the similar claims of UBS, originally filed in the approximate amount of $16.2 million, will be liquidated and allowed as a general, unsecured claim in the amount of $14.1 million, and (iii) the Madeleine Claim, originally filed in the approximate amount of $178 million, will also be allowed under the Plan as a general, unsecured claim in the amount of $135 million, although that amount will be reduced to $133 million on account of the assignment of a $2 million portion of such claim pursuant to the Thompson Settlement (described below). Moreover, in addition to Madeleine's claim waivers, assignment and the re-allocation of a portion of certain distributions to Madeleine (discussed below), Madeleine also will contribute at least $750,000 in distributions that it would otherwise be entitled to receive under the Plan (also discussed more fully below). Under the MOU, each of the foregoing claims allowed by the Plan will not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and will be deemed allowed without necessity of any further filings or amendments, including any proof of claim. Further, each of these allowed claims will be classified and treated as Allowed Claims in Class 4 (Consolidated Debtors Unsecured Claims) of the Plan. As such, these claims will be treated in a manner consistent with the treatment afforded to Unsecured Claims held by similarly-situated creditors in Class 4.

The MOU also provides that the EPD/Breach Claim asserted by CSFB will be handled pursuant to the EPD/Breach Claim Protocol. CSFB agrees to adhere, and will not object, to the treatment of the CSFB EPD/Breach Claim pursuant to the EPD/Breach Claim Protocol. On the other hand, UBS has acknowledged pursuant to the MOU that it does not hold, and shall not assert, any EPD/Breach Claim in the Chapter 11 Cases.

The Debtors have also agreed, under the MOU, to disburse to CSFB certain segregated funds (in the approximate amount of $859,623), held by the Debtors pursuant to the *Stipulation and Order Granting Credit Suisse Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1)*, entered by the Bankruptcy Court on October 16, 2007 ("CSFB Stipulation"). CSFB's claim for the disbursement of these funds will not be classified as a Claim under the Plan but will be separately treated pursuant to section 1129(a)(9) of the Bankruptcy Code. Under the MOU, CSFB and the Debtors have agreed to waive and release any other Claims reserved against each other under the CSFB Stipulation.

The MOU further entails a resolution of certain contractual subordination rights asserted by CSFB and UBS under agreements between and each of them and Madeleine. In the case of CSFB, the MOU provides that the Plan will require the reallocation of CSFB of distributions otherwise payable to Madeleine on account of its Allowed Claim until CSFB has received a minimum recovery under the Plan (on account of its $12.2 million claim) of at least $2.5 million.

The minimum recovery amount is subject to increase (i) by $500,000, if the final distribution percentage on account of the Allowed Madeleine Claim equals or exceeds 15%, and (ii) by another $500,000, if the final distribution percentage on account of the Allowed Madeleine Claim equals or exceeds 20%.

Similarly, in the case of UBS, the Plan will provide for the reallocation to UBS of distributions otherwise payable to Madeleine until UBS has received a minimum recovery under the Plan (on account of its $14.1 million claim) of at least $2.8 million (subject to the same increases applicable to CSFB).

Madeleine has no obligation to make payments to either CSFB or UBS except from, and to the extent of, its distributions under the Plan on account of its allowed claim. Under the MOU, each of CSFB and UBS have agreed that the receipt of the foregoing minimum recoveries under the Plan shall be a full and final settlement and release of any subordination rights held by each of them. CSFB and UBS agree not to assert any further entitlement to benefit from any subordination rights against Madeleine, any other Creditors in the Chapter 11 Cases or any other distributions made under the Plan.

Except for the specific Claims set forth above, the MOU further provides that all other Claims held or asserted by CSFB or UBS in the Chapter 11 Cases against any of the Debtors, including any Claims for administrative expenses, shall be deemed disallowed without necessity of any further filings, notice or approval by the Bankruptcy Court.

The MOU contains other terms that are reflected in various provisions of the Plan. For instance, the MOU also reflects the agreement of the parties with respect to the (a) minimum $500,000 (and possibly more, depending on the ultimate recovery to unsecured creditors) contribution by Madeleine to unsecured creditors (similarly implemented by the re-allocation of amounts otherwise distributed to Madeleine under the Plan and for distribution instead to certain Class 4 unsecured creditors), (b) fixed $200,000 contribution by Madeleine to certain Class 4 unsecured creditors under the WARN Settlement (discussed below), and (c) fixed $50,000 contribution by Madeleine to the holder of the Thompson Claim under the Thompson Settlement (discussed below). As before, Madeleine shall have no obligation to make the foregoing contributions except from, and to the extent of, its distributions under the Plan on account of the Allowed Madeleine Claim. In addition, the MOU addresses the scope of the release and exculpation provisions of the Plan and specifies the mechanism for the Debtors and the Committee to identify those Avoidance Actions that are reserved for prosecution following the confirmation of the Plan (*i.e.*, the Reserved Avoidance Actions). If a creditor is not identified on the schedule of such reserved actions (to be filed with the Bankruptcy Court on or before the 10th day prior to the commencement of the Confirmation Hearing), the Debtors and their estates shall be deemed to have released any Avoidance Actions against such creditors.

The Debtors believe that the Plan faithfully reflects the terms of the MOU and is otherwise consistent in all material respects with the MOU. Accordingly, the Debtors anticipate that the Plan will have the support of the Committee, CSFB, UBS and Madeleine.

Following the execution of the MOU, the parties have since entered into various amendments thereto. Specifically, in order to further the implementation of the MOU pending

the confirmation of the Plan, the parties have agreed to toll the statutes of limitation that might otherwise apply to certain claims and causes of action that are the subject of certain releases set forth in, and conditioned upon confirmation of, the Plan. Accordingly, in July 2009 and July 2010, the parties amended the MOU to extend such statutes through (currently), August 13, 2011.

## J.     WARN Litigation and Settlement

On August 20, 2007, Marcia Rommel and Lawanda Williams (the "Named Plaintiffs"), on behalf of themselves and all similarly situated employees terminated on or about August 7, 2007 (collectively, the "Class Members"), by Aegis Mortgage Corporation and Aegis Wholesale Corporation (the "Debtor-Defendants"), filed a complaint against the Debtor-Defendants and Cerberus Capital Management, L.P. ("Cerberus") seeking damages equivalent to 60 days pay and benefits pursuant to the WARN Act (*i.e.*, Worker Adjustment and Retraining Act, 29 U.S.C. §§ 2101, *et seq*.). The complaint was filed in the Bankruptcy Court as an adversary proceeding and is styled *Marcia Rommel and Lawanda Williams v. Aegis Mortgage Corp., Aegis Wholesale Corp. and Cerberus Capital Management, L.P.,* Adversary Proceeding No. 07-51693 (the "WARN Class Action").

Generally, the WARN Act requires that an employer provide 60 days advance notice of employment terminations that constitute a "plant closing" or a "mass layoff," as each those terms is defined by the WARN Act. Alternatively, in lieu of the required notice, the employer must pay 60 days wages and benefits. The Class Action alleges that the employees of the Debtor-Defendants did not receive the required 60 days advance notice of the termination of their employment and seeks damages equivalent to 60 days wages and benefits for all of the employees of the Debtor-Defendants that were terminated on and after August 7, 2007. The Named Plaintiffs have named Cerberus as a defendant based on their allegation that Cerberus and the Debtor-Defendants were a "single employer" under the provisions of the WARN Act and that Cerberus is therefore jointly liable with the Debtor-Defendants for the alleged failure to provide sufficient notice of employment terminations under the WARN Act.

The maximum alleged WARN damages of the Class Members (assuming they prevailed in the action) are $5,697,796, plus attorneys' fees and costs. In their answer to the complaint, the Debtor-Defendants disputed the amount of damages and further disputed that they violated the WARN Act. The Debtor-Defendants further alleged several affirmative defenses, including that they were not required to provide the full 60 days notice based on the "faltering company" and unforeseeable business circumstances exceptions to the WARN Act.

Pursuant to the terms of a settlement agreement ("WARN Settlement Agreement"), the parties have agreed to settle the WARN Class Action subject to approval of the Bankruptcy Court. In exchange for a full release of all claims by the Class Members arising out of the alleged failure of the Debtor-Defendants to provide notice under the WARN Act, the Debtors' estates will make a payment to counsel for the Class Members of $1.1 million ("WARN Settlement Payment"), for distribution by class counsel in accordance with the terms of the WARN Settlement Agreement. Madeleine, an affiliate of Cerberus through which Cerberus funded the Debtors, will also contribute $200,000 that it would otherwise receive as a distributions under the Plan on account of its allowed claim against the Debtors, to unsecured

creditors of the Debtors. Cerberus will also release the Debtors and the Debtors' estates from any claims it may have for indemnity and/or contribution arising out of the claims alleged against it in the WARN Class Action.

Before any distribution to the Class Members, class counsel will make the following payments from the WARN Settlement Payment: (i) $2,500 will be paid to both class representatives as payment for the services they provided to the class in connection with the prosecution of the WARN Action; and (ii) thirty percent of the amount remaining after deduction of the foregoing service payment will be paid as attorneys' fees to class counsel.

After payment of the service payment and the class counsel fees, class counsel will retain for distribution to Class Members the net amount of $766,500 which will be distributed to the Class Members in the amounts set forth in the WARN Settlement Agreement.

On March 18, 2009, the Bankruptcy Court signed its order preliminarily approving the WARN Settlement Agreement, certifying a class for settlement purposes only, appointing class counsel and class representatives, approving the form of notice to the Class Members and setting a final hearing on approval of the WARN Settlement Agreement for June 15, 2009. Class Members may opt-out of the settlement prior to the final hearing. If they choose to opt-out, they will not receive a distribution under the WARN Settlement Agreement and the Debtors' estates will not receive releases from the opt-outs. Class Members that do not elect to opt-out will be bound by the terms of the WARN Settlement Agreement and will be deemed to have released the Debtors' estate from all claims arising out of the failure to provide notice under the WARN Act.

The WARN Settlement Agreement was finally approved by the Bankruptcy Court on June 15, 2009.

## K.    Thompson Litigation and Settlement

D. Richard Thompson ("Thompson") was a former President and Chief Operating Officer of AMC, as well as a shareholder of AMC. In October 2006, Thompson's employment with AMC was terminated. On or about May 31, 2007, Thompson filed a complaint in the Texas State Court, Harris County Texas, styled as *D. Richard Thompson v. Aegis Mortgage Corp. et al.*, Cause No. 2007-33595 (the "Complaint"). Pursuant to the Complaint, Thompson sued AMC and certain other of the Debtors, Madeleine, L.L.C., Cerberus Capital Management, L.P., Stephen A. Feinberg, James G. Jones, Craig J. Chapman, Dan Gilbert, Chad Patton, Drew A. Tanzman, Mark A. Neporent, Ronald N. Goldstein, Claus H. Lund and Hootan Yaghoobzadeh (collectively, the "Defendants"), alleging, *inter alia*, breach of fiduciary duty by the Defendants. On September 11, 2007, the Complaint was removed by the Debtors to the federal district court and then referred to the bankruptcy court for the Southern District of Texas. The Complaint was then transferred to this Bankruptcy Court.

On February 1, 2007, Thompson filed a proof of claim (number 1300) against the Debtors in an unliquidated amount and attached a copy of the Complaint as the basis for the claim (the "Original Proof of Claim"). On February 4, 2007, Thompson filed an amended proof of claim (number 1440) against the Debtors in an unliquidated amount, also with a copy of the Complaint attached thereto (the "Amended Proof of Claim").

The Debtors and Thomson have since entered into that certain *Stipulation Between Debtors, D. Richard Thompson, and Madeleine, LLC Under Bankruptcy Rule 9019 Compromising Controversy and Allowing Nonpriority Unsecured Claim* ("Thompson Stipulation"). The effectiveness of the Thompson Stipulation is subject to the approval of the Bankruptcy Court. Under the Thompson Stipulation, the Amended Proof of Claim will be allowed as a general unsecured claim in the fixed amount of $5,000,000 (the "Allowed Thompson Claim"). The Allowed Thompson Claim will not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including any proof of claim. Thompson's Original Proof of Claim will be deemed withdrawn with prejudice and the Complaint will also be deemed dismissed with prejudice by Thompson.

In addition, pursuant to the Thompson Stipulation, Madeleine has also agreed that an amount of $50,000 (the "Thompson Contribution") that would otherwise be distributed to Madeleine on account of its allowed claim will instead be re-allocated and paid directly to Thompson under the Plan (to the extent confirmed by the Bankruptcy Court). The Disbursing Agent under the Plan is authorized and directed to deduct the Thompson Contribution from the amounts otherwise payable to Madeleine and instead distribute such amount to Thompson. Notwithstanding any other provision in the Plan or the Thompson Stipulation, Madeleine's only obligation to make the Thompson Contribution shall be from, and to the extent of, its distributions under the Plan on account of the Allowed Madeleine Claim.

Finally, subject to the occurrence of the Effective Date under the Thompson Stipulation, Madeleine will also assign $2,000,000 of the face amount (not recovery amount) of the Allowed Madeleine Claim to Thompson (resulting in an increase of the Allowed Thompson Claim from $5 million to $7 million, and a decrease in the amount of the Allowed Madeleine Claim from $135 million to $133 million). The assignment and transfer of this portion of the claim by Madeleine to Thompson is irrevocable and without any recourse to Madeleine. The Thompson Stipulation also provides for a mutual, general release among the parties to the stipulation.

The Thompson Stipulation was approved by the Bankruptcy Court on September 11, 2009.

## L. Federal Tax Refund

On June 29, 2010, AMC received a federal tax refund in the amount of $7,767,055.56 ("Tax Refund"). The Tax Refund is based on the carryback of AMC's 2008 federal tax net operating loss to a prior tax year. The Tax Refund is sufficiently large that it triggers certain automatic audit and review procedures within the Internal Revenue Service. The Debtors are not aware of any adjustments that should be made to this carryback claim and the related Tax Refund; however, the final outcome and timing of resolution of this matter are not possible to predict. Although the Debtors are seeking to expedite the audit and review process within the IRS, it is possible that the customary process may last approximately nine months, and possibly longer depending on the scope of the review. Generally speaking, once the Tax Refund is received by the taxpayer (in this case, on June 29, 2010), the applicable IRS service center has up to 120 days to assign the claim to the applicable field exam unit. The field exam unit typically submits its recommendation to the supervisory joint committee within 60-90 days thereafter.

Thereafter, the joint committee may issue its final letter within 30-60 days. Under certain circumstances, however, the audit process may be prolonged and may last 18-24 months.

As a result, the Liquidating Debtors and the Disbursing Agent intend to reserve the amount of the Tax Refund pending the expiration of the applicable audit and review procedures (subject, however, to (i) the Debtors' ability under applicable law or the Bankruptcy Code to accelerate such audit and review procedures or seek a determination regarding the Estates' right to the refund, or (ii) other deadlines or limitations that may be applicable to such audit and review procedures). In particular, the Debtors may seek a determination under Section 505 of the Bankruptcy Code that would establish the finality of the Tax Refund. As a result of the uncertain timing regarding the Tax Refund, the recovery estimates and the estimates of Available Cash that are set forth in this Disclosure Statement do *not* include the Tax Refund.

## M. Sale of Aegis REIT Related Assets

On July 27, 2010, the Debtors filed the *Motion of the Debtors for an Order (A) Approving Sale of Certain Assets Free and Clear of All Liens, Claims and Encumbrances Pursuant to Sections 105 and 363(b), (f) and (m) of the Bankruptcy Code; (B) Approving Relief Related to assumption of Liabilities; (C) Approving Certain Bid Protections; and (D) Granting Related Relief* (the "Aegis REIT Sale Motion"). Pursuant to the Aegis REIT Sale Motion, the Debtors seek approval for the sale of certain assets described in Section 2.1(a) of an asset purchase agreement ("REIT Agreement") between Debtor Aegis Mortgage Corporation and AEHC, one of AMC's non-debtor subsidiaries (the "Sellers"), to Chotin Acquisition Company, LLC, or its designee ("Buyer"), free and clear of liens, claims and encumbrances in accordance with sections 105 and 363 of the Bankruptcy Code. A copy of the proposed REIT Agreement is attached to the Aegis REIT Sale Motion. A capitalized term that is used in the following discussion, but not otherwise defined, has the meaning given to such term in the REIT Agreement or the Aegis REIT Sale Motion.

The Sale contemplates a payment by the Sellers to the Buyer in the amount of $2,205,000 in exchange for the assumption of certain Assumed Liabilities by the Buyer and the transfer of certain Purchased Assets to the Buyer. The Purchased Assets are comprised of the capital stock of AIC (a non-debtor Affiliate owned by Debtor AMC), and certain investment certificates owned by AEHC (specifically, (i) six Aegis REIT Certificates related to the five Aegis REIT Trusts, and (ii) two certificates related to two Net Interest Margin trusts). AIC also owns similar investment certificates related to other REMIC and NIM securitization trusts. The ownership of the investment certificates representing the residual interests in the Aegis REIT Trusts entails certain significant ongoing obligations, such as providing tax accounting and reporting and other functions for the REIT Trusts (and engaging tax and other professionals to assist with those functions), maintaining certain trust accounts, and providing independent directors, among others. The Assumed Liabilities are principally comprised all post-Closing obligations of AIC and all post-Closing obligations related to the ownership of the investment certificates to be sold by AEHC. Included among the latter obligations are those various duties and responsibilities described above that are associated with qualifying as a REIT Entity. *See, e.g.,* Sections 4.8 and 5.12 of REIT Agreement.

If the REIT Agreement is approved and consummated, the Estates will be relieved of significant liabilities and ongoing obligations which will be assumed by the Buyer. In particular, the Debtors estimate that the costs of maintaining the status of Aegis REIT as a REIT Entity could be approximately $4.5 to $6.75 million over the anticipated life of the Aegis REIT Trust securitizations. The transfer of the Purchased Assets to a REIT Entity[12] will also permit portions of certain claims filed against the estates to be deemed withdrawn and the Debtors' ongoing liability with respect to the Assumed Liabilities as defined in section 2.1(c) of the Agreement to be eliminated. The claims relate to covenants made by Aegis REIT and other Affiliates to maintain the status of Aegis REIT as a REIT Entity for the life of the Aegis REIT Trust securitizations. The failure to qualify as a REIT Entity may constitute an event of default under the Aegis REIT Trusts and may trigger claims related to the breach of the covenants made in the underlying documents. The Debtors estimate that such breaches could generate $100 million of additional claims against the Estates and significantly dilute the anticipated distributions to Creditors under the Plan. Last, If the Aegis REIT Sale Motion is approved by the Court and the Sale closes, the Debtors will release the Certificate Trustees from any claim they may have with respect to the Assumed Liabilities and the registered and beneficial owners of the subject certificates will be barred from asserting claims against the Certificate Trustees with respect to the Aegis REIT Sale Motion, including the relief sought therein and the Released Claims.

A hearing on the Aegis REIT Sale Motion is currently scheduled for August 17, 2010. If the motion is approved and the Sale closes, the Debtors will select the Aegis REIT Disposition option under the Plan.

## IV.

## PLAN OVERVIEW

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND EQUITY INTERESTS IS SET FORTH IN ARTICLES V THROUGH XIII BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT DEBTORS' PROPOSED PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

---

[12] Specifically, an entity that is (a) a "real estate investment trust" within the meaning of Section 856 of the Internal Revenue Code, (b) a "qualified REIT subsidiary" within the meaning of Section 856(l) of the Internal Revenue Code, or (c) a disregarded entity for U.S. federal income tax purposes.

## A.     Debtor Groups/Substantive Consolidation

The Plan will effectuate the substantive consolidation of all the Debtors except Aegis REIT.[13] Accordingly, the Plan treats the Debtors as a single entity and distributions are made on a collective basis to the Holders of Consolidated Debtors Unsecured Claims and Consolidated Debtors EPD/Breach Claims.

The Consolidated Debtors are the following 8 Debtors:  Aegis Mortgage Corporation, Aegis Wholesale Corporation, Aegis Lending Corporation, Aegis Correspondent Corporation, Aegis Funding Corporation, Aegis Mortgage Loan Servicing Corporation, Solutions Settlement Services of America Corporation and Solutions Title of America Corporation.

The Plan is predicated upon the substantive consolidation of the Chapter 11 Cases of the Consolidated Debtors into a single entity solely for the purposes of the Chapter 11 Cases and all actions with respect to voting, Confirmation, Consummation and implementation of the Plan. Voting will be aggregated by type of Claim without regard to the particular Consolidated Debtor against whom a Claim is held.  On the Effective Date, and solely for purposes of the Plan and the distributions and transactions contemplated thereby, the structure of the Plan essentially consolidates all assets and liabilities of the Consolidated Debtors' Estates into a single estate.

Substantive consolidation of the Chapter 11 Cases for the above-described purposes is supported by the Warehouse Lenders and the Committee, and is warranted for various reasons. Furthermore, the MOU provides that the parties thereto will "agree to support the approval and confirmation of the [Plan] by the Bankruptcy Court pursuant to Sections 1125, 1126 and 1129 of the Bankruptcy Code and the substantial consummation of the [Plan] at the time and according to the terms and conditions of the [Plan]."

In *In re Stone & Webster, Inc.*, the United States Bankruptcy Court for the District of Delaware held that implementation by substantive consolidation is clearly an allowable provision in a Chapter 11 plan.  In fact, the United States Court of Appeals for the Third Circuit recently addressed the equitable remedy of substantive consolidation in bankruptcy cases in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).  In *Owens Corning*, the Third Circuit stated that substantive consolidation of two or more entities is warranted (absent consent) when either "(i) pre-petition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) post-petition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. at 211. Due to the fact that, pre-petition, the Consolidated Debtors' creditors disregarded separateness, and therefore treated the Consolidated Debtors as one legal entity, substantive consolidation is warranted.

Further, in *Owens Corning*, the United States Court of Appeals for the Third Circuit rejected a so-called "deemed consolidation" which had the effect of preventing secured lenders from realizing the benefits of their pre-petition bargain for separate guarantees from a number of

---

[13]  In the event, however, the Aegis REIT Disposition option is selected, any co-Debtor Claims in Classes 7 and 8 of the Plan (*i.e.*, any Claim against Aegis REIT that is also a liability of any of the Consolidated Debtors) that are deemed included in Classes 4 and 5 of the Plan, respectively, shall be treated as if such claims were substantively consolidated as a single Claim against the Liquidating Debtors.

the debtor's affiliates. To be clear, to the extent that the limited consolidation for plan purposes proposed by the Consolidated Debtors can be labeled a "deemed consolidation," such consolidation will not harm the Consolidated Debtors' Unsecured Creditors in that it is the Warehouse Lenders, rather than trade creditors, who have the ability to assert Claims against multiple Consolidated Debtors. (As indicated, the Debtors' Warehouse Lenders support the Plan.) As such, the Consolidated Debtors take the position that there are no trade creditors harmed by the proposed consolidation.

Notwithstanding the substantive consolidation of the Consolidated Debtors, nothing in the Plan shall effect or be deemed to constitute a substantive consolidation of the Consolidated Debtors and Aegis REIT for any purpose.

## B.     Treatment Options for Aegis REIT

As indicated, Aegis REIT is a wholly-owned subsidiary of Debtors ACC, AFC and ALC. Aegis REIT owns the equity of non-Debtor AEHC, a securitization trust which is not a chapter 11 debtor (the "Trust Equity"). Aegis REIT has no other meaningful assets other than the Trust Equity. It is unclear whether the Trust Equity has any value. Aegis REIT also has no Claims against it other than the Claims of certain Warehouse Lenders and Madeleine.

The Plan provides for three alternative means of implementation with respect to Aegis REIT and the associated Aegis REIT Parties.[14]  The three treatment options are: (1) a **disposition** prior to the Effective Date (*i.e.*, a sale or other transfer of all or substantially all of the Aegis REIT Certificates or any Debtor's Equity Interests in any of AEHC, AIC or AABSC to a REIT Entity prior to the Effective Date), (2) ongoing **maintenance** of Aegis REIT as a REIT Entity following the Effective Date (*i.e.*, the reorganization of Aegis REIT as a REIT Entity pending (a) a sale or other transfer of all or substantially all of the Aegis REIT Certificates or any Debtor's Equity Interests in any of AEHC, AIC or AABSC to a REIT Entity, or (b) the maturity, expiration or termination of the Aegis REIT Certificates according to their respective terms), or (3) the **dissolution** of Aegis REIT following the Effective Date (*i.e.*, the determination by Aegis REIT following the Effective Date to (a) dissolve under applicable nonbankruptcy law, (b) sell or transfer all or substantially all of the Aegis REIT Certificates or any Debtor's Equity Interests in any of AEHC, AIC or AABSC to an entity that is *not* a REIT Entity, or (c) otherwise discontinue its status as a REIT Entity).

The first two options (disposition and ongoing maintenance) are each intended to minimize the adverse consequences that might ensue following a determination by Aegis REIT to discontinue its status as a REIT Entity.[15]  Under the disposition option, another qualified REIT Entity would undertake Aegis REIT's obligations with respect to the Aegis REIT Certificates.

---

[14]  The Aegis REIT Parties are: (i) Aegis REIT, (ii) Aegis Equity Holding Corporation, a Delaware corporation ("AEHC"), (iii) Aegis Investments Corporation, a Delaware corporation ("AIC"), and (iv) Aegis Asset Backed Securities Corporation, a Delaware corporation ("AABSC").

[15]  Under the Plan, a REIT Entity refers to an entity that (i) qualifies for taxation as a real estate investment trust under applicable provisions of the Internal Revenue Code, (ii) is a qualified subsidiary of a real estate investment trust under applicable provisions of the Internal Revenue Code, or (iii) is solely owned by either of the foregoing entities but is otherwise disregarded as an entity separate from its owner under applicable provisions of the Internal Revenue Code.

The disposition option would avoid the potential significant accrual of claims based on the failure to maintain the status of Aegis REIT as a REIT Entity. Under this option, the holders of Allowed Class 7 and Class 8 Claims against Aegis REIT would receive the same treatment as (and would be deemed included in) Classes 4 and 5 of the Plan (except that the Convenience Claim option would not be available to the holders of Class 7 Claims). Moreover, any co-Debtor Claims in Classes 7 and 8 of the Plan (*i.e.*, any Claim against Aegis REIT that is also a liability of any of the Consolidated Debtors) that are deemed included in Classes 4 and 5 of the Plan, respectively, will be treated as if such claims were substantively consolidated as a single Claim against the Liquidating Debtors.[16]

If the Aegis REIT Sale Motion (described above) is approved by the Bankruptcy Court, the Debtors would select the Aegis REIT Disposition option under the Plan. Given the broad scope of the assets proposed to be acquired under the terms of the REIT Agreement, there will not be any material Aegis REIT Assets Remainder to be transferred to the Liquidating Debtors following Confirmation (aside from the rights and claims arising under the REIT Agreement). The Debtors are not aware of any Litigation (Aegis REIT) that would be included with the Aegis REIT Assets Remainder.

Under the maintenance option, Aegis REIT would effectively reorganize as an ongoing REIT Entity pending a possible future, post-Effective Date disposition to another REIT Entity. Under this scenario, the Aegis REIT Assets would be transferred to the Liquidating Debtors and, after the deduction of any maintenance costs borne by the Liquidating Debtors, would be distributed on a *pro rata* basis to the Holders of Allowed Class 7 and Allowed Class 8 Claims against Aegis REIT. Significantly, however, under maintenance scenario (as with the disposition option), the Debtors would avoid the substantial dilution of the recovery to holders of Claims against the Consolidated Debtors that might result from the failure of Aegis REIT to maintain its status as a REIT Entity. (Certain of the Consolidated Debtors are contractually obligated to maintain Aegis REIT's status as a REIT Entity.) Even though the reorganization of Aegis REIT would result in only a negligible recovery on any Claims against Aegis REIT, the Holders of Claims against the Consolidated Debtors would not suffer a potentially significant reduction in their distributions under the Plan. Further, the Consolidated Debtors (who will ultimately liquidate) will assign their Equity Interests in Aegis REIT to the Aegis REIT Common Stock Transferee, on the Effective Date. The Aegis REIT Common Stock Transferee will thereafter assume responsibility for retaining the REIT status of Aegis REIT.

---

[16] As discussed in greater detail above, the Debtors obtained the funds needed for their mortgage loan originations under several warehouse lines of credit and master repurchase agreements provided by various Warehouse Lenders, including UBS, Lehman, Bear Stearns, Ixis, CSFB, Liquid Funding, Morgan, RFC and Countrywide. As of the Petition Date, the Debtors estimated that they owed their Warehouse Lenders approximately $412.5 million. Aegis REIT was a co-borrower, and therefore jointly and severally liable, under the warehouse credit facilities with virtually all of these Warehouse Lenders (*i.e.*, UBS, Lehman, Bear Stearns, Ixis, CSFB, RFC and Countrywide). Moreover, Aegis REIT was also a borrower under the Debtors' credit agreement with Madeleine. Under the MOU, subject to confirmation of the Plan, CSFB, UBS and Madeleine have agreed to assert their Claims against the Consolidated Debtors (not Aegis REIT). RFC and Countrywide have similarly agreed, subject to confirmation of the Plan, to assert their Claims against the Consolidated Debtors. If the Aegis REIT Disposition option is selected, any remaining Claims against Aegis REIT in Classes 7 and 8 of the Plan shall receive the same treatment as the Holders of Claims against the Consolidated Debtors in Classes 4 and 5 of the Plan.

The third option (dissolution), is a last-resort alternative in the event the Debtors are unable to identify a suitable disposition prior to the Effective Date or are unable to marshal the resources necessary to maintain the status of Aegis REIT as a REIT Entity pending a potential post-Effective Date sale or other qualified transaction. Under this scenario, the Aegis REIT Assets would be transferred to the Liquidating Debtors and, after the deduction of any dissolution costs borne by the Liquidating Debtors, would be distributed on a *pro rata* basis to the Holders of Allowed Class 7 and Allowed Class 8 Claims against Aegis REIT. It is anticipated that any such distributions would be negligible. Moreover, the dissolution option would potentially trigger the assertion of additional claims against the Consolidated Debtors relating to the failure to maintain the status of Aegis REIT as a REIT Entity. These additional claims might result in significant dilutive consequences to the Holders of Class 4 and Class 5 Claims against the Consolidated Debtors.

## C.    **EPD/Breach Claim Protocol**

EPD/Breach Claims relate to claims for hundreds of thousands of mortgage loans sold by the Debtors in the secondary market to Loan Purchasers. As noted above, many of the agreements that the Debtors used to sell mortgage loans in the secondary market, or to complete securitizations, provided that the buyer could "put" the loans back to the selling Debtor if the Debtor breached certain representations and warranties (a "Breach Claim") or if the borrower committed an early payment or first payment default ("EPD") either immediately after the loan was sold or during a specified period of time, generally around 30-60 days, after the loan was sold (an "EPD Claim").

The Debtors have concluded that attempting to resolve these claims for each individual loan would require both the creditors and the estates to expend resources that would be grossly disproportionate to the amounts at issue, which would have the result of reducing the amount of cash that could be distributed to creditors. Litigating such matters at a loan-by-loan level would also delay substantially the distributions to these creditors. The Debtors therefore propose the EPD/Breach Claim Protocol, which the Holders of EPD/Breach Claims must unanimously accept (unless the Debtors, in consultation with the Committee, otherwise determine to proceed under the protocol with respect to those Creditors that have agreed to abide by the treatment of their EPD/Breach Claims under the protocol). Absent such unanimity, EPD/Breach Claims will be allowed and disallowed in accordance with Bankruptcy Code standards otherwise applicable to disputed claims. The EPD/Breach Claim Protocol is attached as **Exhibit A** to the Plan.

The protocol differentiates between EPD Claims and Breach Claims.

The universe of EPD Claims is known since the period for a borrower payment default that gives rise to an EPD re-purchase right has passed. The damages that flow from the Debtors' inability to repurchase loans subject to EPD rights is more difficult to assess. Because the claimant was unable to resell these loans to the Debtors, it suffered damages, but the Debtors believe that these damages are not equal to the entire unpaid principal balance ("UPB") of the loans. If such matters were litigated loan-by-loan, they would involve such factual and legal issues as whether the amounts of a "loss" realized by a claimant was the result of the Debtors' failure to repurchase the loans or any number of other factors. The Debtors believe that the major determinant of the loss for a loan was the borrower payment history. For example, if a

loan was at one point in payment default but the borrower had cured that default and was presently performing, the loss resulting from the Debtors' failure to repurchase the loan would likely be *de minimus*. On the other hand, if the loan purchaser had foreclosed on the property and held the property as a real estate owned ("REO") the loss was likely to be more severe.

The parties involved in developing this protocol analyzed the Debtors' history of losses incurred by them when they had repurchased loans, the experience of the claimants, amounts asserted in proofs of claim, and industry data. In any such assessment, a date certain also needs to be picked to measure the status of each affected loan. Here, the parties have agreed to use August 31, 2007 – the close of the month of the Petition Date. The protocol for calculating EPD Claims is then based on the following grid for loans subject to EPD Claims measured as of August 31, 2007.

- Current: 5% of UPB

- 31-60 days delinquent: 15% of UPB

- 61-90 days delinquent: 20% of UPB

- 91 or more days delinquent: 30% of UPB

- Borrower in bankruptcy: 35% of UPB

- In foreclosure: 40% of UPB

- REO: 45% of UPB

If the Creditor sold the loan prior to August 31, 2007, and does not know the loan status as of August 31, 2007, the damage assessment will be measured as of the date of the sale. If the loan was foreclosed, the protocol will consider the property to be REO and the measurement of damages will be based on the UPB at the time of foreclosure.

If subsequent to the sale of the loan by a Debtor and prior to August 31, 2007, the borrower and the owner of a loan agreed to modify the payment (principal or interest) terms of the loan, then the loan will be treated under the next most severe category in the grid. For example, if a Creditor and borrower agreed in April 2007 to relax the borrower's payment obligations under a loan, and on August 31, 2007 the borrower was current on the modified schedule, this loan will be treated as though the borrower was 31-60 days delinquent. Similarly, if on August 31, 2007, that same borrower was 40 days delinquent under the modified payment schedule, the loan will be treated as though the borrower was 61-90 days delinquent.

Breach Claims are more complicated. Determining whether the Debtors breached a representation or warranty in a loan sale agreement would entail a detailed loan-by-loan assessment of the specific allegation. In turn, the analysis would entail a degree of subjectivity since some of the standard representations and warranties are not susceptible to clear objective assessment. In addition, many of the secondary loan buyers asserted in their proofs of claim that they would not be able to liquidate such claims fully for years since there often would be no reason to ferret out a breach until and unless the borrower defaulted. And after such assessments were made, it would be necessary to develop a methodology for assessing the damages that

resulted from the Debtors' inability to repurchase the loans, as opposed to losses that the loan buyers suffered based on market and other conditions.

The parties analyzed substantial data and developed a protocol that takes into account statistical measures of the normal incidence in their experience of breaches over the life of a pool of loans. For example, the highest incidence of breaches will likely be recognized relatively soon after a pool of loans is sold. Conversely, after a pool of loans has been held by a loan buyer for a number of years, it is less likely that new breaches will come to the fore. In addition, the protocol utilizes a measure of damages that are likely to result from such a breach which is married with the statistical analysis of the likelihood of a breach based on the seasoning of the pool. The result is the following protocol.

The damages resulting from Breach Claims will be based upon the simplifying assumptions that: (i) .478% of the loans in any pool will at some point be subject to a breach that would have caused the selling Debtor to have repurchased the loan, (ii) the "seasoning" of loans will be taken into account so that this .478% incidence is spread over the life of the pool based on the Debtors' historic data concerning the timing of when Breach Claims are asserted, and (iii) damages resulting from breaches will be set at 28% of the UPB of the loan as of August 31, 2007. The following table sets forth this approach.

| Year | Quarter | % Incidence | Damages |
|------|---------|-------------|---------|
| 2007 | 1 Qtr | .478% | 0.1338% |
| 2006 | 4 Qtr | .382% | 0.1071% |
| 2006 | 3 Qtr | .357% | 0.0999% |
| 2006 | 2 Qtr | .271% | 0.0758% |
| 2006 | 1 Qtr | .217% | 0.0607% |
| 2005 | All Qtrs | .096% | 0.0270% |
| 2004 | All Qtrs | .026% | 0.0069% |
| 2003 | All Qtrs | .013% | 0.0035% |

If an applicable loan purchase agreement between a Debtor and a non-affiliate of the Debtors did not contain an EPD provision, but did allow the purchaser to cause a Debtor to repurchase loans based on breaches of other types of representations and warranties, the damage calculations set forth in the foregoing table will be multiplied by 1.68.

Damages, for purposes of distributions under the Plan, will be measured by applying the percentage factor in the third column of this table against the August 31, 2007 UPB of the loans purchased from the selling Debtor; provided, however, that in no case will the damage calculation for any pool be less than $5,000.

If the Creditor sold the loan prior to August 31, 2007 and does not know the UPB as of August 31, 2007, the damage assessment will be based on the UPB as of the date of sale. If a loan was foreclosed on or prior to August 31, 2007, the measurement will be based on the UPB at the time of foreclosure.

Pursuant to the Voting Instructions, the Debtors have circulated a form of EPD/Breach Claim Questionnaire to the holders of EPD/Breach Claims. The purpose of the questionnaire is

46

to gather information that is sufficient to estimate the amount of EPD/Breach Claims for voting purposes. The Plan also provides that the Holders of EPD/Breach Claims (Submitted) (*i.e.*, those Holders of EPD/Breach Claims that do not affirmatively elect to opt out from the application of the EPD/Breach Claim Protocol to the allowance of their claims), will also be required to complete the EPD/Breach Claim Questionnaire in order to implement the EPD/Breach Claim Protocol for distribution purposes.

Under the Voting Instructions, the Debtors will use the EPD/Breach Claim Questionnaire form ***both*** for estimating EPD/Breach Claims for voting purposes and for determining the amount that Holders of Allowed EPD/Breach Claims (Submitted) will be entitled to receive under the Plan. If the Debtors need additional information in order to determine how much they will distribute to the Holders of Allowed EPD/Breach Claims (Submitted), they may request supplemental responses to the EPD/Breach Claim Questionnaire in order to collect that information.

If a Creditor holds an EPD/Breach Claim and does not timely return the questionnaire by September 20, 2010, then, for voting purposes, such claim will be temporarily allowed in the amount of $1.00. If, however, the form is timely returned, the Debtors will apply the EPD/Breach Claim Protocol to determine the amount of the claim that will be temporarily allowed for voting purposes. Under the Voting Instructions, Creditors will have an opportunity to review and object to the proposed amount of their EPD/Breach Claim that will be temporarily allowed for voting purposes.

If a Creditor that holds an EPD/Breach Claim (Submitted)[17] does not timely return the questionnaire by October 20, 2010, the date of the Confirmation Hearing (or such later date as may reasonably be agreed upon by the Debtors and the Holder of an EPD/Breach Claim (Submitted), not to exceed 15 days following the date of the Confirmation Hearing), then such Creditor shall be forever barred from asserting an EPD/Breach Claim against the Debtors or their property, or sharing in any distributions under the Plan. If, however, the form is timely returned, the Debtors will apply the EPD/Breach Claim Protocol to determine the amount of the claim that will be allowed for distribution purposes under the Plan. Any disputes concerning the application of the EPD/Breach Claim Protocol to the determination of any particular EPD/Breach Claim (Submitted) shall be submitted to the Bankruptcy Court for resolution.

## V.

## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS

### A.    Introduction

---

[17]    As noted, EPD/Breach Claims (Submitted) refers to those Holders of EPD/Breach Claims that do not affirmatively elect to opt out from the application of the EPD/Breach Claim Protocol to the allowance of their claims. A Holder of an EPD/Breach Claim must File a written notice of election with the Bankruptcy Court on or before the Plan Objection Deadline in order to opt out of the EPD/Breach Claim Protocol and instead have its claim independently determined and allowed by order of the Bankruptcy Court (other than as provided for under the EPD/Breach Claim Protocol), or as otherwise permitted under the Plan.

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a Class:

## B. Administrative Claims

Each Holder of an Allowed Administrative Claim shall receive, from the Plan Proceeds, without interest, Cash equal to the Allowed Amount of such Claim, unless such Holder shall have agreed to different treatment of such Claim, at the sole option of the Debtors or the Liquidating Debtors, as the case may be: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holders of such Claims and the Debtors or the Liquidating Debtors, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), until the entry of a final decree or an order converting or dismissing the Chapter 11 Case.

Holders of Administrative Claims (including, without limitation, Professionals) requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code that do not file such requests by the applicable deadline provided for herein shall be forever barred from asserting such claims against the Debtors, their Estates, Reorganized Aegis REIT, the Liquidating Debtors, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, and without waiver of any argument available that such Claim is already time-barred by prior orders of the Bankruptcy Court, all Administrative Claims that are required to be Filed and not Filed by the Administrative Claim Bar Date shall be deemed disallowed and discharged. As provided herein, the Claims Reserve Account will include funds sufficient to cover the aggregate asserted amount of all disputed Administrative Claims. Without limiting the foregoing, all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date.

## C. Professional Fee Claims

The Bankruptcy Court must rule on and allow all Professional Fee Claims before the fees will be owed and paid. For all Professional Fee Claims, except Bankruptcy Clerk's Office fees, the fees and expenses of the Claims Agent, and U.S. Trustee's fees, the Professional in question must file and serve a properly noticed final fee application and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

The Liquidating Debtors may retain and compensate professionals for services rendered following the Effective Date without order of the Bankruptcy Court. If the Liquidating Debtors object in writing to the payment of any compensation, such Disputed amount shall not be paid prior to the earlier of the resolution of such dispute or a ruling by the Bankruptcy Court.

Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered prior to the Effective Date must File and serve, pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

## D. Priority Tax Claims

On the later to occur of (i) the Effective Date or (ii) the date on which such Claim shall become an Allowed Claim, the Liquidating Debtors shall pay to each Holder of an Allowed Priority Tax Claim from the Plan Proceeds the Allowed Amount of such Allowed Priority Tax Claim in full, in Cash (without interest from the Petition Date).

## E. Other Administrative Expenses

On or as soon as practicable following the Effective Date, the Debtors shall release the CSFB Fund to CSFB in full and final settlement and satisfaction of any CSFB Servicing Claims. On the Effective Date, CSFB and the Debtors shall be deemed to waive and release any other Claims reserved against each other under the CSFB Stipulation, including any Claims by CSFB for interest on account of the CSFB Funds (except insofar as such funds may have earned interest while on deposit in the CSFB Account, in which case, the earned interest attributable to such funds shall also be released to CSFB), provided that, nothing in the Plan shall affect CSFB's rights to "Reimbursements" (as defined in the CSFB Stipulation) from Ocwen Loan Servicing, LLC for the period on and after the Petition Date.

## VI.

## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

## A. Summary

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to

the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**B.    Classification and Treatment of Claims against the Debtors**

The classification of Claims and Equity Interests against the Debtors pursuant to the Plan is as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class  1 –  Priority Claims | Impaired | Entitled to Vote |
| Class  2 –  Secured Claims[18] | Impaired | Entitled to Vote |
| Class  3 –  Convenience Claims | Impaired | Entitled to Vote |
| Class  4 –  Consolidated Debtors Unsecured Claims | Impaired | Entitled to Vote |
| Class  5 –  Consolidated Debtors EPD/Breach Claims | Impaired | Entitled to Vote |
| Class  6 –  Velazquez Claims | Unimpaired | Not Entitled to Vote |
| Class  7 –  Aegis REIT Unsecured Claims | Impaired | Entitled to Vote |
| Class  8 –  Aegis REIT EPD/Breach Claims | Impaired | Entitled to Vote |
| Class  9 –  Intercompany Claims | Impaired | Not Entitled to Vote |
| Class 10 – Consolidated Debtors Equity Interests | Impaired | Not Entitled to Vote |
| Class 11 – Aegis REIT Preferred Stock Equity Interests | Impaired | Entitled to Vote |
| Class 12 – Aegis REIT Common Stock Equity Interests | Impaired | Not Entitled to Vote |

**Class 1 – Priority Claims**

a.    Classification:  Class 1 consists of Priority Claims against any of the Debtors.

b.    Treatment:  The Liquidating Debtors shall pay from the Plan Proceeds the Allowed amount of each Class 1 Priority Claim to each Creditor holding a Class 1 Priority Claim as soon as practicable following the later of (a) the Effective Date and (b) the date such Class 1 Priority Claim becomes an Allowed Claim (or as otherwise permitted by law).  The Liquidating Debtors shall pay each Creditor holding a Class 1 Priority Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; provided, however, that such Creditor may be treated on such less favorable terms as may be agreed to in writing by such Creditor.

c.    Voting:  Class 1 is an Impaired Class and Holders of Class 1 Claims are entitled to vote on the Plan.

---

[18]  Each Holder of a Class 2 Claim constitutes a separate subclass under the Plan, to the extent any such Claims exist.

**Class 2 – Secured Claims**

    a.    Classification: Class 2 consists of Secured Claims against any of the Debtors. Each Holder of a Class 2 Claim constitutes a separate subclass under the Plan.

    b.    Treatment: To the extent any Secured Claims exist, at the option of the Debtors, the Liquidating Debtors or Reorganized Aegis REIT, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such Allowed Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the holder of such Claim and the Liquidating Debtors, the Holder of such Secured Claim will receive a Cash payment (from the Plan Proceeds) equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Secured Claim.

    c.    Voting: Class 2 is an Impaired Class and Holders of Class 2 Claims are entitled to vote on the Plan.

**Class 3 – Convenience Claims**

    a.    Classification: Class 3 consists of the Holders of Convenience Claims against any of the Consolidated Debtors.

    b.    Treatment: Each Holder of an Allowed Convenience Claim shall receive, in exchange for and in full satisfaction of such Claim, a Cash payment from the Plan Proceeds equal to 20% of the amount of such Claim. Any Holder of a Claim that would otherwise have been classified in Class 4, but for the timely election on the Ballot by the Holder to reduce the aggregate of all its Claims to a single Claim of $25,000 and participate solely in Class 3, shall be deemed to have waived any right to participate in Class 4 as to any and all Claims held by such Holder and shall receive no distribution under Class 4. Notwithstanding the selection of the Aegis REIT Disposition option, no Holder of a Class 7 Claim (that shall otherwise be deemed classified in Class 4 of the Plan following the selection of such option), shall be entitled to treatment (or to elect treatment) as the Holder of a Convenience Claim under Class 3 of the Plan.

c. Voting: Class 3 is an Impaired Class and the Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

## Class 4 – Consolidated Debtors Unsecured Claims

a. Classification: Class 4 consists of the Claims of Holders of Unsecured Claims against any of the Consolidated Debtors, excluding EPD/Breach Claims against any of the Consolidated Debtors.

b. Treatment: Each Holder of an Allowed Class 4 Claim shall receive a Pro Rata share (with the Holders of Class 5 Claims) of the Net Plan Proceeds. In addition, (i) each Holder of an Allowed Unsecured Claim in Class 4 Creditors Subgroup A shall receive a Pro Rata share of the Class 4 Creditors Contribution, and (ii) each Holder of an Allowed Unsecured Claim in Class 4 Creditors Subgroup B shall receive a Pro Rata share of the WARN Contribution. In the event the Aegis REIT Disposition option is selected, all Class 7 Claims shall be deemed classified under Class 4 of the Plan and shall receive the treatment specified for the Holders of Allowed Class 4 Claims under the Plan. Moreover, any co-Debtor Claims in Class 7 the Plan (*i.e.*, any Claim against Aegis REIT that is also a liability of any of the Consolidated Debtors) that are included in Class 4 of the Plan, shall be treated as if such claims were substantively consolidated as a single Claim against the Liquidating Debtors. Pursuant to the Plan, the Claims of certain holders of Class 4 Claims are being allowed by the Plan. Specifically, on the Effective Date, the (i) the Warehouse Lenders' Claim held by CSFB will Allowed as a Class 4 Claim in the amount of $12,200,000; (ii) the Warehouse Lenders' Claim of UBS will Allowed as a Class 4 Claim in the amount of $14,100,000; and (iii) the Madeleine Claim will be Allowed as a Class 4 Claim in the amount of $135,000,000, provided that, upon the approval of the Thompson Settlement, the amount of the Allowed Madeleine Claim will be reduced to $133,000,000 as a result of the transfer of $2,000,000 of the Allowed Madeleine Claim to Thompson pursuant to such settlement. The foregoing Claims that are Allowed by the Plan are not subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments, including any proof of claim.

c. Voting: Class 4 is an Impaired Class and each Holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.

## Class 5 – Consolidated Debtors EPD/Breach Claims

a. Classification: Class 5 consists of the Claims of Holders of EPD/Breach Claims against any of the Consolidated Debtors.

b.  Protocol: The allowance or disallowance of Class 5 EPD/Breach Claims (Submitted) shall be determined in accordance with the EPD/Breach Protocol if the EPD/Breach Claim Protocol Conditions are satisfied. If any Holder of a Class 5 EPD/Breach Claim (Submitted) fails to (a) submit an EPD/Breach Claim Questionnaire by the date of the Confirmation Hearing (or such later date as may reasonably be agreed upon by the Debtors and the Holder of a Class 5 EPD/Breach Claim (Submitted), not to exceed 15 days following the date of the Confirmation Hearing), or (b) if such Holder has timely submitted an EPD/Breach Claim Questionnaire by the date of the Confirmation Hearing, supply sufficient additional information to calculate the amount of its EPD/Breach Claim (Submitted) in accordance with the EPD/Breach Claim Protocol within thirty (30) days following the date of a reasonable written request for such additional information by the Liquidating Debtors, such Holder shall be forever barred from asserting an EPD/Breach Claim against the Debtors or their property, or sharing in any distributions under the Plan. If the EPD/Breach Claim Protocol Conditions are not satisfied, the allowance or disallowance of such claims will be determined in accordance with the Bankruptcy Code and the resolution procedures established under the Plan. The allowance or disallowance of Class 5 EPD/Breach Claims (Opt Out) shall be determined in accordance with the Bankruptcy Code and the resolution procedures established under the Plan. Any disputes concerning the application of the EPD/Breach Claim Protocol to the determination of any EPD/Breach Claim (Submitted) shall be submitted to the Bankruptcy Court for resolution.

c.  Treatment: Each Holder of an Allowed Class 5 EPD/Breach Claim (Submitted and Opt Out) shall receive a Pro Rata share (with the Holders of Class 4 Claims) of the Net Plan Proceeds. In the event the Aegis REIT Disposition option is selected, all Class 8 Claims shall be deemed classified under Class 5 of the Plan and shall receive the treatment specified for the Holders of Allowed Class 5 Claims under the Plan. Moreover, any co-Debtor Claims in Class 8 the Plan (*i.e.*, any Claim against Aegis REIT that is also a liability of any of the Consolidated Debtors) that are included in Class 5 of the Plan, shall be treated as if such claims were substantively consolidated into a single Claim against the Liquidating Debtors. Certain Holders of EPD/Breach Claims have separately agreed, either in the MOU (discussed above), or other settlement agreements to the treatment of such claims under the protocol. Specifically, the EPD/Breach Claims held by CSFB, RFC and Countrywide Home Loans, Inc., will each be treated as an EPD/Breach Claim (Submitted), subject to the terms of certain settlement stipulations between the Debtors and such parties.

d.  Voting: Class 5 is an Impaired Class and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan

**Class 6 – Velazquez Claims**

    a.    Classification: Class 6 consists of the Claims of Holders of Velazquez Claims.

    b.    Treatment: The Holders of Velazquez Claims will be treated pursuant to the terms and conditions of the Velazquez Settlement. The Debtors shall provide a combined, single notice of the Velazquez Settlement to the Holders of Velazquez Claims pursuant to Federal Rule of Civil Procedure 23(c)(2) and (e). The effectiveness of the Velazquez Settlement shall be conditioned and contingent upon the (a) satisfaction or waiver of the conditions specified in the Velazquez Settlement (including the condition that the number of Velazquez Excluded Class Members shall not exceed 5% of the total number of Holders of Velazquez Class Claims), and (b) approval of such settlement by the Bankruptcy Court according to the procedures set forth in Federal Rule of Civil Procedure 23(e). The Velazquez Settlement shall provide for, among other terms and conditions, (i) the certification, for settlement purposes only, by the Bankruptcy Court of the Velazquez Class Claim as a class Proof of Claim pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 7023 and 9014, and (ii) the stipulated dismissal of the Velazquez Class Action with prejudice on the merits and with each party to bear its own costs and attorneys' fees. Subject to the approval of the Velazquez Settlement, at the time and pursuant to the terms and conditions set forth in the Velazquez Settlement, the Debtors shall make the Velazquez Settlement Payment in full and final settlement, satisfaction and release of all Velazquez Claims. The Velazquez Settlement Payment includes any amounts that may be payable on account of (w) an award of attorney's fees and costs for class counsel appointed by the Bankruptcy Court in connection with the approval of the Velazquez Settlement, (x) costs arising under the Velazquez Settlement or incurred in the Velazquez Class Action, (y) costs of administering the distributions to the Velazquez Class Members, and (z) costs of notice of the Velazquez Settlement to the Holders of Velazquez Claims.

    c.    Voting: The Claims of Velazquez Class Members are not impaired and shall be treated in accordance with the terms and conditions of the Velazquez Settlement. Any Velazquez Excluded Class Member must file with the Bankruptcy Court, on or before the Velazquez Claims Deadline, an application to extend the time (*i.e.*, the Bar Date) within which such member may file an individual Proof of Claim against any of the Debtors arising from or related to any of the Velazquez Claims. The Debtors and the Committee reserve their rights to oppose any extension of the Bar Date for leave to file an individual Proof of Claim that is sought by any Velazquez Excluded Class Member. If any Velazquez Excluded Class Member fails to timely file an application to extend the Bar Date by the Velasquez Claims Deadline, such member shall be forever barred from asserting a Claim against the Debtors or their property, or sharing in any

distributions under the Plan. If a Velazquez Excluded Class Member obtains leave from the Bankruptcy Court to file an individual Proof of Claim, such claim shall be treated as a Class 4 Claim under the Plan. The allowance or disallowance of an individual Proof of Claim permissibly filed by a Velazquez Excluded Class Member shall be determined in accordance with the Bankruptcy Code and the resolution procedures established under the Plan. All rights and defenses to the allowance of an individual Proof of Claim permissibly filed by a Velazquez Excluded Class Member are reserved, respectively, by such member and the Debtors and the Committee.

## Class 7 – Aegis REIT Unsecured Claims

a.   Classification: Class 7 consists of the Claims of Holders of Unsecured Claims against Aegis REIT, excluding any EPD/Breach Claims against Aegis REIT.

b.   Treatment: To the extent any Class 7 Claims exist, one of the following treatments shall be provided: (i) if the Aegis REIT Disposition option is selected, each Holder of an Allowed Class 7 Unsecured Claim shall receive the same treatment as the Holders of Allowed Class 4 Unsecured Claims (and such claims shall be deemed classified in Class 4); (ii) if the Aegis REIT Maintenance option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Operating Costs, each Holder of an Allowed Class 7 Unsecured Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by Reorganized Aegis REIT, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim; or (iii) if the Aegis REIT Dissolution option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Dissolution Costs, each Holder of an Allowed Class 7 Unsecured Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by the Liquidating Debtors, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim.

c.   Voting: Class 7 is an Impaired Class and Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

## Class 8 – Aegis REIT EPD/Breach Claims

a.   Classification: Class 8 consists of the Claims of Holders of EPD/Breach Claims against Aegis REIT.

b.   Protocol: The allowance or disallowance of Class 8 EPD/Breach Claims shall be determined in accordance with the EPD/Breach Protocol if the

EPD/Breach Claim Protocol Conditions are satisfied. If any Holder of a Class 8 EPD/Breach Claim (Submitted) fails to (a) submit an EPD/Breach Claim Questionnaire by the date of the Confirmation Hearing (or such later date as may reasonably be agreed upon by the Debtors and the Holder of a Class 8 EPD/Breach Claim (Submitted), not to exceed 15 days following the date of the Confirmation Hearing), or (b) if such Holder has timely submitted an EPD/Breach Claim Questionnaire by the date of the Confirmation Hearing, supply sufficient additional information to calculate the amount of its EPD/Breach Claim (Submitted) in accordance with the EPD/Breach Claim Protocol within thirty (30) days following the date of a reasonable written request for such additional information by the Liquidating Debtors, such Holder shall be forever barred from asserting an EPD/Breach Claim against the Debtors or their property, or sharing in any distributions under the Plan. If the EPD/Breach Claim Protocol Conditions are not satisfied, the allowance or disallowance of such claims will be determined in accordance with the Bankruptcy Code. Any disputes concerning the application of the EPD/Breach Claim Protocol to the determination of any EPD/Breach Claim (Submitted) shall be submitted to the Bankruptcy Court for resolution.

c. Treatment: To the extent any Class 8 Claims exist, one of the following treatments shall be provided: (i) if the Aegis REIT Disposition option is selected, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive the same treatment as the Holders of Allowed Class 5 Unsecured Claims (and such claims shall be deemed classified in Class 5); (ii) if the Aegis REIT Maintenance option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Operating Costs, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by Reorganized Aegis REIT, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim; or (iii) if the Aegis REIT Dissolution option is selected, then, following the establishment of appropriate reserves for the Reorganized Aegis REIT Dissolution Costs, each Holder of an Allowed Class 8 EPD/Breach Claim shall receive a Pro Rata share of the remaining available Aegis REIT Assets, as such reserves and remaining available assets are determined by the Liquidating Debtors, on the later of the first anniversary of the Effective Date or the date such Claim becomes an Allowed Claim.

d. Voting: Voting Class 8 is an Impaired Class and Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

**Class 9 – Intercompany Claims**

a. Classification: Class 9 consists of all Intercompany Claims.

        b.      Treatment:  There shall be no distribution on account of any Intercompany Claims.

        c.      Voting:  Holders of Class 9 Claims will receive no distribution under the Plan and therefore are deemed to have rejected the Plan.  Accordingly, the Holders of Class 9 Claims are not entitled to vote.

## Class 10 – Consolidated Debtors Equity Interests

        a.      Classification:  Class 10 consists of Equity Interests in any of the Consolidated Debtors.

        b.      Treatment:  There shall be no distribution on account of Class 10 Equity Interests.  Upon the Effective Date, all Class 10 Equity Interests will be terminated and canceled and will cease to exist.  However, if and to the extent that the Disbursing Agent shall have any remaining Net Plan Proceeds on the Final Distribution Date following (and subject to) the payment in full of all Unsecured Claims against all of the Liquidating Debtors, plus the payment of interest on such claims to the extent allowed by law, any such residual assets shall be distributed to the former holders of Class 10 Equity Interests as of the Effective Date.

        c.      Voting:  Holders of Class 10 Equity Interests will receive no distribution under the Plan and therefore are deemed to have rejected the Plan.  Accordingly, the Holders of Class 10 Equity Interests are not entitled to vote.

## Class 11 – Aegis REIT Preferred Stock Equity Interests

        a.      Classification:  Class 11 consists of Aegis REIT Preferred Stock Equity Interests.

        b.      Treatment:  The Holders of the Aegis REIT Preferred Stock Equity Interests shall receive one of the following treatments: (i) if the Aegis REIT Disposition option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist;  (ii) if the Aegis REIT Maintenance option is selected, the Holders of the Aegis REIT Preferred Equity Interests shall retain their Equity Interests; or (iii) if the Aegis REIT Dissolution option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist.

        c.      Voting:  Class 11 is an Impaired Class and Holders of Class 11 Aegis REIT Preferred Stock Equity Interests are entitled to accept or reject the Plan.

**Class 12 – Aegis REIT Common Stock Equity Interests**

      a.      Classification: Class 12 consists of Aegis REIT Common Stock Equity Interests.

      b.      Treatment: No distribution shall be made to the Holders of the Aegis REIT Common Stock Equity Interests. The Holders of the Aegis REIT Common Stock Equity Interests shall receive one of the following treatments: (i) if the Aegis REIT Disposition option is selected, all Class 12 Equity Interests will be terminated and cancelled and will cease to exist; (ii) if the Aegis REIT Maintenance option is selected, then, at the time and subject to the provisions of Section V(B)(2)(d) of the Plan, the Holders of the Aegis REIT Common Stock Equity Interests may assign and transfer their Equity Interests to the Reorganized Aegis REIT Common Stock Transferee; or (iii) if the Aegis REIT Dissolution option is selected, all Class 11 Equity Interests will be terminated and cancelled and will cease to exist.

      c.      Voting: The Holders of Class 12 Equity Interests will receive no distribution under the Plan and are therefore deemed to reject the Plan. Accordingly, the Holders of Class 12 Aegis REIT Common Stock Equity Interests are not entitled to vote.

**VII.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**A.**    **Voting Classes**

Each Holder of an Allowed Claim in Classes 1, 2, 3, 4, 5, 7, 8 and 11 is entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

**B.**    **Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

**C.**    **Presumed Acceptance/Rejection of Plan**

Class 6 is unimpaired and the Holders of Velazquez Class Members in such Class are therefore deemed to accept the Plan and are not entitled to vote. Classes 9, 10 and 12 shall not

receive any distributions under the Plan and the Holders of Claims or Equity Interests in such Classes are therefore deemed to reject the Plan and are not entitled to vote.

## D. Nonconsensual Confirmation

Because Classes 9, 10 and 12 are deemed to reject the Plan by operation of law, the Debtors will request the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

## E. How to Vote

A form of Ballot is being provided to Creditors in Classes 1, 2, 3, 4, 5, 7, 8 and 11 pursuant to which Creditors in such Classes may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives such Creditors one important choice to make with respect to the Plan – to vote for or against the Plan. In order to vote on the Plan, a Creditor should complete the Ballot, as indicated thereon, (1) by indicating on the enclosed ballot that (a) it accepts the Plan or (b) rejects the Plan and (2) by signing its name and mailing the ballot in the envelope provided for this purpose. The Claims Agent will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED NO LATER THAN 7:00 P.M. EASTERN TIME ON SEPTEMBER 28, 2010, AT THE FOLLOWING ADDRESS:

**If by overnight courier or hand delivery:**

**Aegis Mortgage Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd floor
New York, NY 10017**

**If by standard mail (including U.S. Express Mail):**

**Aegis Mortgage Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014**

**CREDITORS SHOULD NOT SEND BALLOTS VIA FACSIMILE OR E-MAIL.**
IF A BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF A BALLOT IS DAMAGED OR LOST, A CREDITOR MAY REQUEST A REPLACEMENT BY ADDRESSING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY SUBMITTED BALLOTS WILL NOT BE COUNTED.

# VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Revesting of Plan Assets and Collection of Plan Proceeds

Upon the Effective Date, the Liquidating Debtors shall be vested with all right, title and interest in the Plan Assets and all such property shall become the property of the Liquidating Debtors. Following the Effective Date, the Liquidating Debtors may use, acquire and dispose of the Plan Assets without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The Plan Assets shall be held by the Liquidating Debtors in trust for Creditors and shall be distributed only in accordance with the Plan. From and after the Effective Date, the Liquidating Debtors shall retain and pursue the Litigation owned by the Liquidating Debtors on such terms and conditions as are consistent with the interests of Creditors of the Liquidating Debtors and the reasonable business judgment of the Liquidating Debtors, sell or liquidate Plan Assets, and collect the accounts receivable, if any, of the Debtors. All Cash, all Liquidation Proceeds, and all Litigation Recoveries realized or obtained by the Liquidating Debtors shall be promptly delivered to the Disbursing Agent for deposit into the Claims Reserve Account. Except as otherwise provided in the Plan and the Confirmation Order, such Plan Proceeds shall be free and clear of all Claims and Liens. To the extent required to make distributions to the Holders of Allowed Claims, fund the Claims Reserve Account, pay Plan Expenses, and otherwise implement the Plan, all Plan Proceeds shall be held in trust by the Disbursing Agent and all Plan Proceeds shall be distributed to Creditors in accordance with section 1123 of the Bankruptcy Code.

### B.    Aegis REIT Alternative Means of Implementation

**General**  On or before the 10th day prior to the Plan Objection Deadline, the Debtors shall make the Aegis REIT Treatment Election and shall carry out the option selected thereby. If the Aegis REIT Disposition option is selected, then (i) the Aegis REIT Sale Agreement will be consummated, (ii) all right, title and interest in any Aegis REIT Assets Remainder will be distributed to, and shall be deemed vested in, the Liquidating Debtors and all such property shall become the property of the Liquidating Debtors, and (iii) all Aegis REIT Assets Remainder will constitute Plan Assets for all purposes.

If, however, the Aegis REIT Maintenance option is selected, Aegis REIT will instead be revested with all right, title and interest in the Aegis REIT Assets and all such property shall become the property of Reorganized Aegis REIT. All Reorganized Aegis REIT Operating Costs, not otherwise defrayed by the assets, income and revenues of Reorganized Aegis REIT or the other Aegis REIT Parties, shall be paid by the Liquidating Debtors as a Plan Expense, provided that, Reorganized Aegis REIT and the Liquidating Debtors shall maintain an accounting of all Reorganized Aegis REIT Operating Costs.

Last, if the Aegis REIT Dissolution option is selected, all right, title and interest in any Aegis REIT Assets shall be distributed to, and shall be deemed vested in, the Liquidating Debtors and all such property shall become the property of the Liquidating Debtors.

**Operations** Under both the disposition and the dissolution options, following the Effective Date, Reorganized Aegis REIT shall conduct no business other than winding up its affairs in accordance with applicable law and the provisions of the Plan. In the event that, following the dissolution of Reorganized Aegis REIT, there exist any remaining corporate assets of Reorganized Aegis REIT otherwise available for distribution among the shareholders of Reorganized Aegis REIT according to their respective rights and preferences, such assets shall instead be distributed to the Liquidating Debtors (and shall constitute Plan Assets). Following the Effective Date, the Liquidating Debtors may use, acquire and dispose of the Aegis REIT Assets Remainder or the Aegis REIT Assets, as the case may be, without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.

On the other hand, under the maintenance option, following the Effective Date, Reorganized Aegis REIT may use, acquire and dispose of the Aegis REIT Assets without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules, but consistent with the terms of the Plan. Reorganized Aegis REIT shall (i) continue to maintain its separate corporate existence for all purposes under the Plan with all the powers of a corporation under applicable law in the jurisdiction in which it is incorporated, (ii) operate and continue to operate in a manner that enables it to qualify as a REIT Entity, and (iii) perform and continue to perform required functions in connection with the Aegis REIT securitization trusts. These required functions include, among others, financial and tax accounting, review and analysis of trustee reports, income tax reporting, payment of bills, booking accounting entries, management of relationships with service providers (tax and other professionals and independent directors), maintenance of required bank and trust accounts, corporate governance and the filing of required corporate annual reports. The ongoing post-confirmation operations of Reorganized Aegis REIT, if carried out through the anticipated lifespan of the various securitization trusts sponsored by Aegis REIT, might last 20-25 years and might entail corresponding expenditures of $4.5 to $6.75 million (collectively, among the various Aegis REIT Parties). In addition, under the maintenance option, Reorganized AEGIS REIT shall be authorized to cause the Aegis REIT Parties to maintain their respective ownership of the Aegis REIT Certificates or, alternatively, shall be authorized to transfer such certificates to Reorganized Aegis REIT (provided that Reorganized Aegis REIT then qualifies as a REIT Entity) or another REIT Entity.

**Management** Under both the disposition and the dissolution options, the Responsible Officer shall be authorized to (X) wind up the affairs of Reorganized Aegis REIT and dissolve Reorganized Aegis REIT, and (Y) put into effect and carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the Chapter 11 Cases, without further action by its directors or stockholders. The Responsible Officer or any officer of Reorganized Aegis REIT will be further authorized to make, execute, acknowledge and file a certificate of dissolution for Reorganized Aegis REIT pursuant to applicable nonbankruptcy law at or following such time as Reorganized Aegis REIT has fully wound up its affairs in accordance with applicable law pursuant to the provisions of the Plan.

On the other hand, under the maintenance option, the management, control and operation of Reorganized Aegis REIT shall become the general responsibility of the board of directors of Reorganized Aegis REIT. The initial board of directors of Reorganized Aegis REIT shall be

composed of those persons identified in a notice Filed by the Debtors on or before the 10th day prior to the Confirmation Hearing. Each of the members of such initial board of directors shall serve in accordance with applicable nonbankruptcy law and the Charter of Reorganized Aegis REIT, as the same may be amended from time to time. From and after the Effective Date, the members of the board of directors of Reorganized Aegis REIT shall be selected and determined in accordance with the provisions of applicable law and the Charter of Reorganized Aegis REIT. Upon the Effective Date, those persons identified in a notice Filed by the Debtors on or before the 10th day prior to the Confirmation Hearing shall be deemed appointed to serve as officers of Reorganized Aegis REIT without further action under applicable law, regulation, order or rule including, without limitation, any action by the stockholders or directors of Reorganized Aegis REIT. The officers of Reorganized Aegis REIT shall serve in accordance with applicable nonbankruptcy law, any employment agreement with Reorganized Aegis REIT, and the Charter of Reorganized Aegis REIT, as the same may be amended from time to time.

Upon written request by Reorganized Aegis REIT, the Holders of the Aegis REIT Common Stock Equity Interests (*i.e.*, AMC, ALC and ACC) may, as promptly as practicable following the receipt of such request, transfer and assign such interests to the Reorganized Aegis REIT Common Stock Transferee, without further notice to Creditors or approval of the Bankruptcy Court.

The allowance or disallowance of a Proof of Claim that is based on, related to or arising from any of the actions described in the Reorganized Aegis REIT Dissolution Election shall be determined in accordance with the Bankruptcy Code and the resolution procedures established under the Plan. All rights and defenses to the allowance of such a Proof of Claim are reserved, respectively, by such Holder and the Debtors.

## C.    **Implementation of Certain Subordination Rights and Reallocations**

As discussed above (at various sections of this Disclosure Statement) in connection with the MOU, the WARN Settlement, the Thompson Settlement and the Countrywide Stipulation, certain Creditors may hold certain subordination rights or remedies or other claims against Madeleine. These rights, remedies and claims are being resolved under the Plan by means of the re-allocation of certain distributions that would otherwise be payable under the Plan to Madeleine on account of the Allowed Madeleine Claim.

Specifically, in the case of CSFB and UBS, the Plan provides that if each of such Creditors does *not* receive a certain minimum amount (subject to adjustment in certain cases depending on the ultimate pro rata distribution to Class 4 Creditors) as a result of the distributions under the Plan on account of its respective claim, then Madeleine will satisfy any shortfall by re-allocating a portion of the distributions on its allowed claim. Madeleine has no obligation, however, to make theses payments except from, and to the extent of, its distributions under the Plan on account of its Allowed Madeleine Claim. The specific terms and mechanics for the potential re-allocation of distributions from Madeleine to each of CSFB, UBS and Countrywide are discussed in greater detail at Sections 5(C)(i), (ii) and (iii) of the Plan. Generally speaking, however, at the time of the Initial Distribution Date, Madeleine will make an estimated, interim payment (in an amount determined in its sole discretion) on account of the potential, anticipated shortfall to each of CSFB and UBS. Later, at the time when the aggregate

Pro Rata distribution percentage applicable to the holders of Allowed Class 4 Claims equals or exceeds ten (10%) percent, Madeleine will pay the full amount of the then outstanding shortfall (less the amount of any prior payments). In the event that the aggregate amount of any shortfall payments exceeds the minimum recoveries otherwise payable to CSFB or UBS, then such parties agree to reimburse Madeleine for any excess payments (either by re-allocating future Plan distributions on account of their respective Claims back to Madeleine or by payments made directly to Madeleine).

In the case of Countrywide, the Countrywide Stipulation similarly provides that if Countrywide does not receive a certain minimum amount as a result of the distributions under the Plan on account of its Allowed Claim, then Madeleine will satisfy any shortfall by re-allocating a portion of the distributions on its Allowed Claim. The mechanics for the re-allocation of the distributions from Madeleine to Countrywide are specified in the Countrywide Stipulation. The Disbursing Agent will be authorized to implement the re-allocation of the distributions under the Plan on account of the Allowed Madeleine Claim to carry out the applicable terms of the Countrywide Stipulation.

In addition to the foregoing potential re-allocations for the exclusive benefit of CSFB, UBS and Countrywide, Madeleine has also agreed to make two additional re-allocations from its distribution for the more general benefit of Class 4 Creditors. First, Madeleine has agreed that an amount equal to the Class 4 Creditors Contribution (at least $500,000, and possibly more depending on the aggregate Pro Rata distribution percentage applicable to the holders of Allowed Class 4 Claims) that would otherwise be distributed to Madeleine on account of the Allowed Madeleine Claim will instead be re-allocated for the benefit of the Class 4 Creditors Subgroup A. The Class 4 Creditors Subgroup A includes every Class 4 Creditors holding an Allowed Class 4 Claim except only Madeleine and any Creditor holding a Warehouse Claim (such as CSFB, UBS and Countrywide). Second, Madeleine has agreed that the WARN Contribution amount (*i.e.*, $200,000) that would otherwise be distributed to Madeleine on account of the Allowed Madeleine Claim will instead be re-allocated for the benefit of the Class 4 Creditors Subgroup B. The Class 4 Creditors Subgroup B includes every Class 4 Creditors holding an Allowed Class 4 Claim except only Madeleine.

Finally, in connection with the Thompson Settlement described above, Madeleine has agreed that the Thompson Contribution amount (*i.e.*, $50,000) that would otherwise be distributed to Madeleine on account of the Allowed Madeleine Claim will instead be re-allocated for the direct benefit of the Holder of the Thompson Claim.

Like the amounts re-allocated from Madeleine to CSFB, UBS and Countrywide, Madeleine has no obligation to make the Class 4 Creditors Contribution, the WARN Contribution or the Thompson Contribution except from, and to the extent of, its distributions under the Plan on account of the Allowed Madeleine Claim.

## D.     Payment of Plan Expenses

All Plan Expenses may be paid by the Disbursing Agent from the Claims Reserve Account without further notice to Creditors of the Consolidating Debtors or approval of the Bankruptcy Court. Any disputes concerning the payment of Plan Expenses shall be submitted to

the Bankruptcy Court for resolution. The Disbursing Agent may also pay the Reorganized Aegis REIT Operating Costs and Reorganized Aegis REIT Dissolution Costs from the Claims Reserve Account from time to time as necessary, provided that, the Disbursing Agent shall maintain an accounting of all such costs for purposes of potential reimbursement by Reorganized Aegis REIT.

## E. Litigation

Except as otherwise provided in the Plan, all Litigation is retained and preserved pursuant to section 1123(b) of the Bankruptcy Code with the exception of any Avoidance Actions that are **not** Reserved Avoidance Actions, each of which shall be deemed waived and released by the Debtors and their Estates upon the Effective Date, without further notice to Creditors or approval of the Bankruptcy Court. Any Avoidance Actions commenced that are not Reserved Avoidance Actions shall be dismissed with prejudice. From and after the Effective Date, all Litigation (Consolidated Debtors), vested in the Liquidating Debtors upon the Effective Date, will be prosecuted or settled by the Liquidating Debtors. All Litigation (Aegis REIT) will be prosecuted or settled by Reorganized Aegis REIT, except to the extent vested in the Liquidating Debtors upon the Effective Date in which case such litigation will be prosecuted or settled by the Liquidating Debtors. To the extent any Litigation is already pending on the Effective Date, the Liquidating Debtors or Reorganized Aegis REIT, as the case may be, as successor to the applicable Debtor, will continue the prosecution of such Litigation. Any Litigation commenced by the Committee shall continue to be prosecuted by the Liquidating Debtors through special counsel. Any Litigation Recovery on account of Litigation (Consolidated Debtors) will be deposited in the Claims Reserve Account as Plan Proceeds. Any Litigation Recovery on account of Litigation (Aegis REIT) will become the property of Reorganized Aegis REIT, except to the extent such litigation is vested in the Liquidating Debtors upon the Effective Date in which case such litigation recoveries will be deposited in the Claims Reserve Account as Plan Proceeds.

## F. Reimbursement for Aegis REIT Advanced Claims

In the event either of the Aegis REIT Maintenance or Aegis REIT Dissolution options are selected, the Disbursing Agent shall maintain an accounting of the amount of Aegis REIT Advanced Claims for purposes of reimbursement by Reorganized Aegis REIT from the Aegis REIT Assets. No distribution shall be made from the Aegis REIT Assets to the holders of Allowed Class 7 or Class 8 Claims unless and until Reorganized Aegis REIT has first reimbursed the Liquidating Debtors for the amount of any distributions made on account of the Aegis REIT Advanced Claims.

## G. Liquidation and Dissolution of the Liquidating Debtors

The Liquidating Debtors shall conduct no business following the Effective Date other than winding up their affairs in accordance with applicable law and the provisions of the Plan. Without limiting the generality or effect of the foregoing, following the Effective Date the Liquidating Debtors shall: (i) undertake those transactions that are necessary, advantageous or practicable to obtain the maximum value from the Plan Assets; and (ii) exercise their best efforts and endeavor in good faith and without undue delay to liquidate all Claims and the Plan Assets and to successfully prosecute the Litigation of the Liquidating Debtors. Pursuant to applicable

bankruptcy and non-bankruptcy law, the Liquidating Debtors (acting through the Responsible Officer) shall be authorized to (i) wind up their affairs and dissolve, and (ii) put into effect and carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the Chapter 11 Cases, without further action by their boards of directors or stockholders.

## H. Power and Authority of the Responsible Officer

From and after the Effective Date the Liquidating Debtors and Reorganized Aegis REIT (unless the Aegis REIT Maintenance Option is selected) will be managed and governed by the Responsible Officer who shall act as the representative of the Liquidating Debtors and Reorganized Aegis REIT. At the time the Debtors provide notice of the selection of the Responsible Officer as contemplated under the Plan, the Debtors will also disclose the contemplated compensation and reimbursement of the Responsible Officer for services rendered and expenses incurred following his or her appointment as of the Effective Date. Activities of the Liquidating Debtors and Reorganized Aegis REIT as permitted and limited under the Plan will be managed by the Responsible Officer. To the extent applicable, the Responsible Officer may use lower priced employees of his firm as he deems appropriate. Compensation and reimbursement of the Responsible Officer, and any lower priced employees from his or her firm (if any), shall be considered Plan Expenses. Confirmation of the Plan shall constitute the appointment of the Responsible Officer by the Bankruptcy Court as the representative of the Liquidating Debtors and Reorganized Aegis REIT (unless the Aegis REIT Maintenance Option is selected) to (a) exercise the rights, power and authority of the Liquidating Debtors and Reorganized Aegis REIT under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, (b) retain professionals to represent the Liquidating Debtors and Reorganized Aegis REIT in performing and implementing the Plan, (c) marshal and liquidate the Plan Assets and to collect the Plan Proceeds for the benefit of Creditors, (d) prosecute the Litigation and otherwise attempt to collect or realize upon the Plan Assets, (e) resolve Disputed Claims and effectuate distributions to Creditors of the Debtors under the Plan, and (f) otherwise implement the Plan, wind up the affairs of the Debtors and close the Chapter 11 Cases. The Responsible Officer shall be authorized to carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the Chapter 11 Cases with like effect as if exercised and taken by unanimous action of the board and shareholders of the Liquidating Debtors and Reorganized Aegis REIT. The compensation arrangements with the Responsible Officer shall be subject to approval by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Responsible Officer will be deemed to have retained the Debtors' Professionals under the arrangements existing on the Effective Date, without any need for new retention agreements or further orders of the Bankruptcy Court. The Confirmation Order shall provide that the Responsible Officer is authorized to execute a certificate of dissolution for the Liquidating Debtors and Reorganized Aegis REIT pursuant to applicable non-bankruptcy law, or otherwise take any necessary steps required to wind up the Debtors under applicable law, at such time as the Liquidating Debtors have fully wound up their affairs in accordance with applicable law pursuant to the provisions of the Plan. The Responsible Officer shall serve until the Liquidating Debtors and Reorganized Aegis REIT are dissolved and a Final Decree is entered closing their Chapter 11 Cases, unless earlier removed by the Bankruptcy Court for cause shown, after notice and a hearing. Upon the removal of the Responsible Officer for cause, or if the sitting Responsible Officer becomes unable, unavailable or unwilling to continue to serve, the Bankruptcy Court will appoint a replacement upon the request of any party in interest. The Responsible Officer shall be

responsible for ensuring that the Liquidating Debtors and Reorganized Aegis REIT comply with their obligations to pay statutory fees under 28 U.S.C. § 1930(a)(6) and the Responsible Officer shall file all post-Confirmation reports required by the Bankruptcy Rules, the Bankruptcy Court, the Local Bankruptcy Rules, or any applicable Guidelines of the United States Trustee.

## I. Power and Authority of the Disbursing Agent

The Disbursing Agent may employ or contract with other entities to perform the obligations created under the Plan. Any third party Disbursing Agent shall receive reasonable compensation for services rendered and reimbursement for expenses incurred in connection with the Plan or any functions or responsibilities adopted under the Plan which amounts may be deducted from the Claims Reserve Account as Plan Expenses. The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, (iv) implement the re-allocation of certain distributions on account of the Allowed Madeleine Claim at the times and in the amounts set forth in Sections V(C)(i), V(C)(ii), VC(iii), V(C)(iv), V(D) and V(E) of the Plan, and (v) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. To the extent that the Liquidating Debtors act as the Disbursing Agent, the Liquidating Debtors shall not receive a fee for such services, although the Liquidating Debtors may employ and pay persons or entities salaries, wages or ordinary compensation for services performed. The Disbursing Agent may also be employed by, or on behalf of, Reorganized Aegis REIT to make the distributions contemplated by the Plan to the Holders of Allowed Class 7 and Class 8 Claims from the Aegis REIT Assets.

## J. Distribution Procedures

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all amounts to be paid by the Disbursing Agent under the Plan shall be distributed in such amounts and at such times as is reasonably prudent. On the Effective Date, or as soon as practicable thereafter, the Disbursing Agent shall: (i) marshal all then available Plan Proceeds; (ii) establish and fund the Claims Reserve Account pursuant to Section V(P) of the Plan; (iii) promptly pay the Holders of (a) Allowed Administrative Claims, (b) Allowed Professional Fee Claims, (c) Allowed Priority Tax Claims, (d) Allowed Priority Claims; and (e) Allowed Convenience Claims, (iv) with respect to Class 2 Creditors who did not receive proceeds from the sale of their collateral, arrange for the Liquidating Debtors and Reorganized Aegis REIT to abandon to such Creditors the collateral securing their respective Claims or make a Cash payment in satisfaction of such Claims; and (v) make interim and final distributions of Net Plan Proceeds to the Holders of other Allowed Claims from the Claims Reserve Account in the amounts and according to the priorities set forth in the Plan. Additionally, notwithstanding any provision to the contrary in the Plan, distributions may be made in full or on a Pro Rata basis depending on (i) the amount of the Allowed Claim, (ii) the then available Plan Proceeds in the Claims Reserve Account, and (iii) the then anticipated Plan Proceeds. The Disbursing Agent shall make the Cash payments to the Holders of Allowed Claims: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank selected by the Disbursing Agent in its sole discretion, or by wire transfer from a domestic bank, at the Disbursing Agent's option, and (b) by

first-class mail (or by other equivalent or superior means as determined by the Disbursing Agent).

## K.    Sole Source of Distributions

Upon the Effective Date, all Claims against the Debtors shall be deemed fixed and adjusted pursuant to this Plan and the Debtors shall have no further liability on account of any Claims or Equity Interests except as set forth in this Plan. All payments and all distributions made by the Disbursing Agent under the Plan shall be the sole and exclusive dividends paid to Creditors under the Plan; provided, however, that nothing contained in this Section V(N) of the Plan, or in any other provision of this Plan, shall be deemed to constitute or result in a discharge of the Liquidating Debtors or Reorganized Aegis REIT (unless the Aegis REIT Maintenance Option is selected) under Section 1141(d) of the Bankruptcy Code.

## L.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. The Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such Withholding Taxes.

## M.    Claims Reserve Account

On or as soon as practicable after the Effective Date, the Disbursing Agent shall (a) to the extent of any Available Cash, create and fund the Claims Reserve Account, and (b) periodically deposit the Cash from Plan Proceeds into the Claims Reserve Account to satisfy the obligations created under the Plan. The Claims Reserve Account shall contain the following six sub-accounts: (1) Secured, (2) Administrative, (3) Priority Claims and Priority Tax Claims, (4) Plan Expenses, (5) Convenience Claims, and (6) Consolidated Debtors Unsecured Claims and EPD/Breach Claims. Each sub-account within the Claims Reserve Account shall contain an amount of Cash deemed sufficient by the Liquidating Debtors for the payment of Allowed Claims in accordance with the priorities and amounts set forth in Article III, all anticipated Plan Expenses, and Disputed Claims. The sub-account for Plan Expenses shall also contain amounts reserved by the Disbursing Agent on account of anticipated Reorganized Aegis REIT Operating Costs and Reorganized Aegis REIT Dissolution Costs. The Disbursing Agent shall be authorized to transfer funds among sub-accounts as necessary to replenish any sub-accounts as and when distributions are made to Creditors. All Plan Expenses may be deducted and paid from sub-account 4 without further order of the Bankruptcy Court. Subject to the priorities established under the Bankruptcy Code, the Disbursing Agent shall periodically transfer all earnings and interest income on the Claims Reserve Account for deposit to and distribution from sub-account 6. In the event the Aegis REIT Dissolution option is selected, the Disbursing Agent may also establish a separate sub-account to hold the proceeds of the Aegis REIT Assets that are distributed to, and deemed vested in, the Liquidating Debtors under the Plan. Unless otherwise provided in the Confirmation Order, the Claims Reserve Account shall be invested by the Disbursing Agent in a manner consistent with the objectives of section 345(a) of the Bankruptcy Code.

## N.    Resolution of Disputed Claims

All objections to Claims shall be Filed not later than 180 days following the Effective Date; provided, however, such deadline may be extended by the Bankruptcy Court for cause shown. If an objection is not timely Filed by the deadline established in Section V(Q) of the Plan, any remaining Disputed Claims shall be deemed to be Allowed Claims for purposes of the Plan. Unless otherwise provided in the Confirmation Order the Liquidating Debtors shall be authorized to settle, or withdraw any objections to, any Disputed Claim following the Confirmation Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of the Plan. Under no circumstances will any distributions be made on account of Disallowed Claims.

## O.    Reserve Provisions for Disputed Claims

The Disbursing Agent shall implement the following procedures with respect to the allocation and distribution of Cash in the Claims Reserve Account, after payment of all senior Claims, to the Holders of Disputed Claims that become Allowed Claims against the Liquidating Debtors:

1.    Cash respecting Disputed Claims shall not be distributed, but, if necessary, shall be withheld by the Disbursing Agent in an amount equal to the amount of the distributions that would otherwise be made to the Holders of such Claims if such Claims had been Allowed Claims, based on the Disputed Claims Amount.

2.    All Holders of Allowed Unsecured Claims shall be entitled to receive interim distributions under the Plan. No distributions may be made to the Holders of Allowed Unsecured Claims unless adequate reserves are established for the payment of Disputed Claims, and sufficient funds are also reserved for payment of expected Plan Expenses. Upon the Final Resolution Date, after payment of all senior Claims, all amounts (if any) remaining in sub-accounts 1-6 of the Claims Reserve Account, after reservation of an appropriate amount for anticipated Plan Expenses, shall be transferred to sub-account 6 for final distribution to the Holders of Allowed Class 4 and Class 5 Claims.

3.    Where only a portion of a Claim is Disputed, at the option of the Liquidating Debtors or Disbursing Agent, as applicable, interim or partial distributions may (but are not required to) be made with respect to the portion of such Claim that is not Disputed.

4.    For the purposes of effectuating the provisions of Section V(R) of the Plan, the Bankruptcy Court may estimate the amount of any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan. In lieu of estimating the amount of any Disputed Claim, the Bankruptcy Court or the Disbursing Agent may determine the Disputed Claims Amount to be reserved for such Disputed Claim, or such amount may be fixed by agreement in writing by and between the Liquidating Debtors and the Holder thereof.

5. When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the provisions of the Plan, Cash equal to a Pro Rata Share of the Cash set aside for Disputed Claims within the applicable sub-account of the Claims Reserve Account, but in no event shall such Holder be paid more than the amount that would otherwise have been paid to such Holder if the Claim (or the Allowed portion of the Claim) had not been a Disputed Claim.

6. Interim distributions may be made from time to time to the Holders of Allowed Claims prior to the resolution by Final Order or otherwise of all Disputed Claims, provided that the aggregate amount of Cash to be distributed at such time from the Claims Reserve Account is practicable in comparison to the anticipated costs of such interim distributions.

7. No Holder of a Disputed Claim shall have any Claim against the Cash reserved with respect to such Claim until such Disputed Claim shall become an Allowed Claim. In no event shall any Holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) from the Debtors, the Liquidating Debtors, or the Claims Reserve Account any payment (x) which is greater than the amount reserved for such Claim by the Bankruptcy Court pursuant to Section V(R) of the Plan, or (y) except as otherwise permitted under the Plan, of interest or other compensation for delays in distribution. In no event shall the Liquidating Debtors have any responsibility or liability for any loss to or of any amount reserved under the Plan.

8. To the extent a Disputed Claim ultimately becomes an Allowed Claim in an amount less than the Disputed Claim Amount reserved for such Disputed Claim, then the resulting surplus of Cash shall be retained in the Claims Reserve Account and shall be distributed among the Holders of Allowed Claims until such time as each Holder of an Allowed Claim has been paid the Allowed amount of its Claim.

### P. **Allocation of Distributions**

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### Q. **Rounding**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

### R. **No Interim Cash Payments of $25 or Less on Account of Allowed Claims**

If an interim distribution to be received by the Holder of an Allowed Claim against the Liquidating Debtors would be $25 or less, notwithstanding any contrary provision in the Plan, at the discretion of the Disbursing Agent, no such interim payment will be made to such Holder, and such Cash shall be held for such Holder until the earlier of (i) the next time an interim

distribution is made to the Holders of Allowed Claims (unless the distribution would still be less than $25 in which case Section V(U) of the Plan shall again apply), or (ii) subject to Section V(W) of the Plan, the date on which final distributions are made to the Holders of Allowed Claims.

## S.    Disputed Payments

In the event of any dispute between and among Creditors as to the right of any Entity to receive or retain any payment or distribution to be made to such Entity under the Plan, the Disbursing Agent may, in lieu of making such payment or distribution to such entity, instead hold such payment or distribution until the disposition thereof shall be determined by the Bankruptcy Court.

## T.    Unclaimed Property

Any entity which fails to claim any Cash within 120 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Upon forfeiture, such Cash (including interest thereon) shall be deposited into the Claims Reserve Account to be distributed to the Holders of Allowed Claims in the manner described in Section V(R)(8) of the Plan for distribution of excess amounts. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors, the Liquidating Debtors, or the Disbursing Agent or any Holder of an Allowed Claim to whom distributions are made by the Disbursing Agent.

## U.    Late-Filed Claims

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a Proof of Claim was first filed after the applicable Bar Date shall be a Disputed Claim. The Liquidating Debtors shall not make any distribution to a Holder of such a Claim unless and until such Claim becomes an Allowed Claim; provided, however, that to the extent such Claim was listed in the Schedules (other than as contingent, disputed, or unliquidated) and would be an Allowed Claim but for the lack of a timely Proof of Claim, the Liquidating Debtors shall treat such Claim as an Allowed Claim in the amount in which it was so listed.

## V.    De Minimus Distributions; Charitable Donation

Notwithstanding anything to the contrary in the Plan, the Disbursing Agent shall not be required to make a distribution to any Creditor if the dollar amount of the distribution is so small that the cost of making that distribution exceeds the dollar amount of such distribution. At the Final Distribution Date, the Responsible Officer may make a charitable donation with undistributed funds if, in the reasonable judgment of the Responsible Officer, the cost of calculating and making the final distribution of the remaining funds is excessive in relation to the benefits to the Creditors who would otherwise be entitled to such distributions, provided that, the amount of such donation (if any) shall be disclosed in the application for a Final Decree filed by the Liquidating Debtors and subject to the approval of the Bankruptcy Court.

## W.    Setoffs

Nothing contained in the Plan shall constitute a waiver or release by the Debtors and/or Liquidating Debtors of any right of setoff or recoupment the Debtors and/or Liquidating Debtors may have against any Creditor or Equity Interest Holder.

## X.    United States Trustee Fees

All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date. Thereafter, the Debtors shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a final decree or an order converting or dismissing the case.

## IX.

## TREATMENT OF EXECUTORY CONTRACTS

## A.    Rejection of Executory Contracts

Except with respect to Executory Contracts that were (i) previously assumed or rejected by order of the Bankruptcy Court, (ii) are the subject of a pending motion to assume or reject pursuant to section 365 of the Bankruptcy Code, or (iii) are identified on the Assumption Schedule, on the Effective Date, each Executory Contract entered into by any of the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code. Nothing in Article VI of the Plan shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such leases. The Plan shall not affect any other contracts or agreements that have been assumed, or assumed and assigned, by order of the Bankruptcy Court prior to the Confirmation Date or which are the subject of a motion seeking assumption, or assumption and assignment, which is pending on the Confirmation Date.

## B.    Claims Based on Rejection of Executory Contracts

All Proofs of Claim with respect to Claims arising from the rejection of an Executory Contract pursuant to the Confirmation Order, if any, must be Filed with the Bankruptcy Court on or before the earlier of the Rejection Bar Date or the date otherwise fixed in an order of the Bankruptcy Court approving such rejection. Any Claims arising from the rejection of an Executory Contract pursuant to the Confirmation Order which are not Filed within such times will be forever barred from assertion against the Debtors, the Liquidating Debtors, or the Estates and their property. All such Claims for which Proofs of Claim are timely and properly Filed and ultimately Allowed will be treated as Unsecured Claims subject to the provisions of Article III of the Plan.

## C. Insurance Policies

To the extent that any or all of the insurance policies set forth on the Assumption Schedule are considered to be executory contracts, then notwithstanding anything contained in the Plan to the contrary, the Plan shall constitute a motion to assume the insurance policies set forth on the Assumption Schedule. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy set forth on the Assumption Schedule. To the extent that the Bankruptcy Court determines otherwise with respect to any insurance policy, the Debtors reserve the right to seek rejection of such insurance policy or other available relief. For the avoidance of doubt, the certain insurance policies (including any insurance policies that are not executory contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on the Assumption Schedule and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute, and benefit from claims) are retained and will be transferred to the Liquidating Trust pursuant to the Plan.

## X.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND TO THE EFFECTIVE DATE

### A. Conditions to Confirmation of the Plan

Confirmation of the Plan is conditioned upon the Court having signed the Confirmation Order in form and substance reasonably satisfactory to the Debtors.

### B. Effect of Failure of Conditions to Confirmation

If the condition in Section VII(A) of the Plan is not met, the Debtors may, at their option, withdraw the Plan and, if withdrawn, the Plan will be of no further force or effect.

### C. Conditions to Effectiveness of the Plan

The effectiveness of the Plan is conditioned upon the (i) entry of the Confirmation Order, (ii) if the Aegis REIT Disposition option is selected, the occurrence of the closing of the Aegis REIT Sale Agreement, and (iii) the execution and delivery of any related documents and instruments in form and substance reasonably satisfactory to the Debtors.

## D.    Substantive Consolidation of the Consolidated Debtors

**Substantive Consolidation Order**

The Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases of the Consolidated Debtors for purposes of carrying out the Plan, including making distributions under the Plan. Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan as herein provided on or before the Plan Objection Deadline, an order substantively consolidating the Chapter 11 Cases of the Consolidated Debtors may be entered by the Bankruptcy Court, which order may be the Confirmation Order. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

**Effect/Extent of Substantive Consolidation**

In effectuation of such substantive consolidation, on the Effective Date: (a) no distributions will be made under the Plan on account of the Intercompany Claims among the Consolidated Debtors; (b) the guarantees of the Consolidated Debtors will be deemed eliminated so that any Claim against the Consolidated Debtors and any guarantee thereof executed by any Debtor and any joint and several liability of the Consolidated Debtors with one another will be deemed to be one obligation of these Consolidated Debtors; (c) each and every Claim against the Consolidated Debtors will be deemed asserted as a single Claim against the Liquidating Debtors as a whole, and will be treated in the same Class regardless of the Consolidated Debtor; and (d) all of the property of the Estates of the Consolidated Debtors that is revested in the Liquidating Debtors shall be pooled in the Plan Assets to satisfy the Claims against the Consolidated Debtors in the amounts and at the times set forth in the Plan. Notwithstanding the substantive consolidation effectuated under the Plan, substantive consolidation shall not affect the obligation of each Consolidated Debtor under 28 U.S.C. § 1930(a)(6) until a particular Chapter 11 Case is closed, converted or dismissed. Notwithstanding the substantive consolidation of the Consolidated Debtors, nothing herein shall effect or be deemed to constitute a substantive consolidation of the Consolidated Debtors and Aegis REIT for any purpose, provided that, in the event the Aegis REIT Disposition option is selected, any co-Debtor Claims in Classes 7 and 8 of the Plan (*i.e.*, any Claim against Aegis REIT that is also a liability of any of the Consolidated Debtors) that are deemed included in Classes 4 and 5 of the Plan, respectively, shall be treated as if such claims were substantively consolidated as a single Claim against the Liquidating Debtors.

**Reservation of Rights**

The Debtors reserve the right at any time up to the conclusion of the Confirmation Hearing to withdraw their request for substantive consolidation of the Chapter 11 Cases of the Consolidated Debtors, to seek Confirmation of the Plan as if there were no substantive consolidation, and to seek Confirmation of the Plan with respect to one Debtor even if Confirmation with respect to the other Debtors is denied.

## E. Effective Date

Provided no stay of the Confirmation Order is then in effect, the Plan shall become effective on the Effective Date.

## XI.

## EFFECTS OF CONFIRMATION

## A. Binding Effect of Plan

The provisions of the confirmed Plan shall bind the Debtors, Reorganized Aegis REIT, the Liquidating Debtors, any Entity acquiring property under the Plan, and any Creditor or Equity Interest Holder, whether or not such Creditor or Equity Interest Holder has filed a Proof of Claim or Equity Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Equity Interest of such Equity Interest Holder is impaired under the Plan, and whether or not such Creditor or Equity Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be as fixed and adjusted pursuant to the Plan. With respect to any taxes of the kind specified in section 1146(c) of the Bankruptcy Code, the Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded.

## B. Revesting of Property of Debtors

Upon the Effective Date, title to all property of the Estates of the Consolidated Debtors in their Chapter 11 Cases shall revest in the Liquidating Debtors. Upon the Effective Date, (i) if the Aegis REIT Disposition Option is selected, title to all Aegis REIT Assets Remainder shall be deemed vested in the Liquidating Debtors, (ii) if the Aegis REIT Maintenance Option is selected, title to all Aegis REIT Assets shall revest in Reorganized Aegis REIT, or (iii) if the Aegis REIT Dissolution Option is selected, title to all Aegis REIT Assets  shall be deemed vested in the Liquidating Debtors, in each case, free and clear of any Liens or Claims except those Liens and Claims expressly preserved by the Plan or the Confirmation Order. All such property shall be retained either by (a) the Liquidating Debtors as Plan Assets for the purposes contemplated under the Plan, or (b) Reorganized Aegis REIT for the conduct of its ongoing business. Without limiting the generality of the foregoing, all Litigation Recoveries, rights to Liquidation Proceeds, and all resulting Plan Proceeds earmarked for disbursement to Creditors under the Plan, shall vest in the Liquidating Debtors upon the Effective Date and shall no longer constitute property of the Estates.

## C. Property Free and Clear

Following the Effective Date, the Liquidating Debtors and Reorganized Aegis REIT may transfer and dispose of their property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

## D. Limitations of Liability

**Exculpation**

The Debtors, the Committee, CSFB, UBS, Madeleine, Cerberus and each of their respective Agents will neither incur nor incur, and are hereby released from, any liability to any Entity for any action in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Cases or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Cases; *provided, however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Creditor or Equity Interest Holder to enforce its rights under the Plan and shall not release any action (or inaction) constituting willful misconduct or gross negligence.

**Releases**

As part of the Plan, the releases set forth below shall be granted pursuant to the Plan and the Confirmation Order:

      a.     Debtors' Release of Agents

On the Effective Date, subject to the Preserved Setoff Rights, the Debtors, Reorganized Aegis REIT and the Liquidating Debtors, for and on behalf of the Estates, shall release and be permanently enjoined from any prosecution or attempted prosecution of any and all Litigation or potential Litigation which any of them has or may have against any of their Agents as of the Confirmation Date; *provided, however*, that the foregoing shall not operate as a waiver of or release from any Litigation or potential Litigation arising out of (i) any express contractual obligation owing by any such Agents, or (ii) the willful misconduct or gross negligence of any such Agents in connection with, related to, or arising out of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan.

      b.     Certain Mutual, General Release

On the Effective Date, the Debtors (for and on behalf of their respective Estates), the Liquidating Debtors, Reorganized Aegis REIT, the Committee, CSFB, UBS, Madeleine and Cerberus, and each of their respective Affiliates and Agents, shall be deemed to have released each other, and each of their respective Affiliates and Agents ("Released Parties"), from any and all debts, claims, damages and causes of action (including any Litigation), whether known or unknown, which each of them now has or may have against each other by reason of any transaction, occurrence, act or omission giving rise to any Claim or Equity Interest that is treated in the Plan, the ownership of any of the Debtors, the business or contractual arrangements between any Debtor and any Released Party, or the Chapter 11 Cases. It is the intention of the Released Parties that this release shall be effective as a full and final release of all claims, debts, rights and obligations against each other arising out of the matters described. In furtherance of this intention, the Released Parties waive the benefit of the provisions of California Civil Code § 1542 (or, if inapplicable, any other similar applicable statute), which provides as follows: ***"A general release does not extend to claims which the creditor does not know or suspect to exist***

*in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."* The releases set forth in this Section VIII(D)(2)(b) are an integral component of the expeditious Confirmation of the Plan and the implementation of the restructuring contemplated by the Plan, particularly the allowance and treatment under the Plan of certain Claims of CSFB, UBS and Madeleine (pursuant to Sections II(E), III(B)(4)(d) and III(B)(5)(f) of the Plan), and the resolution of certain Subordination Rights asserted by CSFB and UBS against Madeleine (pursuant to Section V(C) of the Plan). Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, the foregoing provisions constitute a compromise of certain rights and claims by and among the Released Parties. The Debtors request that the Bankruptcy Court approve this compromise at the Confirmation Hearing. The Confirmation Order shall constitute the determination by the Bankruptcy Court that this compromise is approved.

c.    Third Party Releases

In consideration for the obligations of the Debtors, the Liquidating Debtors and Reorganized Aegis REIT under the Plan, and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Entity that affirmatively votes to accept the Plan, for itself and its respective successors, assigns, transferees and current and former Affiliates and Agents, shall, by virtue of Sections 1126(c) and 1141(a) of the Bankruptcy Code, be deemed to have released any and all debts, claims, damages and causes of action related to any transaction, occurrence, act or omission giving rise to any Claim or Equity Interest that is treated in the Plan, the ownership of any of the Debtors, the business or contractual arrangements between any Debtor and any such Entity, or the Chapter 11 Cases (but excluding, and not releasing, any right to enforce the obligations under the Plan and the other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan), against (A) the Debtors, the Liquidating Debtors, Reorganized Aegis REIT and each of their respective Agents, (B) the Committee and its Agents, and (C) CSFB, UBS, Madeleine, Cerberus and each of their respective Agents.

**E.    Optional Discharge of Aegis REIT**

In the event the Aegis REIT Maintenance option is selected, except as specifically provided in the Plan or in the Confirmation Order, effective on the Effective Date, Confirmation shall discharge Aegis REIT and Reorganized Aegis REIT from any and all Claims including any Claim of a kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtor, (ii) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has voted on or accepted the Plan. Except as specifically provided in the Plan to the contrary, the rights that are provided in the Plan shall be in complete discharge of all Claims against and Liens on the assets and properties of Aegis REIT and Reorganized Aegis REIT.

**F.    Injunction**

*In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of*

the Plan or any documents provided for or contemplated in the Plan, **all Entities who have held, hold or may hold Claims against or Equity Interests in the Debtors or their Estates that arose prior to the Effective Date** *are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, the Estates, or any property of the Debtors or their Estates, with respect to any such Claim or Equity Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, Liquidating Debtors, Reorganized Aegis REIT, the Estates, or any property of the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, or the Estates, with respect to any such Claim or Equity Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, the Estates, or any property of the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, or the Estates, with respect to any such Claim or Equity Interest; (d) asserting, directly or indirectly, any setoff or right of subrogation of any kind against any obligation due the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, the Estates, or any property of the Debtors, the Liquidating Debtors, Reorganized Aegis REIT, or the Estates, with respect to any such Claim or Equity Interest; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Equity Interest.*

## G.    Post-Confirmation Liability of Responsible Officer and Disbursing Agent

The Responsible Officer, the Committee and the Disbursing Agent and their consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, causes of action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Equity Interests for any action or inaction taken in good faith in connection with the performance or discharge of his or her duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent or which constitute willful misconduct. However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct. In addition, the Liquidating Debtors and the Estates shall, to the fullest extent permitted under applicable law, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Debtors and the Estates or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Debtors and the Estates. To the extent the Liquidating Debtors indemnify and hold harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Responsible Officer in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Plan Expenses. All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

## H. **Insurance**

On or after the Effective Date, the Responsible Officer and the Disbursing Agent shall obtain a fidelity bond or similar insurance. In addition, the Responsible Officer may obtain (if available) directors' and officers' liability insurance or errors and omission insurance (or equivalent insurance), provided that such insurance is available at a reasonable price. The cost of any fidelity bond or insurance obtained under the Plan shall be a Plan Expense.

## XII.

## RETENTION OF JURISDICTION

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

1. To hear and determine any and all objections to the allowance of a Claim, actions to equitably subordinate a Claim, or any controversy as to the classification of a Claim in a particular Class under the Plan;

2. To administer the Plan, the Plan Assets, and the Plan Proceeds;

3. To liquidate any Disputed Claims;

4. To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date;

5. To hear and determine any and all motions and/or objections to fix and allow any Claims arising therefrom;

6. To hear and determine any and all applications by Professionals for an award of Professional Fees;

7. To enable the Liquidating Debtors to commence and prosecute any Litigation which may be brought after the Effective Date;

8. To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document or instrument contemplated by the Plan;

9. To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified or vacated;

10. To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

11.     To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code; and

12.     To close the Chapter 11 Cases when administration of the case has been completed.

## XIII.

## MISCELLANEOUS

### A.     Revocation of Plan of Reorganization

The Debtors reserve the right to revoke and withdraw the Plan at any time on or before the Confirmation Date. If the Debtors revoke or withdraw the Plan pursuant to this section, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any entity in any further proceedings involving the Debtors.

### B.     Severability of Plan Provisions

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### C.     Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware.

### D.     Exhibits

All exhibits attached to the Plan, the Plan Supplement, or the Disclosure Statement, as well as the Assumption Schedule, are, by this reference, hereby incorporated into the Plan. The final version of all Exhibits to the Plan, the Plan Supplement, and the Disclosure Statement will be substantially in the forms attached hereto or thereto. Any Plan Supplement will be filed with the Bankruptcy Court no later than then (10) days prior to commencement of the Confirmation

Hearing. The Debtors reserve the right to make nonsubstantive changes and corrections to such Exhibits in advance of the Confirmation Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

**E.**     **Notices**

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first class mail or via facsimile with electronic confirmation of receipt as follows:

### If to the Debtors:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705 (Courier 19801)
Tel. 302-652-4100, Fax 302-652-4400
Attn: Laura Davis Jones, Esquire

### If to the Committee:

Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022
Tel. 212-478-7350, Fax. 212-478-7400
Attn: Mark T. Power, Esquire

**F.**     **Reservation of Rights**

Neither the filing of the Plan nor any statement or provision contained in the Plan or in the Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall (a) be or be deemed to be an admission against interest, and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Plan nor the Disclosure Statement nor any statement contained in the Plan or in the Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding or controversy within or without these Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

**G.**     **Computation of Time Periods**

In computing any period of time prescribed or allowed by the Plan, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in the Bankruptcy Court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

## H.    Defects, Omissions and Amendments

The Debtors may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims or Equity Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan. The Plan may be altered or amended before or after Confirmation as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtors has complied with section 1125 of the Bankruptcy Code. The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code, the Debtors has complied with section 1125 of the Bankruptcy Code and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

## I.    Filing of Additional Documents

The Debtors shall file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## J.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such entity.

## K.    Setoffs and Recoupments

The Disbursing Agent may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtors, the Liquidating Debtors, or the Estates, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Liquidating Debtors, or the Estates, against such Holder.

## L.    Securities Exemption

Any rights issued under, pursuant to or in effecting the Plan, and the offering and issuance thereof by any party, including without limitation, the Liquidating Debtors, Reorganized Aegis REIT or the Disbursing Agent, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, section 1145 of the Bankruptcy Code.

## M.      Plan Interest Rate

If and to the extent it is determined by the Bankruptcy Court that interest is required to be paid on an Allowed Claim other than as set forth in the Plan, the interest rate to be used shall be determined by the Bankruptcy Court.

## N.      Implementation

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

## O.      Record Date

To the extent a record date is required for implementation of the Plan or for purposes of determining the Entities entitled to receive and vote on the Plan, the record date shall be (i) pursuant to Bankruptcy Rules 3017(d) and 3018(a), the date of entry of the Bankruptcy Court's order approving the Disclosure Statement, or (ii) such other date as the Bankruptcy Court may set.

## P.      Certain Actions

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of directors or stockholders of the Debtors under the Plan, including, without limitation, (i) the distribution of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to the applicable general corporation, limited liability, or partnership law of the states in which any of the Debtors are chartered, organized or incorporated, without any requirement of further action by the directors and stockholders of the Debtors.

Effective upon the Effective Date, each Debtor's Charter shall be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Responsible Officer shall be authorized to cancel, annul and extinguish all Consolidated Debtor Equity Interests.

## Q.      Dissolution of Committee

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs

incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to Section II(C) of the Plan.

## R.    Waiver of Ten (10) Day Stay

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the ten (10) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the ten (10) day stay under Bankruptcy Rule 6004(g).

## XIV.

### SUMMARY OF DISTRIBUTABLE ASSETS

The Debtors estimate that, as of a projected Effective Date of November 1, 2010, the Debtors will have Available Cash on hand from the liquidation of Estate assets of approximately $25 million.[19]  This estimate does not include the CSFB Fund of approximately $860,000, which fund will be released to CSFB under the Plan. Furthermore, this estimate of Available Cash assumes that the Aegis REIT Disposition option is selected and that, accordingly, the Aegis REIT Sale Agreement is consummated according to its terms (entailing an anticipated payment by the Debtors of approximately $2.4 million to the purchasers under such agreement). From this estimated amount of Available Cash, the Debtors will have to pay approximately $2,010,000 in Administrative (not including Professional Fee Claims) and Priority Claims that the Debtors estimate will ultimately be Allowed. In addition, the Debtors estimate that the amount of Professional Fee Claims outstanding as of the Effective Date will be approximately $546,000 (this amount may also vary based on interim payments made prior to the Effective Date and additional services rendered or expenses incurred prior to the Effective Date).

Hence, after the deduction of the foregoing amounts, which are payable in full under the Plan, the remaining amount of Available Cash as of the projected Effective Date would therefore be approximately $22.4 million. This amount, however, is subject to reduction for the payment of Plan Expenses that are incurred by the Liquidating Debtors or the Disbursing Agent following the Effective Date. Any augmentation to this amount for distribution to the Holders of Unsecured Claims would derive from successful Litigation and other Liquidation Proceeds. The foregoing estimate of Available Cash does not include the Tax Refund discussed in greater detail above (at such time as the Tax Refund becomes available for distribution, the amount of Plan Assets would correspondingly increase).

## XV.

### RANGE OF RECOVERIES/RISK FACTORS

Because of the huge magnitude of potential swings concerning Allowed Claims in these cases, it is extremely difficult to project any likely range of recoveries on Class 4 and Class 5

---

[19]  Although the Debtors have budgeted their anticipated expenses from the date of this Disclosure Statement through the anticipated Effective Date, the Debtors have ongoing operating and employee expenses that, in the ordinary course of business, may unexpectedly reduce the amount of Available Cash that will be "on hand" as of the Effective Date.

Claims (and any Class 8 and 9 Claims that would be deemed included in Classes 4 and 5 if the Aegis REIT Disposition option is selected). As indicated, the Debtors estimate that, after the satisfaction of all Priority and Administrative Claims, the Debtors will have liquid or other assets on the Effective Date having a value of approximately $22.4 million (again, net of payments associated with the possible selection of the Aegis REIT Disposition option and not including the Tax Refund but subject to the payment of post-Effective Date Plan Expenses). The ultimate Allowed Amount of Class 4 and Class 5 Claims, however, is extremely difficult to calculate with precision. For instance, the filed EPD/Breach Claims against the Consolidated Debtors exceed $150 million, but the actual amount of such Claims remains unliquidated. Additionally, the amount of administrative expenses in liquidating the foregoing Claims is also extremely difficult to predict and will be driven largely by whether settlements can be attained.

In sum, notwithstanding the Debtors' best efforts to provide reasonable estimates of the expected return to the Holders of Claims, there is always a possibility that the efforts of the Liquidating Debtors will be more expensive or less successful than predicted. Additionally, there may be significant delays before any distribution is made on account of Allowed Claims, given the uncertainties of the Litigation.

For the reasons set forth in this Disclosure Statement, the Debtors believe that the very same risks described herein are present, and possibly more significant to Creditors, in a chapter 7 case.

## XVI.

## BEST INTEREST OF CREDITORS TEST

Confirmation of the Plan requires, among other things, that each holder of a claim in an impaired class and each holder of an interest either: (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "Best Interests Test."

### A. Chapter 7

To determine the value that the holders of impaired claims and interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. Bankruptcy Code section 704 requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

The Cash available for satisfaction of Allowed Claims would consist of the proceeds resulting from the disposition of the Debtors' few remaining assets, augmented by the Cash, if any, held by the Debtors at the time of the commencement of the chapter 7 case. Any such Cash amount would then be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation and such additional Administrative Claims and other priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants or other professionals and costs and expenses of the Debtors and the Committee. Such Administrative Claims would have to be paid in Cash, in full from the liquidation proceeds before the balance of those proceeds could be made available to pay other Claims.

## B.  Liquidation Analysis

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtors must demonstrate, and the Bankruptcy Court must determine that, with respect to such Class, each holder of a Claim will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' remaining assets by a Chapter 7 trustee. A liquidation analysis with respect to the Debtors is attached as **Exhibit 1** to this Disclosure Statement. The Debtors believe that any liquidation analysis is inherently speculative. For instance, the liquidation analysis reflects an estimate of the amount of Allowed Claims (described in the chart set forth above in Section II(D) of this Disclosure Statement). The Debtors have based these estimates on a review of the Claims set forth in the Schedules and in Proofs of Claim. No order or finding, however, has been entered by the Bankruptcy Court estimating or otherwise fixing the projected amount of Allowed Claims.

Notwithstanding the difficulty with precisely quantifying recoveries to Creditors, the Debtors believe that the Plan satisfies the Best Interests of Creditors Test. The Plan provides a greater recovery to the Holders of Allowed General Unsecured Claims than such Holders would receive under a liquidation under chapter 7 primarily because (a) the Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee (*i.e.*, the compensation of a trustee, as well as of counsel and other professionals retained by the trustee), while increasing the efficiency of administrating the Debtors' assets for the benefit of its Creditors, (b) the Plan seeks to avoid the dilutive effect of liquidating Aegis REIT (although, if the Aegis REIT Dissolution option is selected, such dilutive effects may be triggered), (c) in the event of liquidation, the aggregate amount of Unsecured Claims would undoubtedly increase (a new claims "bar date" would be established, among other potential consequences arising from conversion), and (d) in the event of liquidation, the Estates of the Consolidated Debtors would not enjoy the efficiencies created by the partial substantive consolidation of the Consolidated Debtors under the Plan. Moreover (as another efficiency), the Debtors and the Committee have already completed much of the analysis concerning the Litigation that a chapter 7 trustee would have to reevaluate before such Litigation would commence.

In chapter 7 cases, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors have already accumulated much of the funds and have already incurred many of the expenses associated with generating those funds. Accordingly, the Debtors believe that there is a

reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed. It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors. All of these factors lead to the conclusion that recoveries under the Plan would be *at least as much*, and possibly greater, than the recoveries available in a Chapter 7 liquidation.

## XVII.

### CERTAIN FEDERAL INCOME TAX
### CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims. This discussion does *not* address the federal income tax consequences of the Plan to (a) the Holders of Intercompany Claims (Class 9), (b) the Holders of unclassified Claims under Article II of the Plan (*i.e.*, Administrative Claims and Priority Tax Claims), (c) the Holders of Secured Claims, or (d) the Holders of Equity Interests. Moreover, this discussion does *not* address the tax consequences of the Plan to the Holders of Claims against or Equity Interests in Aegis REIT or its non-debtor Affiliate, AEHC. As REIT Entities, the tax law, rules and regulations applicable to Aegis REIT and AEHC are unique, complex and beyond the scope of this discussion. This discussion is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the IRS as in effect on the date of the Plan.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Equity Interests, the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or certain Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment

companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to certain Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Consequences to Debtors

### Treatment as Liquidation

For federal income tax purposes, AMC is the parent of an affiliated group of corporations that includes the Debtors and certain of their corporate subsidiaries that join in the filing of a consolidated federal income tax return (Aegis REIT and its REIT subsidiary, AEHC, a non-debtor, are not includable corporations for this purpose). This consolidated group of corporations has reported consolidated NOL carryforwards for federal income tax purposes as of December 31, 2009. In addition, the Debtors expect that the consolidated group will incur additional losses during 2010 that are expected to generate additional NOL carryforwards for the consolidated group as of December 31, 2010. The amount of such NOLs and NOL carryforwards remains subject to review and adjustment by the IRS and to the application of Sections 108 and 382 of the IRC, which may substantially reduce, eliminate, or subject to significant limitations the tax attributes of the Debtors, including the NOLs and NOL carryforwards, as the result of implementation of the Plan.

Under the Plan, the Plan Assets will be vested in the Liquidating Debtors upon Confirmation. In addition, in the event the Aegis REIT Disposition or the Aegis REIT Dissolution options are selected, the Aegis REIT Assets Remainder or the Aegis REIT Assets, respectively, will be transferred to the Liquidating Debtors. If the Debtors remain in existence following the Effective Date of the Plan, the sole purpose of their remaining in existence will be the winding-up of their affairs. Accordingly, the Debtors intend to treat the Plan as a plan of liquidation for federal income tax purposes (depending on the Aegis REIT Treatment Election that is selected, Aegis REIT may also eventually be wound up and dissolved). Upon the Effective Date of the Plan, the Liquidating Debtors (through the Disbursing Agent) will become obligated to make distributions to Creditors at the time, in the amounts and according to the conditions set forth in the Plan.

### Impact on Tax Attributes

While the Debtors intend to wind up their affairs before the liquidation of the Debtors is consummated, the Debtors believe that, notwithstanding the potential for attribute reduction, elimination or limitation, implementation of the Plan should not cause them to incur a material

amount of federal income tax so long as (i) they continue to incur a substantial amount of administrative expenses and other losses that are sufficient to offset income from the assets they hold and gains, if any, from the sale or disposition of assets or (ii) the tax attributes of the Debtors, including the NOLs, will not be reduced, eliminated, or subject to significant limitations such that the attributes will not be available to offset such income and potential gains resulting from the sale or disposition of assets. In that regard, the Debtors intend to take the position that because the Plan is a plan of liquidation for federal income tax purposes, neither its confirmation nor consummation will cause the Holders of Claims to be deemed to have acquired stock, or the shareholders to be deemed to have surrendered stock so that there will not have been an ownership change for purposes of Section 382 of the IRC. Further, any reduction in tax attributes under Section 108 does not occur until the end of the taxable year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD occurs. The Debtors believe that the implementation of the Plan should not cause them to incur a material amount of federal income tax by reason of COD so long as they have disposed of substantially all of their assets on or prior to the last day of the taxable year that includes the earliest date on which they are treated, for federal income tax purposes, as recognizing a material amount of COD.

In the event the Aegis REIT Disposition or the Aegis REIT Dissolution options are selected in subsequent taxable years, the sale by the Debtors of the Aegis REIT assets as part of their winding process could generate gains if the value of the Aegis REIT assets exceeds their tax basis (unrecognized built-in gains). Since an analysis of the unrecognized built-in gains has not been preformed, there is no assurance that any gains or income resulting from the sale of the Aegis REIT assets, in a subsequent taxable year, will not result in a material amount of federal income tax.

## Alternative Minimum Tax

In general, a federal alternative minimum tax is imposed on a corporation's alternative minimum taxable income at a 20% tax rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for alternative minimum tax purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation is generally not allowed to offset more than 90% of its taxable income for federal alternative minimum tax purposes by available NOL carryforwards.

The Debtors believe that the implementation of the Plan should not cause them to incur a material amount of federal alternative minimum tax so long as they wind up their affairs before the liquidation is consummated. If the Debtors incur federal income tax due to the Aegis REIT Disposition or Aegis REIT Dissolution in subsequent taxable years , there is no assurance that alternative minimum tax would not be incurred.

NO RULING HAS BEEN OR WILL BE REQUESTED FROM THE IRS CONCERNING THE TAX STATUS OF THE LIQUIDATING DEBTORS, AND THERE CAN BE NO ASSURANCE THE IRS WILL NOT REQUIRE A PARTICULAR CHARACTERIZATION OF THE LIQUIDATING DEBTORS.

## B.  Consequences to Holders of Claims

The federal income tax consequences of the Plan to a Holder of a Claim will depend upon several factors, including but not limited to: (i) the origin of the Holder's Claim, (ii) whether the Holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above), (iii) whether the Holder reports income on the accrual or cash basis method, (iv) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to this Claim and (v) whether the Holder receives distributions under the Plan in more than one taxable year. HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

Generally, a Holder of an Allowed Claim will recognize gain or loss equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in the Allowed Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

Pursuant to the Plan, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be treated as receiving taxable interest, to the extent any consideration they receive under the Plan is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

Where gain or loss is recognized by a Holder of an Allowed Claim, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the status of the Holder, the nature of the Allowed Claim in such Holder's hands (*i.e.*, whether the claim constitutes a capital asset in the hands of the holder), the purpose and circumstances of its acquisition, the Holder's holding period of the Allowed Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim. The Holder's aggregate tax basis for any consideration received under the Plan will generally equal the amount realized in the exchange (less any amount allocable to interest as described in the previous paragraph). The holding period for any consideration received under the Plan will generally begin on the day following the receipt of such consideration.

A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

## C.     **Withholding**

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding. The Liquidating Debtors will withhold appropriate employment taxes with respect to payments made to a Holder of an Allowed Claim that constitutes a payment for compensation. Payers of interest, dividends, and certain other reportable payments are generally required to withhold thirty percent (30%) of such payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employer identification number), to the payer. The Liquidating Debtors may be required to withhold a portion of any payments made to a Holder of an Allowed Claim if the Holder (a) fails to furnish the correct social security number or other taxpayer identification number ("TIN") of such Holder, (b) furnishes an incorrect TIN, (c) has failed properly to report interest or dividends to the IRS in the past, or (d) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is the correct number and that such Holder is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY FOR INFORMATIONAL PURPOSES AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

# XVIII.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of Creditors and urge Creditors to vote to accept the Plan.

Dated: August 13, 2010

AEGIS MORTGAGE CORPORATION

By: _____
Its: President

AEGIS WHOLESALE CORPORATION

By: _____
Its: President

AEGIS LENDING CORPORATION

By: _____
Its: President

AEGIS CORRESPONDENT CORPORATION

By: _____
Its: President

AEGIS FUNDING CORPORATION

By: _____
Its: President

AEGIS MORTGAGE LOAN SERVICING
CORPORATION

By: _____
Its: President

SOLUTIONS SETTLEMENT SERVICES OF
AMERICA CORPORATION

By: _Michael C. Balog_
Its: _President_

SOLUTIONS TITLE OF AMERICA CORPORATION

By: _Michael C. Balog_
Its: _President_

AEGIS REIT CORPORATION

By: _Michael C. Balog_
Its: _President_

Submitted by:

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
Henry C. Kevane (CA Bar No. 125757)
David M. Bertenthal (CA Bar No. 167624)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Counsel for Debtors and Debtors in Possession

*Signature Pages to Disclosure Statement for Second Amended Plan*

# EXHIBIT 1

## Liquidation Analysis

*Exhibit 1 – Liquidation Analysis*

## LIQUIDATION ANALYSIS

### Introduction

The Debtors believe that Creditors will receive superior recoveries under the Plan than they would receive if these cases were converted to cases under Chapter 7 of the Bankruptcy Code. This result occurs primarily because of three factors: (1) the increased costs associated with conversion of the cases; (2) the loss of significant claim settlements which are proposed to become effective upon confirmation and effectiveness of the Plan; and (3) the risks associated with the Chapter 7 process.

The liquidation analysis presented below (the "Liquidation Analysis") is an estimate, based on a number of significant assumptions. The Liquidation Analysis is not, and does not purport to be, a valuation of the Debtors' assets. The Liquidation Analysis reflects the projected outcome of the hypothetical, orderly liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The projected liquidation proceeds for distribution to each Class are less than or equal to (in the case of the Holders of Equity Interests) the estimated recoveries under the proposed Plan.

Underlying the Liquidation Analysis are a number of values, estimates and assumptions that are inherently subject to litigation and other contingencies beyond the control of the Debtors and their management and advisors. All numbers contained in this analysis are estimates. Some of the values, estimates and assumptions may be inaccurate to some extent. Similarly, other assumptions with respect to the liquidation process may be subject to change. Upon liquidation, there is a general risk of unanticipated events which could have a significant impact upon available cash and disbursements. For all of the foregoing reasons, there can be no assurance that the values reflected in the Liquidation Analysis or recovery percentages would be realized if the Debtors were, in fact, liquidated under chapter 7, and actual results could vary materially from those shown in the analysis. In addition to the foregoing uncertainties, the liquidation is subject to the following notes and assumptions:

1. Amounts of Administrative Claims include estimates for the expenses of professionals retained by the Debtors and the Committee through the Effective Date of the Plan, which is the notional date on which a conversion to a case under chapter 7 of the Bankruptcy Code would occur. The amount of allowed professional fees to be paid has not been fixed, and is therefore an estimate and subject to change.

2. Amounts of Priority Tax Claims, Priority Claims and Unsecured Claims are based on the amounts listed in the Debtors' Schedules, as filed, on those Proofs of Claim filed with the Court and on certain final, non-contingent claim resolutions reached with various Creditors.

3. In the event that the Debtors' cases were converted to cases under chapter 7 and the Debtors were forced to distribute the proceeds in the context of a chapter 7 liquidation, the Debtors would not be able to achieve the same level of recovery for the Holders of Unsecured Claims as under the Plan because of the costs associated

with a Chapter 7 case and because the benefit of certain claim settlements which will be put into effect pursuant to the Plan will not take place. In addition upon conversion a new bar date would be set and additional claims filed, thereby potentially further diluting the possible distribution for creditors.

## SUMMARY OF DISTRIBUTABLE ASSETS

The Debtors estimate that, as of a projected Effective Date of November 1, 2010, the Debtors will have Available Cash on hand from the liquidation of Estate assets of approximately $25 million. This estimate does not include the CSFB Fund of approximately $860,000, which fund will be released to CSFB under the Plan. Furthermore, this estimate of Available Cash assumes that the Aegis REIT Disposition option is selected and that, accordingly, the Aegis REIT Sale Agreement is consummated according to its terms (entailing an anticipated payment by the Debtors of approximately $2.4 million to the purchasers and certain third parties under such agreement). From this estimated amount of Available Cash, the Debtors will have to pay approximately $2,010,000 in Administrative (not including Professional Fee Claims) and Priority Claims that the Debtors estimate will ultimately be Allowed. In addition, the Debtors estimate that the amount of Professional Fee Claims outstanding as of the Effective Date will be approximately $546,000 (this amount may also vary based on interim payments made prior to the Effective Date and additional services rendered or expenses incurred prior to the Effective Date).

Hence, after the deduction of the foregoing amounts, which are payable in full under the Plan, the remaining amount of Available Cash as of the projected Effective Date would therefore be approximately $22.4 million. This amount, however, is subject to reduction for the payment of Plan Expenses that are incurred by the Liquidating Debtors or the Disbursing Agent following the Effective Date. Any augmentation to this amount for distribution to the Holders of Unsecured Claims would derive from successful Litigation and other Liquidation Recoveries. At the present time, however, the Debtors do not anticipate any meaningful Litigation Recoveries. The foregoing estimate of Available Cash does not include the Tax Refund discussed in greater detail in the Disclosure Statement (at such time as the Tax Refund becomes available for distribution, the amount of Plan Assets would correspondingly increase).

## RANGE OF RECOVERIES/RISK FACTORS

Because of the huge magnitude of potential swings concerning Allowed Claims in these cases, it is extremely difficult to project any likely range of recoveries on Class 4 and Class 5 Claims (and any Class 7 and 8 Claims that would be deemed included in Classes 4 and 5 if the Aegis REIT Disposition option is selected). As indicated, the Debtors estimate that, after the satisfaction of all Priority and Administrative Claims, the Debtors will have liquid or other assets on the Effective Date having a value of approximately $22.4 million (again, net of payments associated with the possible selection of the Aegis REIT Disposition option and not including the Tax Refund but subject to the payment of post-Effective Date Plan Expenses). The ultimate Allowed Amount of Class 4 and Class 5 Claims, however, is extremely difficult to calculate with precision. For instance, the filed EPD/Breach Claims against the Consolidated Debtors exceed $150 million, but the actual amount of such

Claims remains unliquidated. Additionally, the amount of expenses associated with liquidating the foregoing Claims is also extremely difficult to predict and will be driven largely by whether settlements can be attained.

In sum, notwithstanding the Debtors' best efforts to provide reasonable estimates of the expected return to the Holders of Claims, there is always a possibility that the efforts of the Liquidating Debtors will be more expensive or less successful than predicted. Additionally, there may be significant delays before any distribution is made on account of Allowed Claims, given the uncertainties of the Litigation.

<u>MEMORANDUM OF UNDERSTANDING AND RESULTING CLAIM RESOLUTIONS</u>

In late 2008, Madeleine, the Debtors, and certain of its principal Warehouse Lenders, with the participation of the Committee, reached an agreement in principle for the resolution under the Plan of certain rights, claims and defenses held by Madeleine, CSFB and UBS (among others). This agreement was set forth in that certain *Memorandum of Understanding* dated as of June 15, 2009 ("MOU"), among AMC, the Committee, Madeleine, CSFB and UBS. Under the MOU, the Debtors agreed to amend the plan of reorganization previously filed by the Debtors on October 14, 2008, to reflect certain consensual terms and conditions. The current Plan is intended to reflect the terms and conditions of the MOU. Under the MOU, each of the Committee, Madeleine, CSFB and UBS agree to support the Plan insofar as it remains consistent in all material respects with the terms of the MOU. If so, each of the foregoing parties agrees not to object to the Plan and will not support or participate in the filing of any other plan in respect of the Debtors in the Chapter 11 Cases.

In consideration for the release of the Estates' potential challenges to the various claims resolved by the MOU, the MOU provides that (i) the claims of CSFB under its Warehouse Credit Facilities with the Debtors, originally filed in the approximate amount of $13.2 million, will be liquidated and allowed under the Plan as a general, unsecured claim in the amount of $12.2 million, (ii) the similar claims of UBS, originally filed in the approximate amount of $16.2 million, will be liquidated and allowed as a general, unsecured claim in the amount of $14.1 million, and (iii) the Madeleine Claim, originally filed in the approximate amount of $178 million, will also be allowed under the Plan as a general, unsecured claim in the amount of $135 million, although that amount will be reduced to $133 million on account of the assignment of a $2 million portion of such claim pursuant to the Thompson Settlement. Under the MOU, each of the foregoing claims allowed by the Plan will not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and will be deemed allowed without necessity of any further filings or amendments, including any proof of claim. Further, each of these allowed claims will be classified and treated as Allowed Claims in Class 4 (Consolidated Debtors Unsecured Claims) of the Plan. As such, these claims will be treated in a manner consistent with the treatment afforded to Unsecured Claims held by similarly-situated creditors in Class 4. The MOU and the settlements contemplated thereunder are contingent upon confirmation of the Plan.

| ASSETS OF THE ESTATE | | |
|---|---|---|
| | Plan | Chapter 7 |
| Total cash in Debtor's Bank/Investment Accounts | $25,000,000 | $25,000,000 |

| | | |
|---|---|---|
| Remaining Liquidation Proceeds[1] | unknown | unknown |
| | | |
| Assets Available for Distribution to Creditors | $25,000,000 | $25,000,000 |

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | PLAN RECOVERY | CHAPTER 7 RECOVERY |
|---|---|---|---|---|
| N/A | Administrative Claims | $220,000 | Estimated Recovery: 100% | Estimated Recovery: 100% |
| N/A | Priority Tax Claims | $680,000 | Estimated Recovery: 100% | Estimated Recovery: 100% |
| N/A | Professional Fee Claims | $546,000[2] | Estimated Recovery: 100% | Estimated Recovery: 100% |
| 1 | Priority Claims | $1,150,000 | Estimated Recovery: 100% | Estimated Recovery: 100% |
| 2 | Secured Claims | <$100,000 | Estimated Recovery: 100% | Estimated Recovery: 100% |

TOTAL AMOUNT AVAILABLE NET OF PAYMENTS TO ADMINISTRATIVE AND PRIORITY CLAIMS:
(Approximately)     $22,400,000.00

---

[1] Unknown at this time but anticipated to be de minimus. The Tax Refund, once final, however, would be included in these amounts.

[2] The estimated amount of outstanding Professional Fee Claims is based on an anticipated Effective Date of November 1, 2010; this amount will vary based on interim payments made prior to the Effective Date, additional unanticipated services rendered or expenses incurred prior to the Effective Date, and possible delays in the occurrence of the Effective Date.

| POTENTIAL EXPENSES OF A CHAPTER 7 CONVERSION | | |
|---|---|---|
| | Plan | Chapter 7 |
| Chapter 7 Administrative Claims (including the fees of professionals for the chapter 7 trustee and the fees of the chapter 7 trustee allowable under § 326 of the Bankruptcy Code) | — | ($1,000,000)[3] |
| **Assets Remaining for Distribution:** | $ 22,400,000 | $ 21,400,000 |

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | PLAN RECOVERY | CHAPTER 7 RECOVERY |
|---|---|---|---|---|
| 3 | Convenience Claims | $5.7 million[4] | Estimated Recovery: 20% | Estimated Recovery: < 7% |
| 4 | Consolidated Debtors Unsecured Claims | $182.5 million under the Plan[5] > $230 million if the cases were converted to Chapter 7 | Estimated Recovery: approximately 5-15% | Estimated Recovery: < 7% |

---

[3] This amount includes a trustee commission of $773,250.00 calculated pursuant to 11 U.S.C. § 326(a) plus estimated professional fees of $226,750.00.

[4] For purposes of the estimated amount of Convenience Claims under the Plan, the Debtors have assumed that each Class 4 Creditor holding Claims in an aggregate amount up to $62,500 would exercise the election to reduce such Claims to a single Convenience Claim of $25,000 under Class 3 of the Plan (this assumes an 8% distribution to the Holder of a Class 4 Claim – if such Holder remained in Class 4, then it would receive a distribution of $5,000, the same amount that the Holder of a Convenience Claim in the amount of $25,000 would receive in Class 3 at a 20% distribution). As of July 13, 2010, it appears that there are approximately 1,600 existing Unsecured Claims under $25,000, for an aggregate amount of approximately $3.1 million. If Creditors with Unsecured Claims between $25,000 and $62,500 elected to reduce their claims to Convenience Claims of $25,000, the aggregate amount of claims in Class 3 would increase to approximately $5.7 million, with a corresponding reduction of the aggregate amount of claims in Class 4. If the cases were converted to cases under Chapter 7 of the Bankruptcy Code, Convenience Claims would be grouped will all other unsecured claims.

[5] This estimate includes the $133 million Madeleine Claim allowed by the Plan (following the reduction of such claim from $135 million as a result of the transfer of $2 million of such claim under the Thompson Stipulation) and an additional $13.9 million in miscellaneous Unsecured Claims that are not Convenience Claims. In addition, under the Plan and certain Claim settlements, (i) the Unsecured Claim of UBS will be Allowed in the amount of $14.1 million, (ii) the Unsecured Claim of CSFB will be Allowed in the amount of $12.2 million, and (iii) the Unsecured Claim of Countrywide will be Allowed in the amount of $2.3 million. If the cases were converted to cases under Chapter 7 of the Bankruptcy Code, the agreed-upon reductions of these claims would not take place. There are other claim reductions that are also contingent on confirmation of the Plan (e.g., RFC) that would trigger larger potential claims upon conversion to Chapter 7.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | PLAN RECOVERY | CHAPTER 7 RECOVERY |
|---|---|---|---|---|
| 5 | Consolidated Debtors EPD/Breach Claims<br><br>Estimated Recovery: approximately 5-15% | $55 million[6] | Estimated Recovery: approximately 5-15% | Estimated Recovery: < 7% |
| 7 | Aegis REIT Unsecured Claims<br><br>Estimated Recovery: de minimus | $<100,000[7] | Estimated Recovery: de minimus | Estimated Recovery: < 7% |
| 8 | Aegis REIT EPD/Breach Claims<br><br>Estimated Recovery: de minimus | $<55 million[8] | Estimated Recovery: de minimus | Estimated Recovery: < 7% |
| 9 | Intercompany Claims<br><br>Recovery: $0 | $0 | Recovery: $0 | Recovery: $0 |
| 10 | Consolidated Debtors Equity Interests<br><br>Recovery: $0 | | Recovery: $0 | Recovery: $0 |
| 11 | Aegis REIT | | Recovery: $0 | Recovery: $0 |

[6] In the absence of the EPD/Breach Claim Protocol contemplated by the Plan (at **Exhibit A**), the Debtors anticipate significantly increased expenses associated with the liquidation of these claims.

[7] Under the MOU, described below, pursuant to the Plan the $178 million Claim of Madeleine will be allowed and treated as a Class 4 Claim against the Consolidated Debtors in the amount of $133 million; hence, the remaining amount of Unsecured Claims asserted against Aegis REIT is negligible.

[8] This estimate assumes that Aegis REIT may be jointly and severally liable for the EPD/Breach Claims asserted against the Consolidated Debtors. The Debtors have not determined what portion of such claims, if any, is *not* a potential obligation of Aegis REIT. On the other hand, the Debtors are not aware of any EPD/Breach Claims that are solely the potential obligation of Aegis REIT. Hence, the Debtors estimate that the amount of EPD/Breach Claims in Class 8 of the Plan is possibly less than the same Claims in Class 5 of the Plan.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | PLAN RECOVERY | CHAPTER 7 RECOVERY |
|---|---|---|---|---|
| | Preferred Stock Equity Interests<br><br>Recovery: $0 | | | |
| 12 | Aegis REIT Common Stock Equity Interests<br><br>Recovery: $0 | | Recovery: $0 | Recovery: $0 |

Under the Plan, the amount of $22,400,000 is potentially available for distribution to the Holders of Unsecured Claims in the aggregate amount of approximately $237,500,000 for a possible distribution of 9.4%, or the midpoint of the recovery range projected in this Disclosure Statement. If the cases were converted to cases under Chapter 7 of the Bankruptcy Code, the amount of $21,400,000 would potentially be available for distribution to the Holders of Unsecured Claims holding Claims in the aggregate amount of approximately $280,000,000 for a possible distribution of 7.6 %. These potential recoveries are only estimates.

## CONCLUSION

For the above stated reasons, the Debtors believe that confirmation of the Plan will produce a better recovery for creditors than would conversion of these cases to cases under chapter 7 of the Bankruptcy Code.